**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Terrence Bressi, | No. CV-18-00186-TUC-DCB |
| Plaintiff, | **ORDER** |
| v. | |
| Pima County Board of Supervisors, et al., | |
| Defendants. | |

**Background.**

      This suit arises from the arrest of Plaintiff Terrence Bressi ("Bressi") for allegedly violating ARS § 13-2906 for obstructing the passage of vehicles through the primary inspection lane at the SR-86 United States Border Patrol ("USBP") checkpoint.

      Bressi frequently passes through the USBP checkpoint on SR-86 while traveling to and from work. On April 10, 2017, Bressi, traveling east, approached the interior checkpoint for that reason and stopped in the south-side lane, the primary stop location. Bressi rolled down his car window to hear the USBP agent, who asked him whether he was a United States citizen. Bressi chose not to answer. It is unclear whether he simply sat silently or told the agent that he would not answer because he believed he had the right to remain silent under the First Amendment to the United States Constitution. For purposes of this motion, the Court assumes the USBP agent understood the Plaintiff was exercising his First Amendment free speech rights when he refused to declare his citizenship. The USBP agent instructed that the Plaintiff was not free to proceed and went to find a

supervisor. This interaction took approximately 80 seconds. (Second Amended Complaint (SAC) (Doc. 42) ¶¶ 148-158.)

Then, Defendant Pima County Sheriff's Department (PCSD), Deputy Roher (Roher), who had been "stationed on the South side of the checkpoint's primary stop location," (SAC ¶ 159), approached the Plaintiff. Defendant Roher told the Plaintiff, he needed to answer the USBP agent's questions. Approximately 64 seconds elapsed while Plaintiff and Roher discussed the merits of this position, and then Roher told the Plaintiff he could leave the checkpoint. Plaintiff complied, but in his rearview mirror saw Defendant Roher "running toward his PCSD patrol vehicle." Plaintiff believed that Roher was going to pull him over so Roher voluntarily pulled over and stopped his car.   Deputy Sheriff Roher pulled behind him, got out of his car, approached the Plaintiff's vehicle, and asked the Plaintiff to exit his vehicle. When Plaintiff failed to answer some of Roher's questions, the Plaintiff was handcuffed and arrested for violating A.R.S. 13-2906, obstructing a highway or other public thoroughfare, i.e., the primary inspection lane. Defendant Pima County Deputy Sheriff Kunze allegedly ratified the arrest. It does not matter whether the arrest was physical or by citation because it is undisputed that Plaintiff was detained by Roher and Kunze at the checkpoint. (SAC § ¶¶ 159-185.)

Plaintiff alleges that Defendant Roher was assigned to the SR-86 checkpoint on April 10, 2017, as part of Operation Stonegarden, a federal grant program that provides PCSD with funding for its deputies to work in conjunction with the USBP on federal border security missions. Participants of Operation Stonegarden were not given authority to enforce federal immigration laws, nor did they receive training on maintaining federal immigration checkpoints. According to Bressi, the purpose of Operation Stonegarden is for PCSD deputies to engage in general law enforcement operations at the immigration checkpoints, including enforcing a zero-tolerance zone for traffic violations.  (SAC ¶¶ 86-117.) Plaintiff alleges that Sheriff's deputies are not trained or supervised in Operation Stonegarden as to the special constitutional limits applicable at interior immigration checkpoints. (SAC ¶¶ 118-147.)

Based on these facts, the Plaintiff has sued the Pima County Defendants in Count I for acting to chill his free speech to not answer questions regarding his citizenship. Plaintiff does not allege that Pima County Sheriff Roher played any part in the USBP stop; Plaintiff's claim is that Roher made a retaliatory arrest because the Plaintiff exercised his right to not speak during the immigration stop. (SAC ¶ 193.)

In Count II, Bressi alleges that the interior checkpoint on SR-86 is operated with the primary purpose of detecting illegal narcotics and/or ordinary criminal wrongdoing and therefore, absent individualized suspicion, every time he is stopped, he is subjected to a temporary seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Essentially, the Plaintiff is arguing that, certainly in the context of PCSD operations at the checkpoint, the checkpoints serve general law enforcement purposes, not immigration, (SAC ¶¶ 201-204), and therefore violate the Constitution. Plaintiff relies on *United States v. Martinez-Fuente,* 428 U.S. 543, 546 (1976), which established that interior border patrol checkpoints can be constitutional "but only where the intrusion on motorists is minimal, the discretion of line-officers is limited, and the operational focus is immigration enforcement. Plaintiff alleges Operation Stonegarden, as it is implemented at checkpoints has none of these limitations.

