Ralph E. Ellinwood
Ralph E. Ellinwood,
Attorney at Law, PLLC
SBA: 3890
PO Box 40158
Tucson, AZ 85717
Phone: (520) 413-2323
Fax: (855) 817-6636
ree@yourbestdefense.com

Amy P. Knight
Knight Law Firm, PC
SBA: 31374
3849 E Broadway Blvd, #288
Tucson, AZ 85716-5407
Phone: 520 878-8849
amy@amyknightlaw.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Terrence Bressi,<br><br>                      Plaintiff,<br><br>    vs.<br><br>(1)    Pima County Sheriff Mark<br>        Napier, in his individual and<br>        official capacities, *et al.,*<br><br>                  Defendants. | Case No. 4:18-cv-00186 DCB<br><br>MOTION FOR PARTIAL<br>SUMMARY JUDGMENT<br>AS TO COUNT II OF PLAINTIFF'S<br>SECOND AMENDED COMPLAINT<br><br>ORAL ARGUMENT REQUESTED |

Plaintiff Terrence Bressi, by and through counsel undersigned, hereby moves

this Court, pursuant to Federal Rule of Civil Procedure 56, for summary judgment

against all federal defendants and against Pima County, *i.e.*, Sheriff Chris Nanos in

his official capacity and the Pima County Board of Supervisors, as to Count II of the

1   Second Amended Complaint. This motion is supported by and specifically

2   incorporates the accompanying memorandum of points and authorities.

3          Dated this _____ day of June 2021.

4                                  Ralph E. Ellinwood, Attorney at Law, PLLC
5                                  Knight Law Firm, PC
6
7                                  /s/ Ralph E. Ellinwood / Amy P. Knight
8                                  Attorneys for Plaintiff
9

# **TABLE OF CONTENTS**

I.      INTRODUCTION .............................................................................6

II.     SUMMARY JUDGMENT STANDARD ....................................................8

III.    THE OPERATION OF THE SR-86 CHECKPOINT VIOLATES THE
        FOURTH AMENDMENT ..............................................................8

        A.      Primary Purpose ....................................................................10
        B.      Reasonableness: Location ..................................................17
                i.      Process        ……………………………………………....18
                ii.     Actual Location ………………………………………..19
        C.      Reasonableness: Effectiveness ………………………………21
        D.      Reasonableness: Scope & Intrusiveness …………………………22

IV.     PIMA COUNTY HAD A CUSTOM, PRACTICE AND POLICY OF
        PARTICIPATING IN THE UNCONSTITUTIONAL CHECKPOINT
        OPERATIONS AND USING THE CHECKPOINT FOR GENERAL LAW
        ENFORCEMENT ………………………………………………………24

V.      TERRENCE BRESSI HAS BEEN REPEATEDLY SUBJECTED TO THIS
        FOURTH AMENDMENT VIOLATION AND WILL CONTINUE TO BE
        SUBJECTED TO IT IN THE FUTURE ......................................................25

VI.     CONCLUSION ...........................................................................26

# TABLE OF AUTHORITIES

Cases

*Alameida-Sanchez v. United States,*
    413 U.S. 266 (1973)..............................................................................6

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 248 (1986)........................................................................8

*Castro v. City of Los Angeles,*
    833 F.3d 1060, 1073 (9th Cir. 2016) ....................................................24

*Celotex Corp. v. Catrett,*
    477 U.S. 317, 323 (1986)........................................................................8

*Cf. Treasury Employees v. Von Raab,*
    489 U.S. 656, 665-66 (1989)................................................................10

*Corrie v. Caterpillar, Inc.,*
    503 F.3d 974, 978 n.2 (9th Cir. 2007) ..................................................22

*City of Indianapolis v. Edmond,*
    531 U.S. 32 (2000) ...............................................9, 10, 12, 14, 21

*Delaware v. Prouse,*
    440 U.S.648 (1979)................................................................... 9

*Illinois v. Lidster,*
    540 U.S. 419 (2004)...........................................................9, 14, 22

*McGhee v. City of Flagstaff,*
    2020 WL 2309881 at *2 (D. Ariz. May 8, 2020)..................................21

*Michigan Dept. of State Police v. Sitz,*
    496 U.S. 444, 450 (1990).....................................9, 10, 18, 21, 22

*Terry v. Ohio,*
    392 U.S. 1, 29 (1968)............................................................22

*United States v. Audelo-Marquez,*
    2017 WL 5514359 (D. Ariz. No. CR-16-1379-TUC-RCC, Sept. 5, 2017) at *22-
    23 ...............................................................13, 20

*United States v. Baca,*
    368 F. Supp. 298 (1973)................................................6, 18

*United States v. Brignoni-Ponce,*
    422 U.S. 873, 878 (1975).........................................11, 23, 24

*United States v. Martinez-Fuerte,*
    428 U.S. 543 (1976)....................6, 7, 9, 11, 12, 13, 17, 18, 19, 20, 21, 22, 23, 24

*United States v. Morales-Armenta,*
    2016 WL 6832618 (D. Ariz. No. CR 15-938-TUC-CKJ,
    Nov. 18, 2016) at *11 ..................................................12

*United States v. Orozco-Acosta,*
    607 F.3d 1156, 1164 n.5 (9th Cir. 2010) ..............................21