In Count III, the Plaintiff claims that Defendants Roher and Kunze arrested him without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Count IV is a *Monell*[1] claim against Defendant Sheriff Napier ("Napier") in his official capacity for his role as the final policymaker over the County's custom and practice of providing PCSD deputies to serve Operation Stonegarden shifts stationed at the SR-86 checkpoint for general law enforcement purposes. Counts V and VI allege failure to train and failure to supervise claims against Napier in his individual capacity and against Defendants Nanos, Kunze, and the Pima County Board of Supervisors (PCBS).

---

[1] *Monell v. Dept. of Soc. Services New York,* 436 U.S. 658 (1978).

1   Bressi alleges a state-law claim in Count 7 for false imprisonment against
2   Defendants Roher and Kunze, which is more accurately described as an illegal seizure/false
3   arrest. In Count 8, he alleges claims against federal Defendants. The Motion for Partial
4   Summary Judgment does not involve Counts 7 and 8.

5   **1.** **Motion to Dismiss Counts I and II for Lack of Subject Matter Jurisdiction**
6   **due to Lack of Standing for Injunctive or Declaratory Relief.**

7   Federal courts are courts of limited jurisdiction and "possess only that power [to
8   hear cases and controversies] authorized by the Constitution and statute, which is not to be
9   expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,
10  377 (1994). The presumption is, therefore, that the cause lies outside the Court's
11  jurisdiction unless the party asserting jurisdiction carries its burden of establishing the
12  contrary. *Id.*; *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir.
13  2010). Under Article III, § 2 of the United States Constitution, the party claiming
14  jurisdiction has the burden of proving: (1) he "suffered a concrete and particularized injury
15  that is either actual or imminent," (2) "the injury is fairly traceable to the defendant," and
16  (3) "it is likely that a favorable decision will redress that injury." *Massachusetts v.*
17  *Environmental Protection Agency*, 549 U.S. 497, 498 (2007); *Lujan v. Defenders of*
18  *Wildlife*, 504 U.S. 555, 560-61 (1992); *Kokkonen*, 511 U.S. at 377; *Chandler*, 598 F.3d at
19  1122. The district court accepts all factual allegations in the complaint as true and construes
20  them in the favor of the complaining party. *Chandler*, 598 F.3d at 1121 (citing *Bernhardt*
21  *v. Cty. of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002)); *Jewel v. Nat'l Sec. Agency*, 673
22  F.3d 902, 907 (9th Cir. 2011). In other words, jurisdiction requires Article III standing;
23  there must be a live case and controversy.

24  The leading case establishing standing for equitable and declaratory relief is *City of*
25  *Los Angeles v. Lyons*, in which the petitioner, Lyons, sought an injunction preventing the
26  application of chokeholds by police officers effectuating arrests. 461 U.S. 95, 97-98 (1983).
27  There, Lyons complained that Los Angeles police officers, without provocation, applied a
28  chokehold during a routine traffic stop that resulted in Lyons losing consciousness and

suffering permanent damage to his larynx. *Id.* The Court denied the injunction, finding that even though Lyons would presumably have standing to seek damages against the city for the injury absent a "real and immediate" irreparable injury, Lyons could not "demonstrate a case or controversy with the City that would justify the equitable relief sought." *Id.* at 102, 105. Additionally, the Court advised that principles of federalism and separation-of-powers "counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate." *Id.* at 112.

In *Lyons* and in subsequent cases, the Supreme Court has clarified that denial of Article III standing was based on Lyon's ability to avoid future injury by not engaging in illegal conduct. *Id.* at 102; *see also Spencer v. Kemna*, 523 U.S. 1, 15 (1998); *Lane v. Williams*, 455 U.S. 624 (1982). Article III standing is not satisfied by "general assertions or inferences that in the course of their activities [complainants] will be prosecuted for violating valid criminal laws." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041 (9th Cir. 1999) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 497 (1974)). Complying with the law will avoid exposure to the challenged course of conduct, thus "prevent[ing] such a possibility [of official misconduct] from occurring." *Lane*, 455 U.S. at 633. Furthermore, it is not enough to be previously exposed to an illegal course of conduct if it is "unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495-96.