4

1
2
3
4
5
6
7
8
9

*United States v. Ortiz,*
    422 U.S. 891, 892-93 (1975)…………………………………………………6
*United States v. Soto-Zuniga,*
    837 F.3d 992, 999 (9th Cir. 2016)....................................................12
*United States v. Soyland,*
    3 F.3d 1312 (9th Cir. 1993)...........................................................12

      Rules
Fed. R. Civ. P. 56.............................................................................1, 8

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    <u>INTRODUCTION</u>**

3

4    In 1976, the Supreme Court considered the Constitutionality of two interior

5    checkpoints operated by the United States Border Patrol on major interstate highways

6    in California and Texas and held, over a vigorous dissent, that given the pressing need

7    to control illegal immigration and the limited intrusion those checkpoints imposed as

8    then operated, they did not inherently violate the Fourth Amendment. *United States*

9    *v. Martinez-Fuerte,* 428 U.S. 543 (1976). At that time, the Border Patrol's authorized

10   force was approximately 1,700 agents.[1] In 1996, what was then the Immigration and

11   Naturalization Service signed a memorandum of understanding with the Drug

12   Enforcement Administration providing for cross-designation of Border Patrol agents

13   with so-called Title 21 authority to enforce federal drug laws (Statement of Facts No.

14   13 (hereinafter "SOF")). After September 11, 2001, "the Border Patrol underwent

15   significant change; doubling [its] workforce and [its] resources," and has "expanded

16   [its] use of intelligence techniques and investigative activities as [it] collaborate[s]

17   with law enforcement agencies throughout government."[2] Today, the agency is part

---

[1]A federal district court was assigned to conduct a comprehensive factual hearing on checkpoint issues following remands in light of *Alameida-Sanchez v. United States,* 413 U.S. 266 (1973). The resulting opinion was *United States v. Baca,* 368 F. Supp. 298 (1973), from which this number is drawn (*id.* at 404); the Supreme Court later relied on the *Baca* findings two years later in *United States v. Ortiz,* 422 U.S. 891, 892-93 (1975)—the year before it decided *Martinez-Fuerte.*

[2] Border Patrol Strategy 2020, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2019-Sep/2020-USBP-Strategy.pdf.

1   of Customs and Border Protection within the Department of Homeland Security,

2   which reports on its website that it employs 19,740 Border Patrol agents.[3]

3   Now, 45 years after *Martinez-Fuerte,* this very different Border Patrol operates

4   very different checkpoints, with different goals and significantly greater intrusion on

5   the traveling public. One such checkpoint is on State Route 86 in Pima County, a

6   small local east-west road, where even recognized local drivers are routinely

7   subjected to dog sniffs, x-rays, license-plate readers, and active intelligence-

8   gathering, and where, for years, deputies from the Pima County Sheriff's Department,

9   who have no authority to enforce immigration laws (SOF No. 26), conducted general

10  law enforcement activities as part of their participation in a federal grant program

11  known as Operation Stonegarden. Plaintiff Terrence Bressi must pass through this

12  checkpoint every time he returns home from his workplace at Kitt Peak National

13  Observatory, and has done so more than 500 times. This checkpoint violates the

14  standards the Supreme Court has established for permissible suspicionless stop

15  programs as a matter of law, and this Court must accordingly grant summary

16  judgment to the Plaintiff on Count II of his amended complaint against both the

17  County[4] and Federal defendants for violating his rights under the Fourth Amendment.

---

[3] U.S. Customs and Border Protection, Snapshot: A Summary of CBP Facts and Figures, *available at*
https://www.cbp.gov/sites/default/files/assets/documents/2021-Apr/cbp-snapshot-mar-2021.pdf.

[4] This motion addresses only the county itself, *i.e.*, Sheriff Nanos in his official capacity and the Pima County Board of Supervisors. Plaintiff does *not* seek summary judgment against the individual defendants. The County's liability for Count II is premised on unconstitutional custom, practice, or policy, separately pleaded in the

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is required if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based on the record.  Fed. R. Civ. P. 56. However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis original). A dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *See id.* at 248–49. The party moving for summary judgment has the initial burden of identifying those portions of the pleadings, discovery and disclosures on file, and affidavits that demonstrate the absence of a genuine issue of material fact. *See, Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

## III.    THE OPERATION OF THE SR-86 CHECKPOINT VIOLATES THE FOURTH AMENDMENT.

The Supreme Court has considered a series of cases on the Fourth Amendment's limits on suspicionless traffic checks. Ultimately, these cases are simply a particular application of the basic Fourth Amendment reasonableness test, but because reasonableness generally requires individualized suspicion, traffic checkpoints—which effect a seizure of all vehicles without individualized

---

Second Amended Complaint as Count IV. A finding that the county is liable on Count II as a matter of law would necessarily subsume the allegations contained in Count IV.

suspicion[5]—raise serious concerns. The programs considered include early immigration checkpoints (*Martinez-Fuerte,* 428 U.S. 543), suspicionless stops for license and registration checks (*Delaware v. Prouse,* 440 U.S.648 (1979)), sobriety checkpoints (*Sitz,* 495 U.S. 444), narcotics enforcement checkpoints (*City of Indianapolis v. Edmond,* 531 U.S. 32 (2000)), and a checkpoint to enlist the public's help in solving a hit-and-run (*Illinois v. Lidster,* 540 U.S. 419 (2004)). Together, these cases establish that "exceptions to the general rule of individualized suspicion," *Edmond,* 531 U.S. at 43, are limited to checkpoints that serve particular compelling government needs where the intrusion is minimal and the scope is targeted to advance the permissible purpose.