The *Lyons* equitable relief analysis was applied by the Ninth Circuit in the context of roving border patrol operations in *Hodgers-Durgin*, 199 F.3d at 1039. There, the Court held plaintiffs failed to show an "immediate and irreparable harm" sufficient to justify enjoining a state to conduct its business in a certain way. *Id.* at 1042. In *Hodgers-Durgin*, plaintiffs frequently traveled on the I-19 near the Mexico border and regularly encountered roving border patrols. *Id.* at 1039. Despite this, they had only been stopped once by Border Patrol over a ten-year period. *Id.* The Court found the likelihood that plaintiffs would be stopped again "too speculative to warrant an equitable judicial remedy . . . that would

require, or provide a basis for requiring, that the Border Patrol change its practices." *Id.* at 1044.

The Court looks at the challenged conduct. In Count I, it is Deputy Sheriff Roher's arrest of the Plaintiff for blocking the traffic lane in retaliation for Plaintiff exercising his First Amendment right to not answer USBP agent's citizenship question. It is not enough to be previously exposed to an illegal course of conduct if it is "unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 495-96.  There is no allegation of a deliberate policy on behalf of the Pima County Sheriffs Department for its sheriffs to make retaliatory arrests when individuals refuse to answer citizenship questions at the checkpoint. The declaratory and injunctive claims for relief against the County Defendants in Count I are dismissed.

In Count II, the allegation is that Deputy Sheriffs, including Defendant Roher, pursuant to County policy and practices, including the Stonegarden Operation, enforce the checkpoint as a "zero tolerance" traffic saturation zone for general law enforcement purposes. Plaintiff asserts this is an unconstitutional purpose for a checkpoint and, therefore, his constitutional rights are violated every time he passes through this checkpoint and is stopped by either USBP or Pima County Deputy Sheriffs, like Roher.

Under Article III, § 2 of the United States Constitution, standing exists for Count II because Plaintiff allegedly suffers a concrete and particularized constitutional injury that is actual or imminent; the injury is fairly traceable to the Operation Stonegarden activities at the checkpoint, and it is likely that a favorable injunction enjoining Operation Stonegarden as currently employed at the checkpoint will redress that injury. The Court does not dismiss the declaratory and injunctive claims for relief against the County Defendants in Count II.

**2.  Qualified Immunity Does Not Bar Bressi's Claim in Count I.**

Qualified immunity is designed to protect an officer who, reasonably, but mistakenly, acts in violation of some constitutional right. *Saucier v. Katz,*  533 U.S. 194, 205 (2001). The doctrine bars the suit; it is not a defense to liability. *Act Up/Portland,*  988

F.2d 868, 872-73 (9th Cir. 1993). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth,*  472 U.S. 511, 526 (1985). Qualified immunity is a legal question, and it is addressed by the Court at the earliest possible point in the litigation. *Act Up/Portland,* 988 F.2d at 872-73.

The doctrine of qualified immunity protects government officials from civil liability except where the official violates a constitutional right that was "clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). A right is clearly established when "every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). This means "existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. The purpose of this requirement is to put officials on notice that their conduct is unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002).

Defendants assert that Bressi cannot show that he has a constitutional right to remain silent at a Border Patrol immigration checkpoint and not move his vehicle out of the primary inspection lane. But this is not the constitutional violation alleged in Count I. Plaintiff claims that Deputy Sheriff Roher arrested and charged him with blocking the traffic lane in retaliation for refusing to answer USBP agent's citizenship question. In this context, Defendants assert that a finding of probable cause for an arrest defeats a retaliatory arrest claim. *Nieves v. Bartlett*, 139 S.Ct. 1715 (2019). Defendants have not, however, established that there was probable cause for the arrest. The Plaintiff alleges that he was told to not move his vehicle out of the primary inspection land by the USBP agent, <u>Sheriff Roher knew this</u>, and the Plaintiff promptly moved his vehicle when Sheriff Roher told him to pull through the checkpoint. Plaintiff alleges he was falsely imprisoned by Defendant Roher when he was "handcuffed and prevented from leaving his location outside of the checkpoint," (SAC ¶ 242), without "probable suspicion" of any crime or state traffic violation, *id.* 246. Plaintiff alleges facts supporting a constitutional claim that he was illegally seized without probable cause. Deputy Roher and Deputy Kunze are not entitled to qualified immunity on the facts as alleged by the Plaintiff, without evidence that

1   the arrest was supported by probable cause or that a reasonable officer would have believed

2   probable cause existed for the arrest.