The evidence unmistakably reveals that the SR-86 checkpoint is intended for narcotics enforcement and is broadly intrusive. As detailed below, drivers passing through the checkpoint are stopped and asked if they are citizens, but they are also routinely subjected to dog sniffs by canines trained to detect narcotics, backscatter X-ray, and radiation detection (SOF No. 13), may be run through law enforcement databases (SOF No. 14), have their license plate data captured by the DEA (SOF No. 19), and may be scrutinized for possible violations by deputies from the Pima County Sheriff's Department (SOF No. 40). Recognized local residents are not exempt from

---

[5] *See, e.g., Martinez-Fuerte,* 428 U.S. at 556 ("It is agreed that checkpoint stops are 'seizures' within the meaning of the Fourth Amendment."); *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450 (1990) ("Petitioners concede, correctly in our view, that a Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint.").

these intrusions (SOF No. 20). The majority of the arrests made at the checkpoint are not for immigration violations, but for narcotics and other law-enforcement reasons (SOF No. 9).  None of these facts are in dispute. Accordingly, the SR-86 checkpoint is unconstitutional as a matter of law.

### A.   <u>Primary Purpose</u>

To outweigh Fourth Amendment protections, the justification for the intrusion must be specific and compelling. A checkpoint operated simply to detect crime would be in the teeth of the Fourth Amendment; if that ever-present need could outweigh the individualized suspicion requirement, the Fourth Amendment's protections would be meaningless. *Cf. Treasury Employees v. Von Raab,* 489 U.S. 656, 665-66 (1989) (valid intrusion "serves special governmental needs, beyond the normal need for law enforcement"). Thus, in *Sitz,* the Court recognized the need to curtail drunk driving (based on number of deaths and injuries and billions of dollars in damage) in accepting a sobriety checkpoint. *Sitz,* 495 U.S. at 452. Conversely, in *Edmond,* the Court forcefully rejected a narcotics checkpoint designed "to uncover evidence of ordinary criminal wrongdoing," holding "general crime control purposes" cannot overcome the Fourth Amendment's limitations. *Edmond,* 531 U.S. at 42, 47.

The Border Patrol contends the primary purpose of the SR-86 checkpoint is "immigration" or "alien smuggling." (**Ex. 1:** BP Depo, pp. 22, 70). As detailed *infra,* the evidence does not support this assertion. But initially, it is important to recognize that this purpose broadly termed "immigration" is quite different from the purpose approved in *Martinez-Fuerte* and other 1970's-era cases. In *United States v. Brignoni-*

10

1   *Ponce*, 422 U.S. 873, 878 (1975), the asserted immigration interest was "to prevent

2   the illegal entry of aliens at the Mexican border." Traffic-checking operations would

3   result in "apprehending some illegal entrants and smugglers" and "deter[ring] the

4   movement of others." *Id.* at 879. *Martinez-Fuerte* described the function of

5   checkpoints as "apprehend[ing] many smugglers and illegal aliens who succumb to

6   the lure of such highways" and "forc[ing] others onto less efficient roads that are less

7   heavily traveled, slowing their movement and making them more vulnerable to

8   detection by roving patrols." 428 U.S. at 557. In other words, they were intercepting

9   smuggling traffic at the checkpoints themselves.

10        Today, the Border Patrol describes what it considers "immigration

11   enforcement" to include widespread investigations of suspected smuggling

12   operations that entail not simply intercepting suspects at the checkpoint, but

13   collecting intelligence as part of ongoing criminal investigations. *See, e.g.,* **Ex.1:** BP

14   Depo at 67 ("So the agent is now putting out some information, which results in

15   Intelligence to assist in . . . further down the day or wait to identify this suspected

16   smuggler"); *id.* at 68 (images of suspected smugglers captured at checkpoints shared

17   with "Intelligence department"); *id.* at 24 (information from DEA-owned license

18   plate readers at the checkpoint shared with "Tucson Sector Intelligence Unit"). 

19   Simply invoking the general topic of "immigration" does not render enforcement

20   activities immune from scrutiny, and there is a massive difference between attempting

21   to intercept those unlawfully present near the border and collecting intelligence to

22   feed into ongoing law enforcement investigations.

1    But regardless of whether today's enforcement activities were contemplated

2    in *Martinez-Fuerte,* the primary purpose of the SR-86 checkpoint is not immigration

3    enforcement, but general law enforcement, and this purpose cannot justify an

4    exception to the Fourth Amendment's individualized suspicion requirement. Indeed,

5    the Ninth Circuit has recently recognized the plausibility of a concern that "the agents

6    working these checkpoints are looking for more than illegal aliens. If this is true, it

7    subverts the rationale of *Martinez-Fuerte* and turns a legitimate administrative search

8    into a massive violation of the Fourth Amendment." *United States v. Soto-Zuniga,*

9    837 F.3d 992, 999 (9**th** Cir. 2016) (citing *United States v. Soyland,* 3 F.3d 1312 (9**th**

10   Cir. 1993) (dissent)).

11   A checkpoint's primary purpose cannot be established solely by an agency's

12   statement of what it intends. Rather, courts assess this question, even in the face of

13   contrary Border Patrol testimony, by looking at the numbers. *See, e.g., United States*

14   *v. Morales-Armenta,* 2016 WL 6832618 (D. Ariz. No. CR 15-938-TUC-CKJ, Nov.