3        Defendants are correct that the Plaintiff does not allege facts in Count I sufficient to

4   support liability by Sheriff Napier, former Sheriff Nanos, or the Pima County Board of

5   Supervisors (PCBS).   Individual liability under 42 U.S.C. 1983 depends on personal

6   participation in the alleged violation. 42 U.S.C. 1983.[2]

7        There is no allegation in Count I that Sheriffs Napier or Nanos or the PCBS had any

8   personal responsibility in the alleged violation. Plaintiff does not allege that any county

9   policy, practice, or failure to train or supervise its officers, like Sheriff Roher, led to officers

10  making retaliatory arrests when citizens refuse to provide citizen information at the

11  checkpoint. Defendants Napier, Nanos, and PCBS are dismissed from Count 1.

12        **3.   Defendant Napier is Dismissed from Count IV in his Official Capacity.**

13        "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit

14  against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "There is no longer a

15  need to bring official-capacity actions against local government officials, for under *Monell*

16  ... local government units can be sued directly for damages and injunctive or declaratory

17  relief." *Id.* at 167 n. 14. Here, the official capacity suit against Sheriff Napier is equivalent

18  to a suit against the entity.  Because both he and the PCBS are named in Count IV, and he

19  is named only in an official capacity, the Court dismisses him in his official capacity as a

20  redundant defendant. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

21

22

23

24  [2] *Jones v. Williams,* 297 F.3d 930, 934 (9th Cir. 2002 (1983 creates a cause of action against
    a person who, acting under color of state law, deprives another of rights guaranteed under
25  the Constitution; 1983 does not create any substantive rights; rather it is the vehicle
    whereby plaintiffs can challenge actions by governmental officials, but there must be a
26  showing of personal participation in the alleged rights deprivation: there is no respondeat
    superior liability under section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658
27  (1978)); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989) (requiring personal
    participation in the alleged constitutional violations); *May v. Enomoto*, 633 F.2d 164, 167
28  (9th Cir.1980) (holding that section 1983 liability must be based on the personal
    involvement of the defendant).

**4.  Plaintiff's Claims of Failure to Train and Failure to Supervise Survive the Motion to Dismiss for Failure to State a Claim, under Rule 12(b)(6).**

Unlike the Court's dismissal of Sheriff Napier, former Sheriff Nanos, and the PCBS in Count I, the Court does not dismiss the individual capacity claims against the Sheriffs, Deputy Kunze and PCBS in Count V, failure to train, and Count VI, failure to supervise. Individual liability under 42 U.S.C. 1983 depends on personal participation in the alleged violation. Plaintiff alleges that Defendant Sheriff Deputy Roher ("Roher") was assigned to the SR-86 checkpoint on April 10, 2017, as part of Operation Stonegarden and performed general law enforcement duties, including arresting the Plaintiff for a traffic violation, without the requisite training and supervision regarding the constitutional limitations at immigration checkpoints. In other words, Defendants failed to train and supervise deputies that Operation Stonegarden, when employed at the checkpoint, had to be minimally intrusive, without discretion, and focused on immigration enforcement, not law enforcement. The Defendants named in this Count are personally responsible for the violations alleged in Count II. The PCBS is responsible for adopting Operation Stonegarden, without requiring specialized training to ensure its constitutional implementation and operation by PCSD, and the PCSD Defendants, Napier and Kunze, are individually responsible for the day-to-day implementation and management of Operation Stonegarden, including training and supervision or lack thereof for its employment at the SR-86 immigration checkpoint.

**5.  Sheriff Nanos is Dismissed.**

Sheriff Nanos has not been the Pima County Sheriff since December 31, 2016. Defendant Nanos is dismissed for this action in its entirety.

**Accordingly,**

**IT IS ORDERED** that the Motion for Partial Summary Judgment (Doc. 46) is GRANTED IN PART AND DENIED IN PART, as follows:

1.  Defendant Nanos is dismissed from the action;

2. Count I, the injunctive and declaratory relief claims are dismissed and Defendants Napier, Nanos, and PCBS are dismissed, and

3. Defendant Napier is dismissed from Count IV.

**IT IS FURTHER ORDERED** that there shall be no further amendments of the First Amended Complaint, and the Defendants shall file an Answer within 21 days of the filing date of this Order.

Dated this 3rd day of April, 2020.

_____

Honorable David C. Bury
United States District Judge