15   18, 2016) at *11 ("[I]nquiry into the statistics may be appropriate to determine

16   programmatic intent of the I-19 checkpoint."); *Soto-Zuniga,* 837 F.3d at 1002

17   (reversing conviction due to district court's refusal to allow discovery of checkpoint

18   search and arrest statistics relevant to the inquiry of "[w]ether the primary purpose

19   of the [San Clemente] checkpoint has evolved from controlling immigration to

20   detecting 'ordinary criminal wrongdoing'") (citing *Edmond,* 531 U.S. at 42).**6**

---

6 Rather than produce the ordered discovery on remand, the government
dismissed the case. S.D. Cal. No. 13-cr-02706-AJB, Minute Entry dated 12/5/16.

1    In *Martinez-Fuerte,* the Court examined the available statistics from one of the

2    checkpoints at issue[7] and noted during the calendar year preceding the challenged

3    stop, "17,000 illegal aliens were apprehended there." 428 U.S. at 554. In the 8-day

4    period surrounding the stop, "roughly 146,000 vehicles passed through the

5    checkpoint," and agents "found 725 deportable aliens in 171 vehicles." *Id.* The

6    numbers here are not in the same universe. In FY 2017, at the SR-86 checkpoint,

7    agents arrested 8 people for immigration-related reasons. (SOF 10) The highest the

8    number has gotten in recent years is 117. *Id.* The Border Patrol would have to operate

9    145 checkpoints like the one on SR-86—on a good year—to apprehend the number

10   of people they did at the single checkpoint approved in *Martinez-Fuerte*. It strains

11   belief that the Border Patrol would build, equip, and staff a 24-hour permanent

12   checkpoint (SOF No. 2) just to catch 8—or even 145—undocumented people.

13   This Court has previously found the nearby I-19 checkpoint to have the

14   primary purpose of immigration where 80% of the arrests during the six months

15   before and after the challenged arrest were immigration-related. *United States v.*

16   *Audelo-Marquez,* 2017 WL 5514359 (D. Ariz. No. CR-16-1379-TUC-RCC, Sept. 5,

17   2017) at *22-23. There, over the course of a year, there were 461 immigration and

18   105 non-immigration arrests. The opinion did not contain event statistics[8] for the

19   second half of the year, but for the first half, there were 89 immigration-related events

---

[7] The Court was not provided with statistics from the second checkpoint.

[8] An "event" generally refers to each vehicle, whereas arrests count each individual person.

13

and 64 narcotics-related events. *Id.* at *8. The numbers of immigration events and arrests stayed well above those for narcotics. At the SR-86 checkpoint, the reverse is true. In the 4 years for which the Border Patrol provided data, the percentage of arrests that were immigration-related ranged from a low of 10% to a high of 68% (SOF No. 10). Across the four years, the percentage is just 47%. For events, the numbers are even more stark. One year, there were just 4 immigration-related events and 43 narcotics; another year it was 25 immigration and 33 narcotics; 19 immigration and 27 narcotics; and, in the year with the most immigration events, they were dead even at 35 each. (SOF No. 10). In no year were there more immigration than narcotics events. These numbers alone conclusively prove that narcotics interdiction is not an ancillary activity here; it is the primary activity.

In addition to the data on what the checkpoint accomplishes, the techniques used reflect a checkpoint's true purpose, and several of the methods used here do not serve immigration-related goals, but rather reflect a goal of detecting narcotics. In *Edmond*—the unconstitutional narcotics checkpoint—"[a]fter stopping a vehicle at the checkpoint, police would examine (from outside the vehicle) the vehicle's interior; they would walk a drug-sniffing dog around the exterior; and, if they found sufficient evidence of drug (or other) crimes, they would arrest the vehicle's occupants." *Lidster,* 540 U.S. at 423 (citing *Edmond*). Agents do precisely the same thing here, albeit with the addition of a question about citizenship. They use dogs trained to detect narcotics and humans in the pre-primary area, with the known occupants still in the vehicle (SOF Nos. 16-17). They run individuals through

criminal-history databases (SOF No. 15). A license plate reader owned by the Drug Enforcement Administration operates at the checkpoint (SOF No. 20), and although it was apparently unsuccessful, the Border Patrol attempted to establish a program using its own automatic license plate readers to collect data on individuals passing through the checkpoint (SOF No. 19). Even an unsuccessful attempt reflects on the agency's goals. These techniques are much more reflective of a goal of seizing narcotics than of intercepting undocumented people. There is no mention of dogs— or license plate readers or databases or local law enforcement activities—in any of the Supreme Court cases describing appropriate immigration checkpoints.

The Border Patrol's representative testified several times the SR-86 checkpoint was primarily for immigration enforcement, (**Ex. 1:** BP Depo, pp. 22, 70, 75), but no reasonable jury would credit this testimony, based not only on the checkpoint's performance and methods, but on the Border Patrol's website, which advertises the checkpoint program as existing partly to detect illegal narcotics (SOF No.8). Similarly, the Border Patrol has represented to the Arizona Department of Transportation that one important purpose of the SR-86 checkpoint is to deter narcotics smuggling (SOF No. 9). Indeed, the agency's published enforcement data says nothing about checkpoints when discussing arrests of aliens, but advertises its monthly "Checkpoint Drug Seizures." (SOF No. 12).

When asked the criteria for referring a vehicle to secondary inspection, the agency representative began to answer "the mere suspicion of illegal—" then corrected himself to say "of immigration, sir." (**Ex. 1:** BP Depo, p. 34). His original

1    answer was consistent with the Border Patrol's training documents (SOF No. 25).

2    When asked about running people through databases, he explained "the agent has to

3    believe that there's some type of criminal activity taking place." (**Ex. 1:** BP Depo, p.

4    74). And when the Tucson Sector prepared a 2016 memo on its checkpoints for

5    agency leadership, its "snapshot" of the SR-86 checkpoint was largely focused on

6    narcotics seizures, including a field for "pounds"; the agency boasted of seizing over

7    600 pounds, while apprehending just 4 non-citizens. (SOF Nos.9, 10)

8         Finally, the Border Patrol's regular inclusion inside the checkpoint of other

9    law enforcement agencies with no immigration enforcement authority confirms it

10   exists to enforce criminal laws, not primarily immigration laws. Although the

11   representative testified other agencies would never be at the checkpoint unless

12   specifically called there (**Ex. 1:** BP Depo, pp. 37-41, 43, 45-46), the evidence is

13   undisputable that Pima County Sheriff's Deputies were routinely stationed there,

14   undertaking tasks such as running license plate checks and inspecting vehicles for

15   equipment violations. (SOF No. 44). And this was no accident. The Border Patrol

16   participates in a federal grant program, Operation Stonegarden, whereby local law

17   enforcement agencies provide overtime personnel whom the Border Patrol assigns

18   each shift to a location of the Border Patrol's choosing. (**Ex. 1:** BP Depo, p. 53; SOF

19   No. 36). Despite the Border Patrol's denials (**Ex. 1:** BP Depo, p. 45), county deputies,

20   reporting back to their own agency, stated again and again not that they were

21   summoned to the checkpoint to respond to a particular situation, but that they were

22   "working" the checkpoint, were "assigned" there, "stationed" there, or simply just

16

were "at the checkpoint" observing traffic. (SOF 41) No reasonable jury could believe, seeing these reports, that such assignments were never made. Because these Deputies have no power to enforce immigration laws (SOF No. 42), their presence at the checkpoint—at the Border Patrol's behest—clearly reflects use of the checkpoint for general law enforcement purposes.

Taken together, the statistics showing narcotics arrests predominating over immigration arrests, the use of techniques more appropriate to narcotics enforcement, the Border Patrol's public statements about its use of checkpoints for narcotics enforcement, and the regular assignment of deputies to the checkpoint, there is no genuine factual issue as to the primary purpose of the SR-86 checkpoint.

### B.    Reasonableness: Location

Even a checkpoint operated for a theoretically permissible purpose violates the Fourth Amendment if its operation is not reasonable. One component of this is location: "a claim that a particular exercise of discretion in locating . . . a checkpoint is unreasonable is subject to post-stop judicial review." *Martinez-Fuerte,* 428 U.S. at 560. In *Martinez-Fuerte,* the Border Patrol identified 5 criteria for locating a checkpoint: "(i) distant enough from the border to avoid interference with traffic in populated areas near the border, (ii) close to the confluence of two or more significant roads leading away from the border, (iii) situated in terrain that restricts vehicle passage around the checkpoint, (iv) on a stretch of highway compatible with safe operation, and (v) beyond the 25-mile zone in which 'border passes'. . . are valid." 428 U.S. at 553. The checkpoints in *Martinez-Fuerte* were "located on important

highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior," and the checkpoints would force smugglers "onto less efficient roads that are less heavily traveled, slowing their movement and making them more vulnerable to detection by roving patrols." 428 U.S. at 557. Similarly, in *Sitz,* the location was selected based on safety, "ensur[ing] minimum inconvenience for the driver," and available space. 496 U.S. at 464 n.5; *see also Baca,* 368 F. Supp. at 406 (checkpoint location should "avoid[] the inconvenience of repeated checking of commuter or urban traffic. . .."). Both the process and location itself are relevant. *See Martinez-Fuerte,* 428 U.S. at 559.

### i.  **Process**

In deeming a location reasonable, the *Martinez-Fuerte* Court relied in part on the fact that it "meets the criteria prescribed by the Border Patrol to assure effectiveness." 428 U.S. at 562 n. 15. It would be impermissible to "locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class." 428 U.S. at 559. Thus, it is incumbent on an agency operating a checkpoint to choose its location carefully, bearing in mind both the effectiveness and the minimization of "interference with legitimate traffic." *Id.*

The Border Patrol does not know who selected the location for the SR-86 checkpoint, or on what basis, and has no documentation of this process (SOF No. 3). The only document it has with any discussion of the location is a 2016 memo—even though the general location was chosen in 2005 and the specific location in 2010, and the checkpoint still operates there now. (SOF 3) This is in itself a problem, as the

1    agency can never show its choice was justified or non-arbitrary if it does not know
2    how the choice was made.

3        This ignorance also evinces a startling disregard for the requirement that the
4    location be chosen to maximize effectiveness and minimize intrusion. The agency
5    does not even know how many vehicles pass through the checkpoint each day, and
6    thus has no metric for the "yield" of its checkpoint, nor the magnitude of its intrusion
7    (SOF No. 4). If the agency were appropriately balancing its operational needs with
8    its intrusions, it would know how many motorists it seizes to produce the few arrests
9    it manages. Apparently, it does realize "the majority of the traffic observed is
10   employees returning from work in Sells, Arizona or the Kitt Peak Observatory, which
11   is operated by the University of Arizona," as it reported in the 2016 memo. But this
12   did not seem to factor into its decision. (SOF 3)

13                  ii.    **Actual Location**

14        One *Martinez-Fuerte* criterion was that the checkpoint be "(ii) close to the
15   confluence of two or more significant roads leading away from the border." 428 U.S.
16   at 553. (SOF 3) More recently, the agency says its checkpoints are "on major
17   highways leading away from the border" (SOF No. 8). But SR-86 is an east-west road
18   that never intersects the border (SOF No. 5). It does not "lead away from the border"
19   and is not near the "confluence" of any major roads. The Court-approved purpose of
20   immigration checkpoints has never been to ensure no alien or smuggler travels any
21   highway anywhere near the border; it is to force smugglers "onto less efficient roads
22   that are less heavily traveled, slowing their movement and making them more

1    vulnerable to detection by roving patrols." *Id.* at 557. In other words, checkpoints on

2    major roads allow the Border Patrol to use less disruptive methods on smaller roads

3    like SR-86. Indeed, all the major roads in Southern Arizona that *do* lead away from

4    the border have checkpoints (SOF No. 6). To suggest these checkpoints on the major

5    roads are not enough is to fundamentally alter the approved role of checkpoints.

6        *Martinez-Fuerte* confirms the Court never contemplated checkpoints on small

7    local highways driven primarily by local commuters. One of the checkpoints

8    discussed was on Interstate 5, the "principal highway between San Diego and Los

9    Angeles," and the other was on U.S. Highway 77 (Interstate 69E), 90 minutes north

10    of Brownsville, on "one of the two major highways running north from the lower Rio

11    Grande valley." *Id.* at 549. This discussion might support the operation of the

12    checkpoint on I-19, the major highway from Nogales to Tucson, but not this small

13    east-west highway.[9] The Supreme Court's approval of the San Clemente checkpoint

14    was also supported by a high "absolute number of apprehensions at the checkpoint,"

15    (17,000 in a single year), confirming the location was a good choice. *Id.* at 554, 562

16    n.15. Here, as detailed *supra,* the absolute numbers are staggeringly low, proving

17    there is not sufficient value in locating a checkpoint on SR-86 to justify the intrusion.

18    Indeed, the number of immigration-related arrests at the SR-86 checkpoint for the

---

[9] This Court found the I-19 checkpoint to have the primary purpose of immigration based partly on its location "in the northbound lanes" on "the most direct route between Nogales, Sonora and Nogales, Arizona. . ." *United States v. Audelo-Marquez,* 2017 WL 5514359 (D. Ariz. No. CR-16-1379-TUC-RCC, Sept. 5, 2017) at *22-23.

1  best year reported by the Border Patrol was 117—meaning the checkpoint functioning

2  its peak averaged only a single immigration arrest every 3.1 days. (SOF 10)

3      **C.**    **Reasonableness: Effectiveness**

4      Another important component of reasonableness is "the extent to which [the]

5  system can reasonably be said to advance [the] interest." *Sitz,* 495 U.S. at 455; *see*

6  *also Edmond,* 531 U.S. at 47 (balancing intrusion against "the effectiveness of the

7  program"). An "incremental contribution" will not suffice. *Prouse,* 440 U.S. at 659.

8  In *Martinez-Fuerte,* the Court examined the number of vehicles stopped, the number

9  referred to secondary, the number yielding deportable individuals, and the number of

10  deportable individuals, producing a sort of "yield rate": out of 146,000 vehicles

11  stopped over ten days, 171 contained deportable individuals (about .11%). 428 U.S.

12  at 554. In *Sitz,* 126 vehicles were stopped and two were arrested for alcohol

13  impairment (about 1.5%). 496 U.S. at 454.  Here, the Border Patrol has no idea how

14  many vehicles it stops. (SOF 4) The Arizona Department of Transportation, however,

15  does collect highway usage data, and has "average annual daily traffic" counts for

16  2017, 2018, and 2019, for the eastbound direction of SR-86, which, multiplied by

17  365, will yield an estimated number of cars that traveled eastbound SR-86 each year.[10]

---

[10]Mr. Bressi requests that this Court take judicial notice of these official and publicly available statistics maintained and reported by the Arizona Department of Transportation, available at
http://www.ms2soft.com/tcds/?loc=Adot&mod=tcds&local_id=100931_EB.
"Because government publications are matters of public record and can be easily verified, they are proper subjects of judicial notice." *McGhee v. City of Flagstaff,* 2020 WL 2309881 at *2 (D. Ariz. May 8, 2020) (citing *Corrie v. Caterpillar, Inc.,* 503 F.3d 974, 978 n.2 (9th Cir. 2007); *see also United States v. Orozco-Acosta,* 607

1    Those estimates are 412,450 (2017), 419,020 (2018), and 409,165 (2019). Using

2    immigration "events" to approximate the number of vehicles stopped yielding

3    immigration arrests, the yield rates were 0.00097% (2017), 0.0059% (2018), and

4    0.0046% (2019). These estimated rates are orders of magnitude smaller than those

5    found sufficient in *Martinez-Fuerte* and *Sitz*. If yield rates matter, and the Supreme

6    Court has made clear that they do, this checkpoint is not remotely justified.

7            **D.      Reasonableness: Scope & Intrusiveness**

8            Courts also analyze how intrusive the stop is, looking at "the reasonableness

9    of the procedures followed in making these checkpoint stops," and whether they

10   render the intrusion "minimal" considering whether the methods are sufficiently

11   related to the permissible purpose. *Martinez-Fuerte*, 428 U.S. at 565; *see also id.* at

12   566-67 ("The principal protection of Fourth Amendment rights at checkpoints lies in

13   appropriate limitations on the scope of the stop . . . our holding today is limited to the

14   type of stops described in this opinion"); *Lidster,* 540 U.S. at 427 (approving

15   checkpoint asking citizens for information where "police appropriately tailored their

16   checkpoint stops to fit important criminal investigatory needs"); *Brignoni-Ponce,* 422

17   U.S. at 881 (citing *Terry v. Ohio,* 392 U.S. 1, 29 (1968) ("[T]he stop and inquiry must

18   be 'reasonably related in scope to the justification for their initiation.'")). In *Martinez-*

19   *Fuerte,* the stop involved only "a brief question or two and possibly the production of

F.3d 1156, 1164 n.5 (9th Cir. 2010) (taking judicial notice of Department of
Homeland Security and Department of Justice statistics available on the agencies'
websites).

22

1    a document," 428 U.S. at 558; it did not include a warrants check, a dog sniff, an x-

2    ray, local law enforcement officers conducting general law enforcement operations,

3    active intelligence gathering, or any other type of intrusion. Moreover, the Court was

4    careful to note that motorists whom the officers recognize as local inhabitants were

5    waved through the checkpoint, which reduced the intrusiveness. *Id.* at 550.

6          Here, the Border Patrol admits it will never "wave through" a recognized local

7    resident without inspection (SOF No. 21). While primary inspection includes the

8    same initial question from *Martinez-Fuerte,* it also includes a dog sniff, exposure to

9    a DEA license plate reader, and at times, inspection by local law enforcement officers,

10   who may also run license plate checks, as well as, without probable cause or even

11   reasonable suspicion of an immigration violation, backscatter x-ray, database checks,

12   and photographing by Border Patrol (SOF Nos. 14-15; 19-20). This increased

13   intrusiveness tips the balance away from reasonableness.

14         Moreover, most of these methods are not sufficiently related to the stated

15   purpose—immigration enforcement—to justify their deployment even if this

16   checkpoint itself were permissible. While it is conceivable that trained canines, x-

17   rays, and license plate checks could help agents catch the occasional smuggler, all

18   have the potential to yield private information that is irrelevant to the stated goal, and

19   they are not sufficiently related to immigration enforcement needs to justify their use.

20   There is *no* immigration-related justification for assigning local law enforcement

21   personnel to a checkpoint, a tactic that dramatically expands the scope of the stop

22   beyond what is needed to accomplish the stated goal. The Supreme Court insisted on

23

1  limits to suspicionless seizures because allowing them to go too far "would subject

2  the residents of . . . (border) areas to potentially unlimited interference with their use

3  of the highways, solely at the discretion of Border Patrol officers . . .." *Martinez-*

4  *Fuerte,* 428 U.S. at 559 (citing *Brignoni-Ponce*). The continued creep of these

5  checkpoints toward general law enforcement, by adding detection methods and local

6  law enforcement personnel and no longer allowing recognized locals to pass through,

7  has yielded exactly the type of interference that concerned the Supreme Court.

8  **IV.   PIMA COUNTY HAD A CUSTOM, PRACTICE AND POLICY OF**
9  **PARTICIPATING IN THE UNCONSTITUTIONAL CHECKPOINT**
10  **OPERATIONS AND USING THE CHECKPOINT FOR GENERAL**
11  **LAW ENFORCEMENT**.
12

13  A local government unit, such as Pima County, is liable for a constitutional

14  violation where it has a "policy or custom" that "led to the plaintiff's injury," and the

15  policy "reflects deliberate indifference to the constitutional rights of its inhabitants."

16  *Castro v. City of Los Angeles,* 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc). Here,

17  Pima County was a central participant in the deprivation of Mr. Bressi's constitutional

18  rights, because the stationing of deputies at the checkpoint to conduct general law

19  enforcement was an important aspect of the unwarranted intrusiveness of the

20  suspicionless seizures at the SR-86 checkpoint (SOF No. 41). The County's

21  participation in the checkpoint was pursuant to an official government policy, as it

22  was part of a grant program repeatedly approved by the Board of Supervisors in which

23  deputies were assigned to locations and tasks of the Border Patrol's choosing. (SOF

24  Nos. 36-38; 41; 43). In other words, these were not the actions of individual county

24

1  employees, but rather a county-level policy decision to provide assistance to the

2  Border Patrol—assistance that included conducting general law enforcement

3  operations at the SR-86 checkpoint. Moreover, in repeatedly approving the grant and

4  permitting deputies to be thus assigned, the County displayed deliberate indifference

5  to the Fourth Amendment rights of its inhabitants because these deputies' activities

6  were fully documented in incident reports that clearly reflected their regularly

7  conducted general law enforcement activities at the SR-86 checkpoint on at least 56

8  occasions. (SOF Nos. 26, 41). The County clearly knew or should have known its

9  deputies were conducting these illegal operations, given their explicit documentation

10  in the deputies' reports, yet allowed it to continue for at least four years. Accordingly,

11  the County's policy of participating in Operation Stonegarden while on notice that it

12  entailed deputies conducting enforcement activities at the SR-86 checkpoint renders

13  it liable for the violation of Mr. Bressi's Fourth Amendment rights.

14  **V.      TERRENCE BRESSI HAS BEEN REPEATEDLY SUBJECTED TO**
15  **THIS FOURTH AMENDMENT VIOLATION AND WILL CONTINUE**
16  **TO BE SUBJECTED TO IT IN THE FUTURE.**
17

18  Plaintiff Terrence Bressi lives in Tucson and works as an engineer, employed

19  by the University of Arizona, at Kitt Peak National Observatory, about an hour's drive

20  west on SR-86. There is no other route to travel between Kitt Peak and Tucson. (SOF

21  No. 7). Beginning in 2005, the Border Patrol began, periodically, to operate a

22  checkpoint along SR-86, between Tucson and Kitt Peak. Since 2010, that checkpoint

23  has been permanently located at milepost 146.5. (SOF No. 1, 2). Mr. Bressi must pass

24  through it to get home from work, which he has generally had to do 50-60 times per

1    year since the checkpoint's inception, and will resume doing when COVID 19

2    pandemic restrictions are lifted (SOF Nos. 33-35). He has thus been "checked" at the

3    checkpoint more than 500 times. Although agents frequently recognize Mr. Bressi

4    and know him to be a U.S. citizen (SOF Nos. 28-29), and have not observed any

5    reason to believe any other people are in his vehicle with him (SOF No. 32), they

6    generally require him to stop anyway so they can, among other things, question him

7    about his citizenship, visually inspect his vehicle, and conduct a canine sniff. (SOF

8    No. 31). Accordingly, Mr. Bressi has personally suffered repeated violation of his

9    own Fourth Amendment rights as a result of the actions of the Border Patrol and Pima

10   County. Although Pima County has, as of now, ceased participation in Operation

11   Stonegarden and is not currently deploying deputies to the checkpoint, it did so,

12   violating Mr. Bressi's Fourth Amendment rights, for at least four years, and could

13   resume participation in Operation Stonegarden in the future. The Border Patrol

14   continues to operate the SR-86 checkpoint as described, and Mr. Bressi will continue

15   to suffer repeated violations of his Fourth Amendment rights if it is allowed to

16   continue.

17   **VI.    <u>CONCLUSION</u>**

18        This Court must grant summary judgment to Mr. Bressi because there is no

19   genuine issue of material fact as to whether the Border Patrol and Pima County have

20   violated Mr. Bressi's Fourth Amendment rights by operating a suspicionless

21   checkpoint on SR-86, for general law enforcement purposes and in a manner that is

22   not reasonable to accomplish any legally permissible purpose, through which Mr.

Bressi must pass to get home from work. The undisputed facts establish the SR-86 checkpoint does not comport with the Fourth Amendment, and Mr. Bressi has suffered, and will most assuredly continue to suffer, injury as a result of the Border Patrol and County's actions.

Dated this 10th day of June 2021.

Ralph E. Ellinwood, Attorney at Law, PLLC
Knight Law Firm, PC

/s/ Ralph E. Ellinwood / Amy P. Knight
Ralph E. Ellinwood
Amy P. Knight
Attorneys for Plaintiff

1

2

<u>**CERTIFICATE OF SERVICE**</u>

3      I hereby certify that on the <u>10th</u> day of June 2021 I electronically transmitted

4   the attached document to the Clerk's office using the CM/ECF System for filing.

5   Notice of this filing will be sent by operation of the court's electronic filing system

6   or by mail as indicated on the Notice of Electronic Filing.

7

8                        /s/ Amy P. Knight

9                        Attorney for Plaintiff

10

11

12  ECF copy to:

13

14  Andrew J. Petersen, Esq.

15  Humphrey & Petersen, P.C.

16  3861 E. Third Street

17  Tucson, AZ 85716

18  APetersen@humphreyandpetersen.com

19

20  Dennis Bastron, Esq.

21  Assistant U.S. Attorney

22  405 W. Congress Street, Suite 4800

23  Tucson, AZ 85701

24  Dennis.Bastron@usdoj.gov

25