In The Matter Of:

**BRESSI**
**v.**
**NAPIER**

---

Transcript of:

**ROBERTO TERAN**

---

**April 29, 2021**



1309 E Broadway Blvd
Tucson, AZ 85719

**O**  520.884.9041
**F**  520.623.1681
ArizonaDepos.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA


TERRENCE BRESSI,                        )
                                        )
    Plaintiff,                          )CASE NO.
                                        )4:18-cv-00186 DCB
vs.                                     )
                                        )
(1) PIMA COUNTY SHERIFF MARK NAPIER,)
in His Individual Capacity, et al., )
                                        )
    Defendants.                         )
- - - - - - - - - - - - - - - - - - )

VIDEOCONFERENCE DEPOSITION OF

ROBERTO TERAN


April 29, 2021

12:20 p.m.


REPORTED BY:  Gina Castro, CSR, RPR
              Arizona CR No. 50989


COLVILLE & DIPPEL, LLC
1309 East Broadway Boulevard
Tucson, Arizona 85719
520-884-9041

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

1          The videoconference deposition of ROBERTO TERAN

2     was taken on April 29, 2021 from 12:20 p.m. to 3:18 p.m.,

3     via Zoom videoconference before Gina Castro, Certified

4     Shorthand Reporter for the State of Arizona and Registered

5     Professional Reporter.

6                    APPEARANCES OF COUNSEL

7     For The Plaintiff:

8     RALPH E. ELLINWOOD, ATTORNEY AT LAW, PLLC
      BY: RALPH E. ELLINWOOD
9     P.O. Box 40158
      Tucson, Arizona 85717
10    520-413-2323
      ree@yourbestdefense.com
11

12    KNIGHT LAW FIRM, PC
      BY: AMY P. KNIGHT
13    3849 East Broadway Boulevard, Suite 288
      Tucson, Arizona 85716
14    520-878-8849
      amy@amyknightlaw.com
15

16    For the Defendants:

17    UNITED STATES BORDER PATROL
      BY: DENNIS BASTRON
18    Tucson Sector Division
      2430 South Swan Road
19    Tucson, Arizona 85711
      520-748-3000
20    dennis.bastron@usdoj.com

21

22    Also Present:

23    Bonnie Hole, Assistant to Mr. Ellinwood
      Jeff Wadman, Border Patrol Attorney
24    Terrence Bressi, Plaintiff
      Ryan Andrus, Humphrey & Petersen, PC
25    Cassidy (admitted after deposition commenced)

Page 3

```
 1                    INDEX OF EXAMINATION

 2

 3    WITNESS: ROBERTO TERAN                          PAGE

 4    By Mr. Ellinwood                                4

 5

 6

 7                    INDEX TO EXHIBITS

 8    EXHIBIT                                         PAGE

 9    Exhibit A    Stats 12-1-2018 - 11-30-2019       52
      Exhibit B    Memorandum, USA - 0319 through 0333  *
10    Exhibit C    Stats 12-1-2019 - 11-30-2020       *
      Exhibit D    Stats 12-1-2016 - 11-30-2017       *
11    Exhibit E    Stats 12-1-2017 - 11-30-2018       *
      Exhibit F    Memorandum, USA - 0276 through 0279  *
12    Exhibit G    Highway Encroachment Permit
                   Application, USA - 0059            *
13    Exhibit H    12-14-18 E-mail, USA - 0059, 0059, and
                   0065                               *
14    Exhibit I    Highway Encroachment Permit
                   Application, BRE 3146              *
15    Exhibit J    Highway Encroachment Permit
                   Application, BRE 3137              *
16    Exhibit K    Highway Encroachment Permit
                   Application, BRE 3155              *
17    Exhibit L    TUS Checkpoint Operations          12
      Exhibit M    Photographs                        *
18    Exhibit N    Photographs                        83
      Exhibit O    Photographs                        83
19    Exhibit P    Photographs                        62
      Exhibit Q    Photographs                        63
20    Exhibit R    Photographs                        69

21

22    * Exhibit not referenced

23

24

25
```

```
 1                      ROBERTO TERAN,
 2              having been first duly sworn,
 3          was examined and testified as follows:
 4                        EXAMINATION
 5    BY MR. ELLINWOOD:
 6         Q    Would you state your full name, Agent Teran, for
 7    the record, please.
 8         A    Yes, sir.  My full name is Roberto,
 9    R-o-b-e-r-t-o.  The last name is Teran, T-e-r-a-n.
10         Q    I'm -- I'm having a very hard time hearing you.
11    Can you move closer to your mic?
12         A    How is that?
13         Q    You're still very, very vague.
14         A    Let me try something else.
15         MR. BASTRON:  I'm hearing him.  I don't know --
16         is the volume turned up sufficiently on your end?
17         MR. ELLINWOOD:  I've got mine turned up all the
18         way, and everyone else is coming through loud and
19         clear.  I'm not sure what the problem is.
20         THE WITNESS:  How about now?
21         MR. ELLINWOOD:  Same -- same problem.  You sound
22         like you're down at the end of a long tube or
23         something.
24         THE WITNESS:  Let me see if I can turn up the
25         volume.  Does that sound better, sir?
```

```
 1              MR. ELLINWOOD:  That does sound a lot better.
 2              THE WITNESS:  Okay.
 3              MR. ELLINWOOD:  Thank you.
 4    BY MR. ELLINWOOD:
 5        Q    So, Agent Teran, who appointed you to be the
 6    30(b)(6) witness for the United States Border Patrol?
 7              MR. BASTRON:  Object to foundation.
 8        Q    You can answer.
 9        A    Yes, sir.  I was appointed by -- I was reached
10    out by the Office of the Chief Counsel --
11              THE COURT REPORTER:  I'm sorry.  I'm sorry to
12         interrupt.  I am having a hard time hearing you.
13              THE WITNESS:  Does that sound a little better,
14         ma'am?
15              THE COURT REPORTER:  It does sound a little bit
16         better.  It just is a little echoey.
17    BY MR. ELLINWOOD:
18        Q    Could you repeat the answer to the last
19    question, Agent Teran?
20        A    Absolutely, sir. The Office of the Chief
21    Counsel within DHS reached out to me and asked if I would
22    be a witness for the government and this deposition, sir.
23        Q    Okay.
24              MR. ELLINWOOD:  Madam Court Reporter, are you
25         able to hear?
```

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

```
 1              THE COURT REPORTER:  It is better.  It's a
 2         little -- it does sound a little echoey still.  But I
 3         am able to hear, yes.
 4              MR. ELLINWOOD:  Okay.  I'll assume if you have
 5         hearing problems, you'll let us know.
 6              THE COURT REPORTER:  I will.
 7              (Cassidy is admitted into the videoconference
 8              deposition by Mr. Ellinwood.)
 9    BY MR. ELLINWOOD:
10         Q    So, Agent Teran, has somebody provided you with
11    Attachment A to our Notice of Deposition?
12         A    Yes, sir.
13         Q    Okay.  And -- and you feel that you can talk for
14    the United States Border Patrol about these issues; is
15    that correct?
16         A    Yes, sir.
17         Q    Okay.  What is -- what is your position in --
18    with the United States Border Patrol at the present time?
19         A    My official title is a Deputy Patrol Agent in
20    Charge of the Tucson Station where I am currently serving
21    as the acting Patrol Agent in Charge of the Tucson
22    Station.  What that entails is I oversee all operations,
23    whether administratively and operationally, that
24    encompasses the Tucson Station, which includes the 86
25    State Route checkpoint.
```

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 7

1      Q     Okay.  And then how long have you been with the

2   Border Patrol?

3      A     I have been -- I began my career with the United

4   States Border Patrol, sir, in 2002 at the Nogales Station

5   as a Border Patrol Agent.  I remained at the Nogales

6   Border Patrol Station until 2003 when I was selected to

7   attend the Border Patrol Tactical Selection course.  I

8   maintained -- I stayed on that team until I was promoted

9   to the position of Supervisory Border Patrol Agent in 2008

10  with the same tactical team.

11          After that, I went -- in 2010, I was detailed

12  over to the Tucson Sector Intelligence Unit overseeing the

13  tactical operations, anti-smuggling units.  From there, I

14  returned back to the tactical team, which is the Border

15  Patrol Tactical Team for the Tucson Sector.  And then I

16  was detailed to the Tucson Station as a supervisor where I

17  oversaw operation of the checkpoint, daily operations that

18  encompasses the border patrol station.  And then in

19  2014 -- 2014, I was -- I accepted a transfer as a

20  supervisor to the Three Points Station, which encompasses

21  operations on the Tohono O'odham Nation.  From there, I

22  also accepted a position at the same station as the

23  Special Operations Supervisor and then as a Watch

24  Commander.

25          In 2019 -- September of 2019, I accepted the

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 8

1   **Deputy Patrol Agent in Charge position here at the Tucson**

2   **Station and have been here since.  My experience, in**

3   **general, comes as an agent assigned to the Nogales**

4   **Station, as well as a -- as a supervisor assigned to the**

5   **Tucson Border Patrol Station, sir.**

6        Q     Thank you.  Now, the checkpoint in question here

7   is the State Route 86 checkpoint.  Am I using the correct

8   designation for that particular checkpoint?

9        **A     Yes.  We refer to it as the State Route 86**

10  **checkpoint, yes, sir.**

11       Q     Okay.  So when we're talking about that in this

12  deposition, we're -- we're all on the same page about

13  which checkpoint we're talking about; right -- if we use

14  SR86?

15       **A     Yes, sir.**

16       Q     Okay.  Now, that checkpoint, as I understand it,

17  went into operation in 2008; is that accurate?

18       **A     Sir, I'm not -- I'm not completely accurate on**

19  **when the date was established.  I know that in 2003 there**

20  **was a clause that had came out from the chief indicating**

21  **the checkpoints were agreed to going active.  And I**

22  **believe -- and if you're saying that was 2008, I'm pretty**

23  **comfortable saying that, yes.  But I wasn't around the**

24  **checkpoint status for the Tucson Station at that time when**

25  **the checkpoints went -- went live.**

1       Q    Are you familiar with that fact -- with the fact

2   that that checkpoint was moved from its original location?

3       **A    Yes, sir.**

4       Q    Okay.  And if I understand correctly, it

5   originally was at milepost 145?

6       **A    Correct, sir.  The reason -- yes, sir.**

7       Q    And -- and that was within the boundaries of the

8   Tohono O'odham Nation; is that correct?

9       **A    It was right at the borderline, sir.**

10      Q    Okay.  And -- and why and when was that moved?

11      **A    So the checkpoint was moved due to -- once**

12  **again, the traffic during that timeframe.  In 2008, the**

13  **Tucson Sector saw a significant increase in foot traffic**

14  **coming across the border.  As a result, there was several**

15  **roads that were allowing vehicular traffic to circumvent**

16  **the checkpoint.  One of those roads being the road which**

17  **is directly to the -- to the east of the location.  So it**

18  **was determined that in order for us to do a better job of**

19  **minimizing traffic, it'd be better suited at the -- where**

20  **it's currently located at mile marker 147.**

21      Q    Okay.  Now, who made the determination to -- to

22  locate the checkpoint originally at milepost 145?

23      **A    Sir, I have no idea who made that determination.**

24      Q    Okay.  Who made the determination to locate it

25  at its present location?

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1      **A      Sir, I'm not aware of that.**

2      Q      So even though you are -- you are here

3   testifying on behalf of the Border Patrol, you don't know

4   who made the decision to establish the checkpoint, State

5   Route 86, in its present location?

6      **A      That is correct, sir.**

7      Q      You're familiar with United States versus

8   Martinez-Fuerte; right?

9      **A      Yes, sir.**

10     Q      And are you familiar with the language in that

11  case that states that the location of a fixed checkpoint

12  is not chosen by officers in the field but by officials

13  responsible for making overall decisions as to the most

14  effective allocation of limited enforcement resources.

15          Are you familiar with that language?

16          MR. BASTRON:  Object to form.

17     **A      Yes, sir.**

18     Q      You can answer.

19     **A      Yes, sir.**

20     Q      But you can't tell us who these other officers

21  were that were responsible for making overall decisions?

22          MR. BASTRON:  Object to form.

23     Q      You can answer.

24     **A      At that time, sir, I was -- I was a Border**

25  **Patrol Agent, and I didn't have specific knowledge of**

 1    **checkpoint information, sir.  I reported for duty, and I**

 2    **went and took the assignments I was supposed to.**

 3            MR. ELLINWOOD:  Okay.  I'm going to stop and

 4        mute myself here for a moment.

 5            Okay.  I'm going to unmute.  For the record,

 6        Mr. Bressi is present with me, as is co-counsel, Amy

 7        Knight.

 8    BY MR. ELLINWOOD:

 9        Q    Are you familiar, Agent Teran, with a document

10    dated September 27, 2016?  The title appears to be TUS

11    Checkpoint Operations.

12        **A    Yes, sir.**

13        Q    Okay.  And I don't have an exhibit number for

14    that yet.

15            MR. ELLINWOOD:  Do you -- do you have an exhibit

16        number, Madam Court Reporter?

17            THE COURT REPORTER:  Let me check here.

18            MR. BASTRON:  And we never got a set of exhibits

19        for the deposition.  Did you guys send us a set of

20        exhibits for the deposition?

21            MR. ELLINWOOD:  I thought we did.  If -- if not,

22        Bonnie should -- Bonnie's here and -- and I'll have

23        her send it over to you right away.  I thought you

24        were getting it as well.

25            MR. BASTRON:  Well, he has that document because

```
1         we were -- that was one of them we gave him to

2         prepare.  So he has that particular document --

3              MR. ELLINWOOD:  Okay.

4              MR. BASTRON:  -- now identified as L.  But if

5         you have any other ones that we haven't given to him

6         to prepare, then -- then we might have to do an

7         e-mail.  But he has that one --

8              MR. ELLINWOOD:  Okay.

9              MR. BASTRON:  -- I believe -- or you can ask

10        him, but I believe he does.

11             MR. ELLINWOOD:  Okay.  The -- the -- I was

12        leaving it up to the court reporter to assign the --

13        the letters, and so we didn't know that until today.

14             Anyway, I guess we're all on the same page that

15        this TUS Checkpoint Operations document is Exhibit L

16        and that Agent Teran has that document and is

17        familiar with it; right?

18             THE WITNESS:  Yes, sir.

19   BY MR. ELLINWOOD:

20        Q    Okay.  So, Agent Teran, why was this document

21   created?

22             MR. BASTRON:  Object to foundation.

23        Q    You can answer.

24        A    Sir, this document was created to address the

25   checkpoint operations and also on what was the standard
```

1   **operating procedure on how we were going to operate these**

2   **checkpoints.  It was a base -- it was a base foundation.**

3       Q    I -- I couldn't hear the last sentence you --

4   can you try it again?

5       **A    It was a base foundation percent for operations**

6   **at that -- the checkpoint, sir.  I'm sorry.  I -- I don't**

7   **know which microphone is working on this, the camera at**

8   **the top or the laptop at the bottom, sir.**

9       Q    Okay.  Well, you're down at the bottom of the

10  screen, if that gives you any -- any hint about which one

11  is working.

12          So Exhibit L is dated September 27, 2016 and

13  describes the justifications for the three checkpoints; is

14  that correct?

15          I can't hear you.  I'm sorry.

16      **A    I don't have headphones.  Sorry.**

17      Q    Okay.  So I -- I didn't hear what your response

18  was to my question that this covered the three checkpoints

19  in the Tucson Sector there; SR86, Arivaca, and the other

20  one coming up from Sasabe.

21      **A    Sir, it is an operational document allowing us**

22  **to perform -- it was based on the operations on setting**

23  **up, establishing the checkpoints, and basic operations for**

24  **what would be required and necessary to operate the**

25  **checkpoint.**

 1      Q    Okay.  Has this document been updated since

 2  September 27, 2016?

 3      **A    Not to my knowledge, sir; so, no.**

 4      Q    Now, in a section of this document entitled

 5  Challenges -- I don't see page numbers, so I can't tell

 6  you which page, but it's into the document, and the

 7  heading is Challenges.

 8              MS. KNIGHT:  Page 7.

 9              MR. ELLINWOOD:  What?

10              MS. KNIGHT:  Page 7.

11  BY MR. ELLINWOOD:

12      Q    It's page 7, I'm told.  Have you been able to

13  find it?

14      **A    I'm looking for it now, sir.  I'm having -- the**

15  **computer is freezing here.  Sorry.**

16      Q    We're having every technological issue we can.

17      **A    You said page 7?**

18      Q    That's what I'm told.  Have you found it yet?

19      **A    No, sir.**

20      Q    Is your -- is your computer not working, is that

21  the problem?

22      **A    I just shut down and restarted this, sir.**

23      Q    Perhaps we can show it to you by screen share.

24              MR. ELLINWOOD:  You said page 7.

25              MS. HOLE:  Did the document come up for viewing?

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 15

```
 1              MR. ELLINWOOD:  Yeah.  I'm -- I'm seeing it.
 2    BY MR. ELLINWOOD:
 3        Q    Can you see this document, Agent Teran?  There
 4    we go.
 5        A    Yes, sir.
 6        Q    So can you see this document, Exhibit L, now?
 7        A    Yes, sir.
 8        Q    Okay.  And do you see the section therein with
 9    the title Challenges?
10        A    Yes, sir.
11        Q    Okay.  And in this section, my client,
12    Mr. Bressi, is specifically mentioned with regard to the
13    checkpoint on Highway 86; is that correct?
14        A    Yes, sir.
15        Q    Do you know why he was included in there?
16        A    Mr. Bressi was included in this particular
17    document because he was a common traveler through the
18    checkpoint -- sorry -- a regular traveler through the
19    checkpoint and, at times, was uncooperative while passing
20    through the checkpoints.
21        Q    Okay.  How would you define uncooperative?
22        A    Not willing to answer questions from the agents
23    when spoken -- when asked about his citizenship.  Also, at
24    times, would stop and honk loudly, distracting the agents.
25    At times, when asked to move into secondary, he would not
```

1    **follow commands or orders of the officers at that time.**

2         Q    Okay.  Now, the United States Border Patrol has

3    known Mr. Bressi, who he is and where he works, for

4    decades, haven't they?

5              MR. BASTRON:  Object to foundation.

6         Q    You can answer.

7         **A    Yes, sir.  We've known Mr. Bressi for multiple**

8    **years traveling through the check- -- traveling through**

9    **the 86 checkpoint.  The reason we -- we inspect -- so no**

10   **person or vehicle is exempt on the inspection of the**

11   **vehicle, no matter how many times we recognize and we see**

12   **a person.  There have been numerous instances in my career**

13   **where a person who travels through the checkpoint has been**

14   **later apprehended or charged with smuggling, whether it**

15   **was humans or narcotics, traveling through the**

16   **checkpoints.  At times, it was used as ruse for us to get**

17   **to know the traffic in the attempt that we would wave them**

18   **through.**

19        Q    You are aware that -- that Mr. Bressi is an

20   employee at the University of Arizona; correct?

21             MR. BASTRON:  Object to foundation.  I'm also

22             going to object because this is outside the scope of

23             the 30(B)(6) designation.  But go ahead and answer if

24             you know.

25        **A    Yes, sir.**

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

```
 1       Q    And that he is -- his workplace is up on Kitt

 2   Peak; correct?

 3            MR. BASTRON:  Same objection.

 4       A    Yes --

 5            MR. BASTRON:  Same -- same objection.

 6       Q    You can answer.

 7       A    Yes, sir.

 8       Q    And isn't it true, Agent Teran, that in order to

 9   get to Kitt Peak from Tucson, one would have to go through

10   the checkpoint on Highway 86; correct?

11       A    If you're traveling from Tucson, yes, sir.  If

12   you're traveling from Casa Grande, you can take a

13   different route.  But, yes.

14       Q    Still talking about Exhibit L, the document that

15   we just looked at, how is this document disseminated

16   within the Border Patrol?

17       A    So this document is specific to the Tucson

18   Station, sir.

19       Q    So that means who -- which personnel would

20   actually have received this document?

21       A    This document would have been sent to the -- the

22   watch commanders, the commanders of the unit, and, at

23   times, disseminated down to the supervisory staff.

24       Q    Okay.  And by supervisory staff, does that mean

25   people at the SR86 checkpoint?
```

```
 1       A    Supervisory staff at the State Route 86
 2   checkpoint, yes, sir.
 3       Q    Okay.  And would this document then -- would
 4   have been permissible for a supervisor to share this with
 5   people they were supervising?
 6       A    Yes, sir.
 7       Q    This document was part of the disclosure in this
 8   case and is identified as being subject to a protective
 9   order, but that is in regard to this case itself.  That
10   wasn't on the original document; right?
11            MR. BASTRON:  Object to form and foundation.
12       Q    You can answer, if you know.
13       A    I don't understand your question, sir.
14       Q    Okay.  The -- the document that we have, in red,
15   says, subject to protective order.
16       A    Okay.
17       Q    And I'm -- my question to you is, on the
18   original document, Exhibit L, that language was not there,
19   was it?
20       A    Not to my knowledge, sir.
21       Q    Okay.  You have said that this document,
22   Exhibit L, has not been updated.  Do the justifications
23   for the three checkpoints remain accurate?
24       A    Yes, sir.  We continue to see a steady flow of
25   traffic attempting to circumvent the checkpoint, and we
```

1    **have seen an increase in traffic entering illegally into**

2    **the United States.  And it's within the Tucson Station's**

3    **responsibility, sir.**

4        Q    Okay.  Agent Teran, are you familiar with the

5    encroachment permits for the SR86 checkpoint from the

6    Arizona Department of Transportation?

7        **A    I have seen them, yes, sir.**

8        Q    Okay.  And these permits -- these permits use

9    some phrases I'd like to talk with you about.  Do you know

10   who prepared the various encroachment permit requests that

11   have been disclosed in this case?

12       **A    We have a -- we have a supervisor who's assigned**

13   **specifically to the overall operations of the checkpoint**

14   **and who's in close contact with the Arizona Department of**

15   **Transportation who submits these reports on behalf -- I'm**

16   **sorry -- these permits on behalf of the Tucson Station.**

17       Q    Okay.  So this is kind of routine work that you

18   have a specific person assigned to; is that correct?

19       **A    Yes, sir.  And the reports are submitted yearly.**

20       Q    Okay.  Now, in -- in some of these requests for

21   encroachment permit, the use of the phrase, functional

22   equivalent of the border, has been used.  My question to

23   you is, does the United States Border Patrol consider the

24   Highway 86 checkpoint a functional equivalent of the

25   border?

1      **A      At this location, yes, sir, due to the traffic**

2   **flow from the Tohono O'odham Nation.  And it's within 100**

3   **miles of the border.**

4      Q      The applications also refer to this checkpoint,

5   that is the State Route 86 checkpoint, as a tactical

6   checkpoint.  Are you familiar with that term?

7      **A      Yes, sir, but the -- we stopped referring to**

8   **tactical checkpoints at the present time.  We now refer**

9   **them to permanent checkpoints.**

10     Q      Okay.  Well, let's talk about that.  At least in

11  2015, 2016, the Border Patrol would be using the term

12  tactical checkpoint with regard to the Highway 86

13  checkpoint.  What did that mean at that time?

14     **A      So we had the authority to establish these**

15  **tactical temporary checkpoints at locations where they**

16  **were operationally necessary for the Border Patrol to**

17  **conduct a border enforcement mission.  As the years ran**

18  **through, even from 2015, we really didn't -- we stopped**

19  **moving the checkpoints, sir.  So they no longer became a**

20  **tactical checkpoint.  There was buildings, there was a**

21  **lot of -- there was a lot of equipment that was being --**

22  **that was at these locations where the tactical portion**

23  **went away, and we starting referring to these as more of a**

24  **permanent checkpoint.  There's really nothing tactical**

25  **about the State Route 86 checkpoint, sir.**

```
 1      Q    Okay.  So you now refer to it as a permanent
 2  checkpoint?
 3      A    We -- yes.  We refer to it as a more permanent
 4  checkpoint, sir.
 5      Q    Okay.  And -- and that change from denominating
 6  it tactical to permanent means what?  What's the
 7  difference between those two denominations?
 8      A    It's not where this checkpoint, we can pack it
 9  up in a trailer and move it -- and move it -- remove the
10  entire footprint from the current location.  This -- this
11  checkpoint now requires a significant amount of work
12  and -- you know, from four to six hours or eight hours to
13  remove this checkpoint from its location.  It would take
14  some time for us to move.  And we can close it down.  We
15  can close it and open it within a short amount of time,
16  but the removal of the equipment, in order to keep the
17  motorists safe and the agents safe, will take some time.
18  So, therefore, it is a permanent checkpoint.
19      Q    So what -- what date did this checkpoint get the
20  title permanent?
21      A    I'm not aware of that, sir.
22      Q    Can you even give me the year?
23      A    I cannot, sir.  I just know that they refer to
24  it as a permanent check -- there's no difference between
25  tactical checkpoint and permanent checkpoint, sir, at the
```

1  **Tucson Station when it refers to the 86 checkpoint.**

2      Q    Okay.  So what would you say, Agent Teran, was

3  the primary purpose of the State Route 86 checkpoint?

4      **A    Immigration, sir.**

5      Q    And by immigration, you mean what?

6      **A    Immigration checkpoint, sir.  We were making the**

7  **determination -- asking travelers through there if they --**

8  **if they were United States citizens.  And we were checking**

9  **if they were -- if they had legal documents to be in,**

10  **travel to, or remain in the United States legally.**

11      Q    Okay.  That checkpoint has license plate

12  readers, doesn't it?

13          MR. BASTRON:  Object to form.

14      Q    You can answer.

15      **A    No, sir.  Not Border Patrol -- not Border Patrol**

16  **license plate readers.**

17      Q    I'm sorry.  I couldn't hear you.

18      **A    It does not have -- currently it does not have**

19  **license plate readers, sir.**

20      Q    Well, it did have for some time, didn't it?

21          MR. BASTRON:  Objection --

22      **A    I believe --**

23          MR. BASTRON:  Go ahead.

24      **A    Sorry.  I believe that there were -- so they**

25  **were -- they belonged to a different agency, not Border**

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 23

1   **Patrol.**

2        Q     Which agency was that?

3        **A     That was the Drug Enforcement Administration.**

4        Q     Okay.  And how long did the DEA have license

5   plate readers at the SR86 checkpoint?

6             MR. BASTRON:  Object to form.

7        **A     So it was -- those license plate readers were**

8   **not within the footprint of the State Route 86 checkpoint,**

9   **sir.  They were never located at the 86 checkpoint.**

10       Q     I'm -- I'm sorry.  I don't understand what you

11   mean by that.

12       **A     So the -- the license plate readers, that --**

13   **that -- that -- that the Drug Enforcement Administration**

14   **deployed on State Route 86 were not within the footprint**

15   **of the -- of the State Route 86 checkpoint.**

16       Q     And by the footprint, you mean the map that was

17   attached to the encroachment permit?

18       **A     Yes, sir.**

19       Q     Is this -- that what you mean?

20       **A     Yes, sir.**

21       Q     Okay.  So if the license plate reader was

22   outside of the boundary of the encroachment permit, that's

23   what you mean by not within the footprint; is that

24   correct?

25       **A     That is correct, sir.**

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 24

```
1        Q    Okay.  But you will agree that the DEA had
2    license plate readers there at the checkpoint albeit
3    apparently outside of the footprint?
4             MR. BASTRON:  Object to form.
5        A    Yes, sir.
6        Q    You can answer.
7        A    Yes, sir.  But they were not used by Tucson --
8    agents assigned to the Tucson Station 86 checkpoint.
9        Q    Okay.
10       A    So that was all limited access.  I -- I, me,
11   even as an Active Patrol Agent in Charge, never had access
12   to the license plate readers.  So I was never -- I never
13   used the information in order to -- for a smuggling order
14   or anything of that degree.
15       Q    So a different federal agency, the Drug
16   Enforcement Administration, received the data, is -- and
17   you did not -- you, the United States Border Patrol, did
18   not?
19       A    We, as the agents assigned to the checkpoint,
20   no.  With any kind of -- with any agency in the federal
21   government, there is information sharing, so we have to --
22   I would say that that information was being shared with
23   the Tucson Sector Intelligence Unit, but not really
24   specifically agents assigned to, say, a task force or if
25   there was a particular requirement.  But Tucson Station
```

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

Page 25

1   agents did not enter the data, and they did not analyze

2   the data associated to the -- that was being collected by

3   the license plate readers.

4       Q   I see.  The Border Patrol has used dogs at the

5   SR86 checkpoint, have they not?

6       A   Yes.  And we continue to use them, sir.

7       Q   Okay.  And those dogs -- what is the purpose of

8   having them at this checkpoint?

9       A   They're an additional tool in the detection of

10  humans being illegally smuggled through the checkpoints

11  into the United States.

12      Q   Is -- is -- are all of these dogs only trained

13  to detect the odor of humans?

14      A   No, sir.  They're cross-verified.  They can

15  detect narcotics as well, sir.

16      Q   As a matter of interest, since a car traveling

17  through the checkpoint would presumably have humans in it,

18  how would a dog differentiate between the humans that the

19  agent can see and humans that the agent cannot?

20      A   Sir, I have never been a canine handler.  I'm --

21  I'm unable to speak on how -- on how the canine actually

22  detects it.  I mean, I do know that it's an open-air

23  sniff, and dogs are very successful in detecting concealed

24  humans in a vehicle.

25      Q   At the SR86 checkpoint, can you tell me how many

1    concealed non-U.S. citizens have been detected?

2            MR. BASTRON:  Object to foundation.

3    Q    You can answer.

4    **A    In what timeframe, sir?**

5    Q    Since its inception in 2008.

6    **A    Sir, I couldn't tell you that.  I don't know the**

7    **numbers off the top of my head.  I know that over the**

8    **years, we've gotten -- even over this last year, our**

9    **numbers have significantly increased as a result of that**

10   **humans, unfortunately, are a -- in commodity.**

11           **So, for example, if we apprehend a group at the**

12   **checkpoint, there's a good possibility that they get sent**

13   **south into Mexico, and they may be recycled through the**

14   **program.  In the earlier stages, there was a lot --**

15   **particularly from the Tohono O'odham Nation, there was a**

16   **lot of contraband, a lot of narcotics that was coming**

17   **across.  So humans weren't -- they -- it wasn't -- they**

18   **were dropping them off, and they were walking around.  So**

19   **encounters with human smuggling at the checkpoint was not**

20   **as significant, but numbers were still being affected.**

21           **Over the years, as we move on -- or the**

22   **legalization going on inside the United States, the**

23   **aliens -- we've seen a significant increase in alien**

24   **smuggling attempts through the checkpoint.**

25           **So I know that I was sent a document with some**

1   statistics.  Can I reference that?

2        Q    Sure.

3        A    So from December of -- December of 2019 to

4   November of 2020, you're looking at 117

5   immigration-related arrests, 35 incidents.  It's just --

6   it's an increase from 2015 where you had 21 immigration

7   arrests and 7.  So the -- the -- the checkpoints do serve

8   a purpose, and they help us out because we are good at

9   tracking people.  When the checkpoints are operational,

10  these vehicles are apprehended; we are able to got out and

11  catch these folks, preventing them from getting into these

12  vehicles and increasing the -- the risk to the public.

13          MR. ELLINWOOD:  I'm going to take a short break

14       here, if I may.  And I'm going to mute my mic.  Why

15       don't we take -- it's now 1- -- looks like 1:05,

16       1:06.  Why don't we come back at 1:15.  Everybody

17       take a break.

18              (Off the record at 1:06 p.m.)

19              (On the record at 1:16 p.m.)

20  BY MR. ELLINWOOD:

21       Q    Agent Teran, I want to clarify a couple of

22  things we've already covered before we move on.

23          The Exhibit L, the Tucson Checkpoint Operations

24  document that we've talked about and you have seen and --

25  can you tell me if there was any such document prepared

 1  before September 27 of 2016?

 2       A    **No, sir.**

 3       Q    No, sir, you can't tell me; or no, sir, there

 4  wasn't one?

 5       A    **Sorry, sir.  No, sir, I don't know.**

 6       Q    You don't know?

 7       A    **No.**

 8       Q    Have you ever seen a document like this before

 9  the September 27, 2016, Exhibit L?

10       A    **Nothing specific for the Tucson Sector.  I have**

11  **seen a document from the chief -- the chief, I believe, in**

12  **2003 when he talked about checkpoint operations in**

13  **general.  But nothing specific to Tucson.**

14       Q    Okay.  And that was the 2003 document; is that

15  correct?

16       A    **Yes, sir.**

17       Q    Okay.  And as far as you know, there has been

18  nothing between 2003 and September 27 of 2016, then,

19  discussing these checkpoints; right?

20       A    **Not to my knowledge, sir.**

21       Q    Okay.  Now, I had -- I had asked you, in talking

22  about the Martinez-Fuerte language, about the

23  establishment of this checkpoint on State Route 86.  And

24  you told me you didn't know who had decided to put the

25  checkpoint there.  Am I remembering your answer correctly?

1    **A    That is correct, sir.**

2    Q    Okay.  Do you know what information was used to

3    determine to put that checkpoint there?

4    **A    No, sir.**

5    Q    You -- you know that the checkpoint, we've

6    already discussed it a bit, directly impacts people going

7    to and from Kitt Peak; correct?

8    **A    By impact, if you mean that they -- that they**

9    **are stopped and temporarily detained at the checkpoint in**

10   **order to perform a check, then, yes, sir.**

11   Q    Okay.  So people that work there are going to

12   have to go through that checkpoint routinely if they live

13   in Tucson; right?

14   **A    If it's operational, yes, sir.**

15   Q    Okay.  Which brings me to another question.

16   Other -- other than short periods of time, has this

17   checkpoint on State Route 86 ever not been operational?

18   **A    It is one of our primary duties to ensure that**

19   **that checkpoint is operational, when possible.  That means**

20   **there's weather permitting, there's additional traffic, at**

21   **times we have to temporarily close them, but the**

22   **operation -- the checkpoint is operational the vast**

23   **majority of the time, sir.**

24   Q    Okay.  And by that you mean seven days a week,

25   24-hours a day, fully operational?

 1      **A      Yes, sir.   There's always somebody at the**
 2 **checkpoint.   Period.**
 3      Q      Okay.   Now, the Martinez-Fuerte language
 4 discusses that the officials determining the location of a
 5 checkpoint should be unlikely to locate a checkpoint which
 6 bears arbitrarily or oppressively on motorists as a
 7 classification.   Do you know -- or how that language was
 8 used to determine the State Route 86 checkpoint?
 9           MR. BASTRON:   Object to form and foundation.
10      Q      You can answer.
11      **A      No, sir.**
12      Q      Do you know what information, statistics, or
13 information was used to determine the effectiveness of
14 locating that checkpoint on SR86?
15           MR. BASTRON:   Object to form and foundation.
16      Q      You can answer.
17      **A      The checkpoint is used to restrict illegal**
18 **aliens from the border at a location that the checkpoint**
19 **is tactically operational, one of the best locations in**
20 **order for us to allow the inspections of people traveling**
21 **and traffic coming into the United States as a result of**
22 **the -- of the main infrastructure located in a certain**
23 **area, sir.**
24      Q      Agent Teran, isn't it true that the SR86
25 checkpoint actually is not on a road from the border?

1      **A      That is correct, sir.  Highway 86 is an**

2  **east/west road.**

3      Q      And there are checkpoints on both roads coming

4  up from the border, that is, the SR286 from Sasabe and the

5  other checkpoint -- what's the other one -- on 80/85?

6      **A      Yes, sir.**

7      Q      So how does the SR86 checkpoint qualify for

8  being on a road from the border?

9          MR. BASTRON:  Object to form.

10      Q      You can answer.

11      **A      There are two major roads that lead from the**

12  **border to Tohono O'odham Nation, which is FR21 and FR- --**

13  **and Federal Route 19.  Both those locations, they have**

14  **direct access to the border, and, therefore, State**

15  **Route 86 is the equivalent of the border at that -- at**

16  **that location.  Traffic can come in and -- traffic does**

17  **enter illegally and access the road, and they use State**

18  **Route 86 in order to further themselves into the United**

19  **States.**

20      Q      So, Agent Teran, are you saying that the purpose

21  of the State Route 86 checkpoint is based on traffic

22  coming across the Mexican border into the Tohono O'odham

23  Nation?

24      **A      Traffic does enter illegally on the**

25  **international boundary to the Tohono O'odham Nation, sir.**

1      Q     So is the answer, yes, the justification of the

2  SR86 checkpoint is based on that traffic across the

3  Mexican border into the Nation?

4           MR. BASTRON:  Object to form.

5      Q     You can answer.

6      **A     So, yes, the checkpoint -- the justification of**

7  **the checkpoint is for us to detect and deter traffic**

8  **coming through areas of the Tohono O'odham Nation, as well**

9  **as areas of the Tucson Station, as well as areas in the**

10 **Ajo Border Patrol Station.**

11     Q     I need just a minute.

12           And so, Agent Teran, when we were talking about

13 the license plate readers, I want to make sure that I

14 understand you correctly.  Did you testify that the Border

15 Patrol has never had its own license plate readers at the

16 SR86 checkpoint?

17     **A     We have a -- we had a pilot program that was**

18 **never operational.  So it was never used as a -- as a tool**

19 **to track or otherwise.  There was a -- Border Patrol has**

20 **been -- has made efforts to establish a license plate**

21 **reader program, but it was not successful at the State**

22 **Route 86 checkpoint.**

23     Q     It was not -- I couldn't hear you.  It was not

24 successful to do what?

25     **A     The license plate readers, during the pilot**

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

1    **program, was not successful at the State Route 86**

2    **checkpoint.**

3         Q    Okay.  And what period was the pilot program?

4         **A    January of 2018 through July of 2018.**

5         Q    And what was the purpose of the pilot program?

6    What did the Border Patrol hope to use these license plate

7    readers for?

8         **A    Data collection and then identify smuggling**

9    **organizations.  But that access was never granted to**

10   **Tucson Station agency.  It was -- it was a pilot program**

11   **that was assigned to the Tucson Sector Intelligence Unit.**

12        Q    And why was it deemed unsuccessful?

13             MR. BASTRON:  Object to foundation.

14        Q    You may answer.

15        **A    I don't know, sir.**

16        Q    Another thing I'd like to clarify, Agent Teran,

17   is when we were talking about the functional equivalent of

18   the border language on the encroachment permits, were you

19   using the Tohono O'odham Nation boundary in reference to

20   that or were you referring to the Mexican boundary, that

21   is, the border between the United States and Mexico?

22        **A    So that -- that is the equivalent of the border**

23   **between the -- or boundary with the Reservation --**

24   **sorry -- the boundary south of the Reservation is the**

25   **international boundary with Mexico, as well as the Tohono**

1    O'odham Nation, is considered United States of America,

2    yes, sir.

3        Q    Okay.  I'm -- I'm -- so are you talking about

4    the border between Mexico and the Tohono O'odham Nation?

5        A    Yes, sir.

6        Q    Okay.  And -- and how many miles, if you know,

7    is the SR86 checkpoint from the Mexican/Tohono border?

8        A    It's approximately 52 miles to the Tohono

9    O'odham Nation.

10       Q    Okay.  Now, with regard to secondary and

11   primary, can you tell me what the Border Patrol requires

12   of agents in terms of a reason to send a car to secondary

13   at the SR86 checkpoint?

14       A    In order for an agent to send a person to

15   secondary from the primary inspection area is the mere

16   suspicion of illegal -- of immigration, sir.  So, once

17   again, the checkpoint is primarily immigration in nature;

18   so any mere suspicion for immigration-led purposes.

19       Q    Okay.  And mere suspicion, where -- where is

20   that on the -- the probable cause scale?

21       A    It's pretty low.  I have to have an

22   indication -- mere suspicion in primary that the driver is

23   not -- not being -- that has not satisfied my -- my

24   ability to determine whether that person is lawfully

25   admitted and can -- can remain in the U.S. legally.

1     Q    Okay.  So when agents try -- you have already

2   made reference that Mr. Bressi was ordered to secondary.

3   What mere suspicion was that based on?

4          MR. BASTRON:  Object to form and foundation.

5          And, also, this is outside the scope of the 30(b)(6)

6          designation.  But he can answer if he wants to.

7     **A    Sir, I have no idea.**

8     Q    So you don't know?

9     **A    No, sir.**

10    Q    With regard to the use of dogs, is their role

11  different between primary and secondary?

12    **A    So the canine is deployed at the Border Patrol**

13  **checkpoint -- excuse me -- at the pre-primary location,**

14  **which is the location prior to arriving at the primary**

15  **agent, where the agent greets the driver, identifies**

16  **himself as a Border Patrol Agent, and states that it's an**

17  **immigration checkpoint and asks the driver and any other**

18  **occupants in the vehicle for their citizenship.  And the**

19  **canine is deployed prior to that, yes.**

20    Q    Okay.  And you've already testified that these

21  canines are trained to sniff narcotics; correct?

22          MR. BASTRON:  Object to form.

23    Q    You can answer.

24    **A    They're trained to detect an odor.**

25    Q    An odor of narcotics?

1    **A      Humans, contraband.**

2       Q     Okay.  And so if a canine alerts, for lack of a

3    better word, what happens?

4    **A      The vehicle is then -- so the canine is probable**

5    **cause allowing us to secondary the vehicle for further**

6    **inspection.  The vehicle arrives at the primary location.**

7    **There's communication between the canine handler and the**

8    **agent at primary.  And the secondary agent -- we also have**

9    **a secondary agent at the secondary location.  The canine**

10   **handler, who, with his canine, will approach the vehicle**

11   **and go through a process.**

12      Q     Are there specific documents that spell out

13   exactly what the agent needs to determine in order to send

14   a vehicle to secondary?

15   **A      As an agent in primary, you have to determine**

16   **citizenship.  Once again, are they legally in the country,**

17   **do they have the proper documentation to be in, travel**

18   **through, or remain in the country?  If a canine -- once**

19   **a -- if a canine alerts, that's probable cause for us to**

20   **believe that there is either concealed humans in the**

21   **vehicle, primarily -- and in cases of that, there has to**

22   **be further investigation into what the odor was.**

23      Q     My question was whether there were any documents

24   created to specifically guide agents in making that

25   determination of whether to send a vehicle to secondary.

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

```
1              MR. BASTRON:  Object to foundation.

2        Q     You can answer.

3        A     We have a training -- we have training

4   documents, sir, from the academy.  This is the -- that

5   tells us a base of what we need to do in order to

6   obtain -- to determine citizenship.

7        Q     Are there any specific documents with regard to

8   the SR86 checkpoint other than the academy training

9   documents?

10       A     Not to my knowledge, sir.

11       Q     Okay.  I'd like to talk a little bit about local

12  law enforcement at the SR86 checkpoint, which is number

13  six on our Attachment A that you said you were familiar

14  with.  What do you understand the Border Patrol's policies

15  to be with regard to local law enforcement having a

16  presence at this SR86 checkpoint?

17       A     They don't have a presence at the 86 checkpoint.

18  If they respond -- if they do have a presence, it's a

19  request from -- for some -- some type of infraction or

20  they are performing duties outside of the enforcement

21  zone.  But they're not allowed in the enforcement zone to

22  perform any type of state regulation.

23       Q     So is it your testimony that -- that local law

24  enforcement -- and by that I mean the Pima County Sheriff,

25  the state police, Tohono O'odham officers -- would never
```

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1  be at the SR86 checkpoint unless they were specifically

2  called there?

3       A    Yes, sir.  There's no -- we don't have --

4  there's no reason for them to enforce Arizona law at the

5  checkpoint.  Once again, if a call -- if I made a call to

6  Pima County to come pick up a -- say, a missing child or

7  missing person or through our records after inspecting a

8  vehicle in secondary we had probable cause to believe that

9  there's an additional -- we determine that somebody had an

10 active warrant out of Pima County, yes, there's

11 notification then made for them to respond.  But that's

12 it, sir.

13      Q    Okay.  Are you familiar with the -- the

14 Operation Stonegarden contract between Pima County and the

15 Border Patrol?

16      A    Yes, sir.

17      Q    Okay.  And while that's not in effect now, it

18 was in effect for many years; correct?

19      A    Yes, sir.

20      Q    Okay.  And didn't Operation Stonegarden

21 anticipate and use Pima County Sheriff's deputies at the

22 checkpoint?

23      A    No, not to my knowledge, sir.  They -- they

24 worked outside of the footprint of the checkpoint

25 enforcing their regulations.  They were not at the

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1  checkpoint to perform immigration functions or enhance

2  Border Patrol safety measures.

3      Q    Can you tell me what the Border Patrol policy

4  would have been which would allow deputies to be within

5  the footprint of the checkpoint even if they were not

6  performing any such functions?

7             MR. BASTRON:  Object to form.

8      Q    You can go ahead.

9      A    For example, if we had an uncooperative

10  motorist.  At that point, there's no -- at that time the

11  crime would be impeding traffic.  We would make a request

12  from the U.S. Trooper or Department of Public Safety or

13  Pima County to come and assist in supporting a failure to

14  keep the flow of traffic or possibly impeding traffic.

15  That's how they're going to respond; as a result of us

16  determining there was a missing person or we identified

17  that there was an active warrant, and they were willing to

18  come in to assist.  It was a request through -- for

19  assistance that was communicated through our dispatch to

20  their dispatch for them to respond for assistance.

21      Q    Maybe you didn't understand my question or maybe

22  I didn't articulate it well enough.  My question was

23  during the time that Operation Stonegarden was in effect,

24  isn't it true that the Border Patrol had local law

25  enforcement officials, specifically sheriff's deputies,

```
 1   actually within the footprint of SR86, even though they
 2   had not been called there for any specific purpose?
 3        A    Not to my knowledge on that, sir.  Once again,
 4   if they responded in support of a request from Border
 5   Patrol.
 6        Q    So your position -- Border Patrol's position is
 7   the only reason that a sheriff -- Pima County Sheriff's
 8   deputy would have been at that checkpoint is if they were
 9   specifically called there for a specific reason; is that
10   correct?
11             MR. BASTRON:  Object to form.
12        A    Yes, sir.
13             MR. ELLINWOOD:  I'm going to mute here for just
14        a second.
15   BY MR. ELLINWOOD:
16        Q    Okay.  Agent Teran --
17        A    Yes, sir.
18        Q    -- we keep using this term footprint, and I want
19   to make sure that your use of it is -- we understand
20   completely.  We talked earlier about the map that was
21   attached to the encroachment permits which lays out the
22   perimeter of the entire area covered by the encroachment
23   permit; correct?
24        A    Yes, sir.
25        Q    When you are talking about footprint, are you
```

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

1    talking about a -- an area inside of that map or the

2    perimeter boundaries of that map?

3           MR. BASTRON:  Object to form.

4    Q    You can answer.

5    **A    I'm talking about the boundaries within the**

6    **checkpoint, sir, from the enforcement zone.  That's an**

7    **area that's clearly marked off that says encroachment area**

8    **leading from the checkpoint, which is on the exhibit here,**

9    **allowing the -- that's the pre-primary area, all the way**

10   **to the secondary area and encompassing that to which**

11   **allows us to safely inspect vehicles.  And then there are**

12   **also several agents at the checkpoint to support our**

13   **operations.**

14   Q    What exhibit are you looking at?

15   **A    It's the document that was -- the Arizona**

16   **Department of Transportation Highway Encroachment Permit**

17   **application.**

18   Q    Okay.  Which -- which -- which year?  There's --

19   **A    2019.**

20   Q    Okay.  So if a deputy operating under Operation

21   Stonegarden were to simply appear at the SR86 checkpoint

22   without being called, what would be the Border Patrol's

23   response to that?

24   **A    We -- we wouldn't have Pima County working at**

25   **the checkpoint as a general crimes checkpoint.  The**

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1  **purpose of Stonegarden was to assist us with addressing**

2  **other traffic in the communities where we don't have --**

3  **where there's not a lot of enforcement.  For example,**

4  **Tubac, Arizona, where we have a deputy patrolling all the**

5  **time to assist in keeping that community safe.  They would**

6  **respond and -- and detain these persons.  But we don't**

7  **have Pima County at the -- at the checkpoint performing**

8  **any type of enforcement activity that they can enforce.**

9       Q    And is that statement true for the entire time

10  that Operation Stonegarden was in effect?

11      **A    To my knowledge, yes, sir.  I can only attest to**

12  **what I know.**

13      Q    Who made the determination of which deputies

14  would be assigned to SR86 through the Operation

15  Stonegarden grant?

16           MR. BASTRON:  Object to form.

17      Q    You can answer.

18      **A    I don't know.**

19      Q    Would you agree that someone in the Border

20  Patrol made a determination of who -- which personnel

21  should come out and when?

22      **A    I don't know about the personnel who would sign**

23  **up for Operation Stonegarden.  What I do know is**

24  **they're -- that they're required to call the station and**

25  **the supervisor would call to a location where there --**

1  where we had no manpower on that particular day.  But the

2  checkpoint is not one of those locations where we have no

3  manpower in order to perform the functions.  So they were

4  directed by the supervisor or the watch commander to a

5  particular location.

6       Q    And by supervisor do you mean somebody at the

7  SR86 checkpoint?

8       A    No.  Somebody who's at the Tucson Station when

9  they call in to report that they are going on duty or off

10 duty.

11      Q    If such a request is made, Agent Teran, does

12 that generate any kind of paperwork?

13           MR. BASTRON:  Object to form.

14      Q    You can answer.

15      A    As with anything, there are reporting

16 requirements.  They'll submit those directly to us, and

17 they go through their respective station.

18      Q    I'm not sure I understood your answer.

19      A    There are always reporting requirements --

20      Q    Was -- was some -- was some kind of written

21 document produced as a result of a request for a local law

22 enforcement?

23           MR. BASTRON:  Object to form.

24      Q    You can answer.

25      A    I guess I don't -- I don't understand the

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

1  **question, what you're asking me.  Is it -- are you asking**

2  **me if -- if there was -- if there was a schedule to -- to**

3  **go to a certain area?**

4    Q   I'm -- I'm asking you how, on a particular day,

5  were there certain deputies that responded to SR86

6  pursuant to Operation Stonegarden and how that worked;

7  who -- who made the request for them, who determined who

8  they were.  And I understood your answer to be that some

9  supervisor, but not one at SR86, made that determination.

10          MR. BASTRON:  Object to form.

11          MR. ELLINWOOD:  Let me -- let me mute here for a

12      minute.

13  BY MR. ELLINWOOD:

14    Q   Agent Teran, I'm sorry this is getting a little

15  confusing.  I'm trying to kind of clarify it.

16          Are you familiar with a term called watch

17  commander?

18    **A   Yes, sir.**

19    Q   Okay.  In the Border Patrol, who -- who is a

20  watch commander and what do they do?

21    **A   A watch commander commands a patrol group of**

22  **agents.  There's a shift -- there's a shift commander and**

23  **he has overall technical and administrative control of a**

24  **shift for a -- for a particular time period.**

25    Q    Okay.  And in the Tucson Sector, where would the

Page 45

```
 1    watch commander be located?

 2        A    One of two places.  At the Tactical Operations

 3    Center or at the -- in the office, which is located at the

 4    Tucson Station.

 5        Q    Okay.  Would a watch commander be located in the

 6    SR86 checkpoint?

 7        A    Not unless there was a particular situation

 8    which required the watch commander to respond.

 9        Q    Okay.  Are you familiar that -- with the

10    Operation Stonegarden requirement that the watch commander

11    would make the designation of Pima County deputies and the

12    need for them at a particular moment in time?

13        A    So if there was a schedule created -- the call

14    would come into the Tactical Operations Supervisor, which

15    I told you earlier, and then an area would be designated

16    where they would go.  It was never an assignment, to my

17    understanding, directly to respond to work at the State

18    Route 86 checkpoint.

19        Q    But if a deputy was at the SR86 checkpoint, it's

20    because a watch commander told him to be there; is that

21    correct?

22             MR. BASTRON:  Object to form.

23        Q    You may answer.

24        A    It would have been at the request for additional

25    assistance in which the officer would not remain
```

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 46

1    Stonegarden.  If they responded to assist, for example,

2    with an uncooperative motorist, to assist in removing them

3    from the highway, at that point, the officer is no longer

4    part of Stonegarden because it's no longer

5    immigration-related.  They're dealing with that specific

6    situation.

7              So if -- if that's what you're referring to,

8    then, yes, we would need the support of the local agency

9    because we can't enforce traffic law.

10       Q    Okay.  And then my question is, if such a thing

11   occurs, does that generate some kind of a written report,

12   document of some kind?

13       A    Any time --

14            MR. BASTRON:  Object -- sorry.  Object to form.

15       Go ahead and answer.

16       A    When we look at -- we generate these -- for us

17   it's a report of investigation, as well as -- I'm assuming

18   that the deputies also complete their end-of-shift report.

19   So I can't say if there was documentation ordered because

20   I didn't work with the deputy, I didn't order the deputy

21   there.  But there will be a report created as with any law

22   enforcement agency.

23       Q    Okay.

24       A    That's what I know.

25       Q    Now I'd like to ask you some general questions

1    about data generated by the SR86 checkpoint.  Can you tell

2    me, first of all, what data is generated?

3        **A    The data we generate from the checkpoint is**

4    **associated to a seizure of some sort, whether it's human,**

5    **vehicle seizure, and apprehensions at the checkpoint.**

6        Q    Okay.  And are these -- just, as an example, if

7    there is an apprehension of a non-U.S. citizen, is the

8    data specific enough to describe whether that person was

9    attempting to pass through concealed or simply -- or

10   attempted to pass through?  Does it make that kind of

11   differentiation?

12       **A    An agent who writes a report is describing the**

13   **entire situation from the initial encounter.  So if there**

14   **was a person who was attempting to conceal themselves, it**

15   **would be indicated in the report.**

16       Q    But that -- Agent Teran, that's not my question.

17   My question is, is the data from that report separated out

18   between concealed and unconcealed, as an example?

19       **A    Not to my knowledge, sir.  It's an**

20   **apprehension --**

21       Q    Okay.

22       **A    -- or a seizure.**

23       Q    Okay.  And the data that you just talked about

24   in terms of seizures and apprehensions and things like

25   that, where does that data go?  How does -- what happens

1   to it once it leaves SR86?

2       **A      We have an enforcement database and the**

3   **information is entered into that.  And then you have**

4   **somebody who is assigned to an upper management branch**

5   **where they consolidate the information and disseminate**

6   **as-needed to whoever is on a need-to-know basis.**

7       Q    So is the -- is the data actually entered right

8   there at the SR86 checkpoint?

9       **A      No, sir.  We don't have that capability at the**

10  **checkpoint.  But the agents will return to the Tucson**

11  **Station and input that information into the database.**

12      Q    Okay.  So let me just take this as an example.

13  If a particular agent seizes a load of marijuana -- we'll

14  call him Agent X -- how is the data from that seizure

15  actually entered into this database?

16      **A      An agent arrives at the station, will process --**

17  **will weigh the contraband and store it.  Then he'll go**

18  **into the computer and begin writing, creating the events**

19  **for the incident, and then enter all the pertinent**

20  **information into that database.  And then we'll print out**

21  **a report with the information.**

22      Q    Okay.  Are there any regulations or protocols

23  about how promptly that needs to be done?

24      **A      It's usually about -- it's usual- -- it's**

25  **immediate in nature, usually by the end of the shift.**

 1   **Once again, you have to understand the drive time from the**

 2   **State Route 86 checkpoint to the Tucson Station is**

 3   **approximately 40 minutes.  So incorporate that with**

 4   **significant amount of traffic on State Route 86 to Tucson.**

 5        Q    To your knowledge, is the data separated by

 6   whether the seizure occurred at primary or secondary?

 7        **A    Not to my knowledge, sir.**

 8        Q    Not to your knowledge is the data separated;

 9   correct?

10        **A    Not to my knowledge, that's correct, sir.**

11        Q    So a seizure would appear without any reference

12   to whether it occurred at primary or secondary?  I just

13   want to make sure we're clear.

14             MR. BASTRON:  Object to form.

15        Q    You may answer.

16             And what was your answer, Agent Teran?

17        **A    In the narrative portion of the report, there**

18   **would be facts indicating why a seizure took place.  But**

19   **on the page where we document the report, it does not.**

20   **There's -- there's -- it doesn't tell the difference**

21   **between a conceal or a non-conceal.**

22        Q    Okay.  And it doesn't tell the difference

23   between primary or secondary as the site of seizure?

24        **A    No.  Because at that point, we're making a**

25   **determination from primary that we need to first secondary**

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1    **the vehicle to further our investigation.  So the**

2    **seizures, for the most, take place in secondary during**

3    **that secondary inspection.**

4    Q    Okay.  Is data generated by the number of

5    vehicles going through the checkpoint for a given moment

6    in time -- a day, hour, what?

7    **A    We don't track that information, sir.**

8    Q    So there -- there are no -- there's no data

9    generated as to the actual number of vehicles going

10   through the checkpoint?

11   **A    No, sir, we don't have a vehicle counter or --**

12   **an agent doesn't sit and count each vehicle that enters**

13   **the checkpoint, no, sir.**

14   Q    And have you ever -- has the Border Patrol ever

15   kept track of the number of vehicles going through the

16   checkpoint?

17   **A    I can only speak to the State Route 86**

18   **checkpoint, sir; not to my knowledge.**

19   Q    I'm sorry.  I didn't hear.  As to the SR86

20   checkpoint what?

21   **A    Not to my knowledge, sir.**

22   Q    Okay.  Ever, even from its inception in 2008

23   until the present?

24   **A    Not to my knowledge, sir.**

25   Q    Okay.  Does the data entry into the database

 1   allow for the agent to indicate whether a seizure was as a

 2   result of a canine alert or not?

 3       **A    Yes, it does give a canine -- yes, it does give**

 4   **the canine credit in the database.**

 5       Q    So there is is -- there is data created for all

 6   seizures, whether they're immigration or otherwise,

 7   credited to a canine alert; is that correct?

 8       **A    Yes, sir.**

 9       Q    Okay.  I'm going to take a minute here, if I

10   may.

11           While she's doing that, Agent Teran, is there a

12   limit on the period of time that the I44s are preserved?

13       **A    Sir, I'm unaware of the actual timeframe a paper**

14   **copy of the I44 form is to be preserved, but I know in the**

15   **system they -- they're there for quite some time. I'm**

16   **unable to tell you the -- the total time that they're in**

17   **the system or if they ever even go away from the system.**

18       Q    I -- I could only hear part of your answer.

19   Did -- did you say that you're unaware of how long they're

20   in the system?

21       **A    I don't know if they're ever deleted from the**

22   **system. We do maintain a paper copy for up to five years**

23   **on -- on -- at the station.  But then they -- the database**

24   **disposed of the -- according to the -- to the schedule**

25   **of -- doing away with all the documentation.  But the**

1   other purpose of the database is that information is in

2   there -- I would like to say indefinitely, but that's

3   not -- that's not my area of expertise.

4       Q     Okay.  Now, we have up Exhibit A, which is some

5   stats from December 1 of 2018 to November 30 of 2019.  Do

6   you see that?

7       A     Yes, sir.

8       Q     So are you familiar with these statistics?

9       A     Yes, sir.

10      Q     Are you familiar with any other compilation of

11  these same statistics?

12      A     No, sir.

13      Q     Okay.  Do you know the source of these

14  statistics?  In other words, where it says,

15  immigration-related events, 19; where did that figure come

16  from?

17      A     It was from -- that data is from the EID, which

18  is the info system that they pull the information from.

19      Q     Okay.  And when you say they, who is this?  Is

20  it another computer, is it a person, what is it?

21      A     It will be a human.  In our case, a Border

22  Patrol Agent is assigned to an upper management

23  collections team and data is entered in a particular

24  timeframe, and they extract this information based off of

25  this database and the entry of information.

1    Q    So this -- this agent is taking raw data and

2  creating a summary like Exhibit A; is that correct?

3    **A    I wouldn't say it's raw data because the**

4  **information is in the system.  It's accurate information**

5  **as being associated to the checkpoint seizure and the time**

6  **requirements in providing this information that you see in**

7  **front of you, sir.**

8    Q    Okay.  But as far as the Border Patrol is

9  concerned, this is -- this is accurate, up-to-date

10  information for this particular time period; is that

11  correct?

12    **A    This is what's been presented to you, sir, yes.**

13    Q    Okay.  And -- and the breakdown that is

14  represented by -- here on Exhibit A is as far as the raw

15  data is broken down with regard to the SR86 checkpoint; is

16  that correct?

17    **A    Yes, sir.**

18    Q    Are you aware of any other summaries or

19  breakdowns of data from the SR86 checkpoint other than the

20  form that's used here?  And we -- we also have other years

21  in the exhibits.

22    **A    No, sir.**

23    Q    So this is it?

24    **A    To my knowledge.**

25        MR. BASTRON:  Hang on.  We've disclosed -- are

1          you talking about other years or other forms?

2          Because we disclosed three years' worth of these

3          statistics.

4               MR. ELLINWOOD:  Right.  But there are --

5               MR. BASTRON:  Oh, they're on the same page?

6               MR. ELLINWOOD:  No.  They're all the same form.

7          I guess is -- what I'm trying to get at is is there

8          any other form other than these that have been

9          disclosed for, I think, four years?

10    BY MR. ELLINWOOD:

11         Q    Can you answer that, Agent Teran?

12         **A    To my knowledge, there's an end-of-year report.**

13    **But Tucson Station doesn't have a requirement to -- to**

14    **regularly review those reports.**

15         Q    I'm not sure I understood what you were saying.

16    Can you repeat that, please.

17         **A    Sir, no documents or stats associated to this**

18    **data that you have was received, sir.  So I have not seen**

19    **a statistic or a metric or a summary of events associated**

20    **to the checkpoint seizures aside from this that I'm seeing**

21    **on the screen right now.**

22         Q    Okay.  So what I'm getting at, Agent Teran,

23    is -- is looking at Exhibit A where it says,

24    narcotics-related events, 27; what does that mean?

25         **A    That we had 27 narcotic-related events at the**

1  checkpoint.

2      Q    How does that differ from the narcotics-related

3  arrests?

4      A    There could have been a principal and a

5  co-principal in the vehicle -- and this -- and this I

6  would say -- I'm using it as an example.  So there was 27

7  incidents that arrived there that were identified.  And

8  total apprehensions were 36, where it could have been a

9  principal, a co-conspirator, and any other parties

10  involved.  That's where those -- those numbers are coming,

11  and if the agency is able to prove that all parties in the

12  vehicle were associated to that particular smuggling going

13  on.

14      Q    So we're not talking about automobiles.  We're

15  talking about individual people?

16      A    Arrests, yes, sir.

17      Q    Okay.  So if a bus pulled up and had 27 people

18  in it and they were all undocumented, including the

19  driver, that would be 27 people, not one bus; right?

20      A    It would be one event and 27 people.

21      Q    Okay.  Are any statistics kept as to the

22  automobile associated with these events?

23           MR. BASTRON:  Object to form.

24      Q    You can answer.

25      A    The way we track that -- the -- the seizure of

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

1    vehicles are associated to the I44 in order to -- where

2    they pull this information from this.

3        Q    So the answer is there's no -- there's no

4    separate data kept with regard to the vehicle itself?

5        A    It's part -- it's considered part of this event.

6    So unless I know the specific event, I don't know that the

7    vehicle was seized at that time.

8        Q    Okay.  So what I'm getting at here, Agent Teran,

9    is there are many, many kinds of vehicles.  Is any data

10   kept with regard to whether a pickup truck or a sedan or a

11   bus or a minibus or any different kind of vehicle is

12   related to one of these events?

13       A    Not to my knowledge.  It's considered

14   conveyance.

15       Q    Okay.  So, again, with Exhibit A, under

16   immigration-related events, there's an asterisk, and it

17   says, incident type of AAS or CAS.  Can you tell us what

18   AAS and CAS mean?

19       A    Yes.  AAS stands for administrative alien

20   smuggling, and CAS is criminal alien smuggling.

21       Q    What's the difference?

22       A    You have a family member transporting in -- a

23   family member that transports the checkpoint.  They're --

24   that's an administrative seizure.  Or a -- and then you

25   have a narcotic seizure, which is criminal.

1     Q    Okay.  I'm not sure I understand you here when

2  it relates to an immigration-related event because I'm

3  assuming that if it involved narcotics, it's in a

4  different category of data.  Am I wrong?

5     **A    Correct.  That's what I just mentioned, sir.  So**

6  **administrative alien smuggling case, that's how the -- the**

7  **aliens are classified on -- as -- as part of the process.**

8  **Criminal -- criminal alien smuggling is associated to**

9  **either narcotics seizure or some sort of -- if there is a**

10 **person in the trunk with some extenuating circumstance**

11 **that increases the endangerment aspect of it.  That's**

12 **automatically criminal.  Now, if I can articulate that.**

13 **It's going to be administrative in nature if it's just an**

14 **alien case; we would process it as an administrative**

15 **seizure.**

16    Q    I see.  So an administrative case doesn't

17 involve any other criminal activity other than an

18 immigration violation?

19    **A    Yes, sir.**

20    Q    And if there is any other criminal activity on

21 top of an immigration violation, it is then a criminal --

22 a CAS event; is that correct?

23    **A    That is correct, sir.**

24    Q    Now, down where it says narcotics-related

25 non-immigration-related arrests, on Exhibit A, the data is

```
 1    35.  We have the same asterisk seen here.  How does that

 2    relate to narcotics-related, non-immigration?

 3         A    I don't know the answer to that one, sir.

 4         Q    So can you tell me, for instance, the difference

 5    between narcotics-related arrests, which, on this

 6    document, are 36, and narcotics-related,

 7    non-immigration-related arrests, 35?

 8         A    No, sir.

 9         Q    The -- some of my confusion here is -- if a

10    police report or an I44 is not created, is any data

11    created at all?  In other words, to give you a

12    hypothetical, somebody shows up at the checkpoint.  The

13    driver is smoking a joint of marijuana.  The agent says,

14    throw it out, and let's him go, would that create a

15    statistic?

16         A    So we don't have the driver fill out the -- the

17    secondary individual in that sort of a case.  Whether it's

18    acceptable for prosecution, that's -- that's -- that's a

19    different story.  But there is an incident that's

20    generated for that because, yeah, although it's a --

21    although in Arizona it's allowed -- it's legal in Arizona,

22    it's still a federal -- a federal crime, and it won't get

23    passed that checkpoint.

24         Q    Okay.  I -- I -- I think we're still far afield.

25    If, for whatever reason, the agents at the SR86 checkpoint
```

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

```
 1   determine that they're not going to prosecute this person
 2   for having the -- the marijuana, does that generate a
 3   statistic?
 4       A    Anything involving any type of narcotic, sir,
 5   will generate an I44 from that agent.
 6       Q    Okay.  Even if there's no prosecution?
 7       A    Even if there's no prosecution.
 8       Q    Okay.  And so would that, then, fall into the
 9   narcotics-related event because --
10            (Mr. Ellinwood and the witness speaking over one
11            another.)
12            THE COURT REPORTER:  I'm sorry.  Could you
13       repeat the end of that question, please.
14       Q    Would -- would that, Agent Teran, that we --
15   the -- the scenario we've just been discussing, fall into
16   the narcotics-related events category?
17       A    Sir, I'm not -- I don't know what the -- what
18   the non-immigration-related arrests is particularly with
19   this graph.  I don't know the answer.
20       Q    Okay.  Exhibit A, is this a form that is
21   generated annually for the use of the Border Patrol?
22       A    In particular to this one here, was a -- was a
23   request from the Office of Chief Counsel.
24       Q    Okay.  So this data was created because --
25   because of this case?
```

1      **A      It was requested from the Office of Chief**
2  **Counsel, sir.**
3      Q    Okay.  So this is not a form that is just
4  generated in the data.  It's just generated in the
5  ordinary care of business by the Border Patrol; is that
6  correct?
7      **A      Prior to this, I have never seen it, sir.**
8      Q    Okay.  Fair enough.
9           MR. ELLINWOOD:  It is 2:23.  I want to confer
10      with my client and co-counsel and -- so I'm going to
11      go mute for a few minutes.  But we're almost done.
12           (Off the record at 2:23 p.m.)
13           (On the record at 2:29 p.m.)
14  BY MR. ELLINWOOD:
15      Q    So, Agent Teran, before we leave the -- these
16  statistics, I'm going to give you a hypothetical and ask
17  you how it would appear in this statistical summary.
18           A U.S. citizen is smuggling non-U.S. citizens
19  and is apprehended.  The whole group is apprehended at
20  SR86.  How does that arrest of those individuals appear?
21  In other words, is the U.S. citizen included in an
22  immigration arrest?
23      **A      By non-U.S. citizen are you referring to**
24  **undocumented aliens?**
25      Q    Okay.  So where would the U.S. citizen who

1    presumably is arrested for alien smuggling, where does he

2    appear?

3        A    That was my question, sir.  So when you -- when

4    you talk about non-citizens, we have resident aliens who

5    are lawfully admitted.  So my question is are these

6    undocumented aliens who have no legal purpose to be in the

7    United States; before I answer your question?

8        Q    Undocumented.

9        A    Undocumented.  Okay.  For undocumented, so that

10   is associated with -- that is a principal -- that would be

11   charged as a principal U.S. driver with, say, the number

12   of folks that was apprehended in the vehicle.

13       Q    And so does the United States citizen driver

14   appear as an immigration arrest?

15       A    It will be -- it will not appear as an

16   immigration arrest, sir.

17       Q    Where will that U.S. citizen appear?

18       A    That would fall under the administrative

19   seizure, the AAS, unless we can determine it was criminal

20   in nature.  And then, at that point, it would be

21   characterized as a statistic.  And, for us, it would show

22   up on the I44 as a United States citizen principal with

23   total amount of undocumented aliens.

24       Q    But how -- how would that appear on Exhibit A?

25   Is he going to be one of the immigration statistics or

1   some other statistic -- the U.S. citizen?

2        **A    It would not be an immigration statistic because**

3   **that's not an immigration -- the -- the citizen of the --**

4   **the United States citizen has the legal authority to be,**

5   **travel to, and remain in the United States.  That's not**

6   **an -- that's not an immigration violation.  Now, that may**

7   **be where -- where -- so that incident is not**

8   **immigration-related for us.  I would assume -- I can't**

9   **tell you -- once again, that's not a number that we**

10  **particularly carry.  To us, it's a case.**

11       Q    Now, I'd like to talk to you about some of the

12  other detection equipment there at SR86.  There is, in our

13  exhibit list -- and we disclosed a picture of a -- it

14  looks like a large crane of some type at the checkpoint.

15  What is that?

16       **A    I don't have a picture of that, sir.**

17       Q    Okay.  She's trying to get you one.

18            MR. ELLINWOOD:  Exhibit P, if Bonnie would put

19       that up, please.

20       Q    Exhibit P is now on the screen, and you can see

21  a -- a large crane-like structure in the black box.

22       **A    So that is a camera that we use to assist in the**

23  **detection of subjects who are intending to circumvent the**

24  **checkpoint.**

25       Q    So does this refer to -- you had earlier talked

1    about foot traffic around the checkpoint.  Is that what
2    you're referring to?
3        **A    Yes, sir.**
4        Q    Okay.  So this is a camera?
5        **A    Yes, sir.**
6        Q    And nothing more?
7        **A    It's a camera, sir, that we use to look around**
8    **in the air.**
9        Q    And -- and do you know the range of this camera?
10       **A    I do, sir, but the information on the law**
11   **enforcement --**
12           MR. BASTRON:  Agent -- yeah, Agent Teran, I'm
13       going to object.  This is law enforcement sensitive,
14       and I don't think that's relevant for the case.  And
15       if we give away too much information, it could be
16       used -- you know, to circumvent the law enforcement
17       capabilities.  I mean, it's sensitive intelligence.
18       So you can ask another question.
19       Q    So at the checkpoint, Agent Teran, there appears
20   to be some kind of x-ray capability.  What can you tell me
21   about that at SR86?
22           MR. BASTRON:  Object to form.
23       Q    You can answer.  We've got -- which exhibit
24   number is this?  Q.  Okay.  Can you see that, Agent Teran?
25       **A    Yes, sir.  That is a Backscatter machine, which**

1    is an x-ray machine.

2         Q    Okay.  And used to do what?

3         A    To identify anomalies within a compartment of a

4    vehicle.

5         Q    And is every vehicle that goes through the

6    checkpoint subject to this examination?

7         A    No, sir.

8         Q    So how -- how and who determine what vehicle to

9    examine with this Backscatter?

10        A    So this will be used at the secondary inspection

11   in order to identify anomalies.  So there's two ways that

12   this process works.  We can ask for consent from the

13   driver allowing us to scan the vehicle or if we have

14   probable cause to believe that there is contraband or a

15   human hidden within the -- the vehicle.

16        Q    And this would only occur at secondary; is that

17   correct?

18        A    Yes, sir.

19        Q    Okay.  If the initial contact agent does not

20   have mere suspicion of an immigration violation, what

21   level of probable cause does he need to send a vehicle to

22   secondary?

23             MR. BASTRON:  Object to form.

24        Q    You can answer.

25        A    Reasonable suspicion, sir, we're sending the

1    **vehicle to secondary based on the agent's observations.**

2        Q    Okay.  And then at secondary, this Backscatter

3    machine could be used; is that correct?

4        **A    Yes, sir.  But only if we have probable cause to**

5    **believe or the consent from the agent -- the driver or**

6    **whoever is in control of the vehicle allowing us to do so.**

7        Q    Okay.  Now, going back to the data entry issue,

8    my understanding from your answer was that the agents did

9    not possess the ability to enter data at the SR86

10   checkpoint, and they had to go back to the Tucson office,

11   I guess, to enter the data that we talked about to

12   generate these statistics, the I44 forms; is that correct?

13       **A    Yes, sir.**

14       Q    Okay.  Now, we -- we have photographs, and I'll

15   be glad to show them to you, of laptops there at the

16   SR86 -- we didn't mark them.  Okay.  Well, I don't have

17   photographs.  But I -- laptops have been seen at the SR86

18   checkpoint.  Whose laptops would these have been, and what

19   would they have been used for?

20            MR. BASTRON:  Object to foundation.

21       Q    You can answer.

22       **A    They're used for -- they're law enforcement --**

23   **it's a law enforcement tool.  So, for example, if we have**

24   **an uncooperative motorist and -- a particular agent has**

25   **access to a system; they can request the license plate,**

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

 1  **check when the license -- determine vehicle information.**

 2      Q    Okay.  So these laptops would be used to access

 3  law enforcement databases; is that --

 4      **A    That's correct.**

 5      Q    -- am I understanding that correctly?

 6      **A    Yes, sir.**

 7      Q    Okay.  And those laptops are the property of the

 8  Border Patrol; is that correct?

 9      **A    Yes, sir.**

10      Q    Okay.  Does the Border Patrol allow its agents

11  to use personal devices at SR86?

12      **A    Can you elaborate on the question, sir?**

13      Q    I'm talking about a cell phone or an iPad or

14  things like that.

15      **A    Agents have devices and use devices for**

16  **performing primary and/or secondary duties or pre-primary**

17  **inspection duties.  We don't -- we only use them as a tool**

18  **to access the law enforcement system.**

19      Q    Okay.  Is it -- is it an authorized practice for

20  an agent to use a personal cell phone to take a photograph

21  of a motorist passing through the checkpoint?

22      **A    Agents are issued a government-issued cell**

23  **phone -- cellular phone that has the capability to capture**

24  **images.**

25      Q    So your answer is, yes, they can, if they're

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

```
 1   using the Border Patrol-issued cell phone?
 2             MR. BASTRON:  Object to form.
 3        Q    Is that a yes?
 4        A    We issue the phones for that particular reason,
 5   sir --
 6        Q    Okay.
 7        A    -- for agents' use.
 8        Q    What are the protocols or guidelines for an
 9   agent to photograph a motorist?
10             MR. BASTRON:  Object to form.
11        Q    You can answer.
12        A    With consent.  That's usually how we identify
13   motorists or a -- somebody who is a -- is creating a
14   lookout -- a lookout for a further alert.  And that's
15   based on the information when an agent identified that
16   there was additional factors within the vehicle leading
17   him to believe that they're possibly involved in
18   smuggling -- some type of smuggling activity within the
19   vehicle.  So the agent is now putting out some
20   information, which results in Intelligence to assist in --
21   in -- further down the day or wait to identify this
22   suspected smuggler.
23        Q    So these photographs that are taken on agency
24   cell phones, are they loaded into the same database that
25   the I44s are loaded into?
```

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1      **A      No, sir.**

2      Q      What database are they loaded into?

3      **A      I do not know what database they're loaded into.**

4      Q      How many different databases does the Border

5      Patrol load information into?

6      **A      When we're dealing with apprehensions and the**

7      **seizures --**

8      Q      I'm asking for anything that happens at SR86.

9      **A      Is this an apprehension or seizure, sir?  Those**

10     **enter into e3.**

11     Q      Okay.  What other ones?  You don't know what

12     happens to photographs that agents take on -- on those

13     issued cell phones.  Any other databases?

14     **A      We have what's called Be on the Lookout.  It's**

15     **BOLO for a suspected smuggler.  Those images do get shared**

16     **with the Intelligence department.**

17     Q      You have a Wanted board there at SR86.  How long

18     has that been in existence?

19             MR. BASTRON:  Object to form.

20     Q      You can answer.

21     **A      I don't know when that -- that board was put**

22     **together or how long it's been there.**

23     Q      Do you know whose photographs appear on the

24     Wanted board?

25     **A      It's hard to say.  It was in the course of 2010**

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

Page 69

```
 1    where we identified 300 smugglers and their pictures were
 2    posted on the Wanted poster.
 3         Q    So the photographs on the Wanted board are all
 4    of people you believe were engaged in human smuggling?
 5              MR. BASTRON:  Object to form and foundation.
 6         You guys are talking about two different things.
 7              MR. ELLINWOOD:  Are we?  Exhibit R.  Maybe
 8         Bonnie can put it up.  And then we won't that have
 9         confusion.
10              MR. BASTRON:  Okay.  Because there -- there was
11         another record that may have been -- so I guess I was
12         confused because that's what I was thinking of.  So
13         thanks for putting this up.
14    BY MR. ELLINWOOD:
15         Q    Okay.  So we've got Exhibit R up now, Agent
16    Teran.  How did these images get put on this board?  Who
17    makes that determination?
18         A    These are -- this was part of the Intelligence
19    program.  They were operating within the Tucson Sector.
20    And this information on the Wanted poster is what we --
21    when we get information from the suspects.  If you know
22    something about these suspects, then we can get some
23    information from them.  The reason for the Wanted poster
24    is we get more information of these suspects.
25         Q    Well, the fact that it's posted, and it's fairly
```

1  large and visible at SR86 checkpoint, what was its purpose

2  there?

3      **A     So the information we have is law enforcement**

4  **sensitive.  But we were just trying to collect information**

5  **on these suspects; their name, vehicle they drive, any**

6  **information that we could collect, and then we could**

7  **further investigate.  And if I recall, none of these were**

8  **resident aliens or United States citizens.**

9      Q    Going back to the discussion we just had about

10  cell phone photograph activity there by agents at the SR86

11  checkpoint, when you use the term smuggler, were you

12  talking about human smuggling, narcotics smuggling, or

13  what?

14      **A     The primary purpose of the State Route 86**

15  **checkpoint, sir, is alien smuggling.**

16      Q    I see.  Agent Teran, I could only see the top of

17  your head, so I wasn't sure what I was looking at.

18      **A     Sorry.**

19      Q    No problem.  The -- when we talked about the

20  laptops at the SR86 checkpoint and you -- you said that

21  they could be used to access the database and you used

22  this as an example -- license plates.  Do you remember

23  that?

24      **A     Yes, sir.**

25      Q    Okay.  Is this a database that would give the

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1    agents access to information nationwide or is it a

2    restricted database?

3        **A    So the law enforcement tools that they would use**

4    **is a -- is a database.  You can definitely access**

5    **information from individuals from -- in a different state,**

6    **absolutely.  But it's specific to immigration duties,**

7    **not -- not just general crimes.**

8        Q    Okay.  So can -- can these laptops be used to

9    access, for instance, immigration files and things like

10   that?

11       **A    If you're referring to an immigration file as an**

12   **e3 event, absolutely; but not an immigration -- an A file**

13   **or event.  We can access information based on getting**

14   **access through that agent; whatever agent has unlimited**

15   **access to every database.  It's specific to certain agents**

16   **who take the training and actually have authorization to**

17   **take out these laptops.**

18       Q    Do they -- do these laptops have access, for

19   instance, to the NCIC network, criminal records?

20       **A    Yes, they are capable, sir.  Now, once again,**

21   **depends on what access the agent had when he was operating**

22   **at that time.**

23       Q    He was operating what?  I couldn't hear.  I'm

24   sorry.

25       **A    So, yes, those -- those tablets do have the**

1   capability to access -- of accessing those systems, but if

2   the agent doesn't have access to allow him to enter a

3   site, then he wouldn't be looking at that -- he or she

4   would not be looking at that.

5        Q    I'm a little confused.

6        A    So not every agent has access to every -- to

7   everybody's records, sir.  That's -- that's limited.  So

8   you have an agent who is certified to use a laptop, who

9   can perform certain functions and certain checks

10  associated to a particular individual that they're dealing

11  with at the checkpoint.

12       Q    Okay.  But if -- if Agent A didn't have that

13  authority, Agent B -- he could ask Agent B, who did have

14  the authority, to make the search; right?

15       A    But there would have to be a particular need,

16  sir.  We just don't go around running records checks on

17  everyone.  There's no need for that.  It has to be

18  specific to that incident, and there's gotta be a cause

19  for it.  You need to know who the driver is -- and that's

20  an example, sir.

21       Q    Okay.  Does -- does -- do these laptops provide

22  access to driver's license data nationwide?

23       A    I'm not 100 percent sure on that, sir.  I know

24  they provide information depending on the type of search,

25  but I don't know if they have -- if it will allow us to

1    **access driver's license information across the nation.  I**

2    **don't know that.**

3         Q    Okay.  Do you know of any written protocols or

4    directives or anything else created by the Border Patrol

5    that establishes the rules of usage for these various

6    databases that can be accessed by these computers there at

7    SR86?

8         **A    There are several training courses and several**

9    **training venues.  So there's several different trainings**

10   **that we complete in order for us to understand the rules**

11   **that go into use of technology.  So, yes, sir, there's**

12   **policies, there's individual training.**

13        Q    Okay.  Agent Teran, is any record kept of each

14   access made on these computers?  In other words, if Agent

15   A runs a -- let's say a driver's license check or an

16   immigration database check, is a record kept of that?

17        **A    So when you're on the system, it's assigned to a**

18   **specific user, has a specific identification for a certain**

19   **person that allows them to access the system.  So when you**

20   **do run a record, it's associated to the person running the**

21   **record.**

22        Q    Okay.  So sort of like a username and -- and --

23        **A    User ID.  Sorry, sir.**

24        Q    Okay.  And are they -- are the hard drives and

25   information generated on these devices maintained

1  indefinitely?

2      **A    Yes.  Due to certain litigation that we have**

3  **been on, yes.**

4      Q    Okay.  And where are the records kept of what

5  devices are at what checkpoint?  In other words, are there

6  records showing what devices were at SR86 at any given

7  point in time?

8      **A    So over time, we've gotten better at tracking**

9  **what equipment is issued.  There's a -- we have a system**

10  **now in place that agents check out equipment.  If it's**

11  **assigned to a particular location, and if it's primarily**

12  **assigned to a checkpoint, we can track that as well.**

13      Q    And these training materials that you made

14  reference to, is there some standard required for an agent

15  to use these laptops to access the database?  In other

16  words, is it mere suspicion, is it something less, is it

17  something more?

18      **A    Once again, we're talking about identifying a**

19  **person -- a person.  So there has to be some type of**

20  **interest or the agent has to believe that there's some**

21  **type of criminal activity taking place.  So there is -- we**

22  **are running these records checks based on the -- the**

23  **fact -- the belief that there's some criminal activity.**

24  **So we're looking at these mere suspicions and asking, who**

25  **does this vehicle belong to?**

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

1      Q     Is there any difference between

2   immigration-related issues and other law enforcement

3   issues?

4            MR. BASTRON:  Object to form.

5      Q     You can answer.

6      **A     So, for us, the primary function is immigration.**

7   **Period.  I mean, that's the basis of our operations, is**

8   **immigration.  Do we enforce other laws?  Absolutely.  But**

9   **that's as a result of an encounter dealing with**

10  **immigration.**

11     Q     Okay.  I guess my -- my question is, is there

12  any difference in the information required for an agent to

13  access a database for other than immigration purposes?

14           MR. BASTRON:  Object to form.

15     Q     You can answer.

16     **A     We're looking at -- you run an immigration**

17  **history check, and it -- and if a person doesn't come up**

18  **immigration, then there's -- there's -- I guess I'm**

19  **confused by your question, sir.**

20     Q     Well, let me -- let me try to rephrase it.  I

21  don't pretend to be a perfect questioner.  I understand

22  that your claim is that the primary purpose is immigration

23  enforcement.  My question is, if there were no immigration

24  issues at all, would an agent be authorized to access any

25  database through these computers?

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1       A       So we're talking based on the -- there has to be

2   a specific reason why the agent is accessing that

3   information on that particular person.  So if an agent had

4   reasonable suspicion that this person had -- say, for

5   example, marijuana is in the vehicle, and this person is

6   not wanting to provide any identification to us.  The

7   agent is going to take it or refer it to -- in order so we

8   can identify who this person is so that we know -- and, at

9   times, when we're running these checks we do find, God

10  forbid, a wanted criminal, that they have outstanding

11  warrants.  And that's why we defer to the state to follow

12  through a violation or for them to -- we ask them, would

13  you like us to hold him for you?

14          So, yes, do we, like, at times, encounter

15  records associated to a Wanted person at the checkpoint?

16  Absolutely.  Agents have a belief, probable cause to hold,

17  and then we have a reasonable suspicion that there's some

18  type of activity taking place -- illegal activity at the

19  checkpoint by that person.

20      Q    If a person's referred to secondary, will there

21  be a -- a Wanted hold search for them in every case?

22      A    Not in every case, sir.

23      Q    Okay.  Routinely?

24      A    I don't know if it's routinely, but, yes, agents

25  do run checks.

1    Q    Okay.  My -- my question was specific to

2    vehicles sent to secondary.

3    **A    At secondary?  We do, sir.  Once again, we**

4    **have -- we're -- we're trying to identify exactly -- we're**

5    **trying to collect the entirety of a situation before we**

6    **make a determination of how to proceed.  Do we have an**

7    **immigration violation?  Did the canine give us probable**

8    **cause to send that vehicle to secondary so that we can**

9    **conduct a thorough search of, say, the compartment area to**

10   **see if there's anything concealed within the vehicle?**

11   Q    Okay.  Okay.  Couple of follow-ups here, Agent

12   Teran.

13        What is the criteria for determining citizenship

14   at the checkpoint?  In other words, is an oral

15   declaration, I'm a U.S. citizen, good enough or is

16   something more required?

17   **A    An oral declaration such as, I am a United**

18   **States citizen, can suffice.  At times, the agent will**

19   **make that determination that it's not the case, and he can**

20   **refer to secondary.**

21   Q    Okay.  And in what -- give me an example of a

22   motorist who says they're a citizen, what would trigger a

23   trip to secondary?

24   **A    The agent is not satisfied with the motorist's**

25   **answer or there is additional -- in plain view -- an**

```
 1   agent, in plain view, observes something in the backseat
 2   that doesn't make sense.  Or somebody -- or maybe
 3   something else that just -- something else that -- that
 4   leads the agent to believe that this person is not being
 5   forthcoming with all of the answers.
 6        Q    So when would a motorist be required to produce
 7   proof of citizenship at this checkpoint?
 8        A    It can be at primary, if it's easy and
 9   accessible.  But if it's not, we move to secondary in
10   order to assist the flow of traffic.  We don't -- we don't
11   make efforts to detain people for long periods of time
12   unnecessarily.
13        Q    Well, most people don't carry passports and
14   birth certificates and things like that.  So what, other
15   than the declaration, I'm a U.S. citizen, is going to
16   suffice?
17             MR. BASTRON:  Object to form.
18        Q    You can answer.
19        A    Nine times out of ten, that -- that will
20   suffice, sir.  It's the -- it's the one time where it just
21   doesn't make any sense.  It's not -- there aren't
22   traditional factors going on and that agent believes that
23   this person is not a United States citizen, is not being
24   truthful with the answers; therefore, moves to the
25   secondary review.
```

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

1     Q     If the agent knows that the occupant of the car

2    is, in fact, a citizen because of prior encounters, is

3    there any reason to go further?

4         **A     So we have an obligation to -- to -- once again,**

5    **nobody is exempt on inspection at the checkpoint, whether**

6    **it's vehicle or person.  So, partially, you're correct,**

7    **sir, when you say, we know this person is a United States**

8    **citizen -- but I don't know if, at this point, they're**

9    **traveling with somebody else.  Could they have picked**

10   **somebody up on their way to work to the checkpoint?  Could**

11   **they be hiding somebody in the bed of the truck?  Because**

12   **that's why we take the time and question every single**

13   **motorist that passes through the checkpoint an a regular**

14   **basis, even if he's been there hundreds and hundreds of**

15   **times.**

16        Q     We've talked about some detection devices there

17   at the SR86 checkpoint.  The -- the -- what did you call

18   it?  The Scattershot, the -- the x-ray --

19        **A     Yes, sir.**

20        Q     And the -- the dog and all the rest of it.  Is

21   there anything else there at SR86 that we haven't talked

22   about?

23        **A     When you talk about operational equipment, we**

24   **have the personal radiation device, the PRD, that sits on**

25   **the agent's belt that alerts us to radiation?**

Case 4:18-cv-00186-DCB   Document 104-1   Filed 06/10/21   Page 81 of 107

**Deposition of ROBERTO TERAN**
**BRESSI v. NAPIER**

Page 80


```
1        Q    Okay.  Anything else?

2        A    And then the device that we use to identify the

3   source of radiation.

4        Q    Okay.  And this is -- this is because if

5   somebody had a nuclear weapon or something that they were

6   trying to smuggle through?

7        A    That is part of the Nuclear Regulatory

8   Commission, sir, yes, sir.  In general, the checkpoint

9   would be a good location to help us identify that threat.

10       Q    Okay.

11            MR. ELLINWOOD:  So, Bonnie, please put up O and

12       M -- N.  O and N.

13  BY MR. ELLINWOOD:

14       Q    And while she's doing that, Agent Teran, if the

15  motorist refuses to answer the citizenship question, what

16  is going to be necessary for that motorist to be released?

17       A    So this is where our training and experience

18  comes in, as well as the supervisor at the location.  So,

19  for example, if we have an uncooperative motorist, as I

20  alluded to earlier, is sitting at the checkpoint with a

21  horn in full blast and creating an additional cause,

22  that's one of the situations where we would request for

23  the assistance from the local department because, at that

24  point, they're holding up the traffic.  This is one of the

25  occasions where we'd use our radio dispatch or one of
```

(520) 884-9041          Colville & Dippel, LLC
File No.  68157          www.ArizonaDepos.com

1    those laptops that will ask the information of the vehicle

2    to help us identify who the suspect -- who the subject is.

3    Again, if it's one or the same person that keeps coming

4    through the checkpoint, like you mentioned earlier, we

5    understand it's a U.S. citizen, we'll conduct a routine

6    search of the vehicle and allow him to continue.  So

7    there's other -- there's other ways to do it so we can

8    continue with the flow of traffic through the checkpoint,

9    and we're not detaining folks unreasonably.

10        Q    Just to be clear, the motorist pulls up and

11    refuses to answer the citizenship question.  They're not

12    honking their horn, they're not doing anything else, what

13    is necessary for them to be released from the checkpoint?

14        A    So, at that point, each motorist that arrives at

15    the checkpoint, we have the application in which would

16    determine that citizenship.  We're asking for the motorist

17    to identify themselves; we'll ask them if they're a U.S.

18    citizen.  The majority of the motorists do comply with our

19    request, and then you're on the road fairly quickly.

20             If they're not -- in the case they are

21    questioned and they're not willing to respond to our

22    question, this is where we'll go back to say, hey --

23    somebody that we've seen before -- maybe I'm a new agent

24    to the checkpoint, I -- I'm gonna ask my supervisor for

25    some assistance.  At that point, if nobody knows who this

1    person is, if the person is not willing to go to secondary

2    and remains at the -- at the primary location, we will run

3    a license plate check.  There's a couple different tools

4    that they'll use in order to determine this person's

5    identity.

6            Once we're satisfied with our requirements, they

7    are on their way.  But, at this point, if they're not

8    responding cooperative, we're going to send them to

9    secondary so we can further investigate that, as the

10   motorist is not willing to provide information or that

11   they're legally allowed to remain, travel to, travel

12   through the United States.

13       Q    But if they're known to the Border Patrol, then

14   your answer is they're allowed to proceed?

15           MR. BASTRON:  Object to form.

16       Q    You can answer.

17       A    If this is a person that's come to my checkpoint

18   and has identified themselves as an United States citizen

19   and I -- and made a distinct- -- they decide they're not

20   going to answer my questions, I'm looking in plain view.

21   I conduct my -- my immigration -- I can also use follow-up

22   questions, say, are you still a United States citizen?  I

23   might get a nod, a little chuckle, and then I continue on.

24   That satisfied my requirement as a Border Patrol Agent;

25   that it's still the same person.  If I know the person's

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

 1   name, I might call them by their name; it hasn't changed.
 2   They can continue on.  So, yes, we're trying to prevent
 3   people from -- that is the primary function at the
 4   checkpoint, is immigration business.  But we're also not
 5   gonna create a situation for -- that's unwarranted in
 6   nature.
 7        Q    Okay.  Exhibit O is up.  Can you see that?
 8        A    Yes, sir.
 9        Q    There is a device in a black box on the canopy
10   there of a shelter.  Do you see that?
11        A    Yes.  Do you have a close-up of it?
12        Q    Yes.  Down at the bottom on the right, I
13   believe, is a close-up of the same device.
14        A    I have no idea what that is, sir.  I can't tell
15   you, sir.
16        Q    Okay.  Okay.  And then Exhibit N -- we are
17   having a little trouble moving this around.  Do you have N
18   there with you?
19        A    Yes, sir.
20        Q    Okay.  In the top picture, there's a device in a
21   red box that looks like it's on the pole next to a sign
22   that says speed limit.  Do you see that?
23        A    Uh-huh, yes, sir.
24        Q    Okay.  What is that device?
25        A    I can speak to that.  That is a -- that is a

1  **mechanism that we have in order to deploy the tire**

2  **deflation devices remotely when we have a high-speed**

3  **event.**

4      Q    Okay.  So, Agent Teran, trying to bring this to

5  a close here.  I need to get some clarification on this

6  issue of the non-compliant motorist.

7          Is it your position, as the Border Patrol

8  representative and thus the Border Patrol, that until an

9  agent is satisfied that somebody is a U.S. citizen when

10 they refuse to answer the question that you can keep them

11 there indefinitely?

12     **A    Yes, sir.**

13     Q    Okay.  Okay.  You were unable to answer a lot of

14 questions on Attachment A, and I guess we'll deal with

15 that at a different point in time.  But, at this point,

16 we're done with you.  And I really appreciate, Agent

17 Teran, you sitting through this.  This is not a fun way to

18 spend the afternoon.  So stay healthy, and I appreciate

19 your answers and your cooperation.

20     **A    Thank you.  You take care.**

21     Q    Okay.

22         MR. BASTRON:  Hang on.  Ryan should be able to

23     go next if he wants to answer some questions.

24         MR. ANDRUS:  I don't have any questions.

25         MR. BASTRON:  No questions?  Okay.  And I have

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 85

1          no redirect.  So we will read and sign.  And that

2          should be it.

3                  (Deposition concluded at 3:18 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 86

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF ARIZONA

 3

 4   TERRENCE BRESSI,                    )
                                         )
 5        Plaintiff,                     )CASE NO.
                                         )4:18-cv-00186DCB
 6   vs.                                 )
                                         )
 7   (1) PIMA COUNTY SHERIFF MARK NAPIER,)
     in His Individual Capacity, et al., )
 8                                       )
          Defendants.                    )
 9   - - - - - - - - - - - - - - - - - - )

10              DECLARATION UNDER PENALTY OF PERJURY

11            I declare under penalty of perjury that I have

12   read the entire transcript of my deposition taken in the

13   above-captioned matter, or the same has been read to me,

14   and the same is true and accurate, save and except for

15   changes and/or corrections, if any, as indicated by me on

16   the DEPOSITION ERRATA SHEET hereof, with the understanding

17   that I offer these changes as if still under oath.

18            Signed on the_____day of_____, 20__.

19

     _____
20   ROBERTO TERAN

21

22

23

24

25
```

1          DEPOSITION ERRATA SHEET
2

3     Page No._____Line No._____Change to: _____
4     _____
5     Reason for change: _____
6     _____
7     Page No._____Line No._____Change to: _____
8     _____
9     Reason for change: _____
10    _____
11    Page No._____Line No._____Change to: _____
12    _____
13    Reason for change: _____
14    _____
15    Page No._____Line No._____Change to: _____
16    _____
17    Reason for change: _____
18    _____
19    Page No._____Line No._____Change to: _____
20    _____
21    Reason for change: _____
22    _____
23
24
25    _____        _____
      ROBERTO TERAN                           DATE

Deposition of **ROBERTO TERAN**
**BRESSI v. NAPIER**

Page 88

```
 1                    CERTIFICATE OF REPORTER

 2

 3     STATE OF ARIZONA )
                        )              ss:
 4     COUNTY OF PIMA   )

 5
               I, Gina Castro, a Certified Shorthand Reporter
 6     for the State of Arizona and Registered Professional
       Reporter, do hereby certify that the foregoing deposition
 7     was taken before me in the County of Pima, State of
       Arizona; that an oath or affirmation was duly administered
 8     by me to the witness, ROBERTO TERAN, pursuant to A.R.S.
       41-324(B); that the questions propounded to the witness
 9     and the answers of the witness thereto were taken down by
       me in shorthand and thereafter reduced to typewriting;
10     that the transcript is a full, true, and accurate record
       of the proceeding, all done to the best of my skill and
11     ability; that the preparation, production, and
       distribution of the transcript and copies of the
12     transcript comply with the Arizona Revised Statutes and
       ACJA 7-206(J)(1)(g)(1) and (2).
13             The witness herein, ROBERTO TERAN, reserved
       right to review and signature.
14             I FURTHER CERTIFY that I am in no way related to
       any of the parties nor am I in any way interested in the
15     outcome hereof.
               IN WITNESS THEREOF, I have set my hand in my
16     office in the County of Pima, State of Arizona, this 17th
       day of May 2021.

17

18

19

20                                 Gina Castro, CSR, RPR
                                   Arizona Certificate No. 50989
21

22             I certify that Colville & Dippel, LLC, has
       complied with the ethical obligations set forth in ACJA
23     7-206 (J)(1)(g)(1) through (6).

24

25                                 Colville & Dippel, LLC, RRF No. 1129
```

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 89

| **A** | | | |
|---|---|---|---|
| **aas** 56:17,18,19 61:19 | 51:13 | 58:13 59:5,14 | 70:15 |
| **ability** 34:24 65:9 88:11 | **additional** 25:9 29:20 38:9 45:24 67:16 77:25 80:21 | 60:15 63:12,12 63:19,24 64:19 65:5,24 66:20 67:9,15,19 | **aliens** 26:23 30:18 57:7 60:24 61:4,6 61:23 70:8 |
| **able** 5:25 6:3 14:12 27:10 55:11 84:22 | **address** 12:24 **addressing** 42:1 **administered** | 69:15 70:16 71:14,14,21 72:2,6,8,12,13 | **allocation** 10:14 **allow** 30:20 39:4 51:1 66:10 |
| **abovecaptioned** 86:13 | 88:7 **administration** 23:3,13 24:16 | 72:13 73:13,14 74:14,20 75:12 75:24 76:2,3,7 | 72:2,25 81:6 **allowed** 37:21 58:21 82:11,14 |
| **absolutely** 5:20 71:6,12 75:8 76:16 | **administrative** 44:23 56:19,24 57:6,13,14,16 | 77:11,18,24 78:1,4,22 79:1 80:14 81:23 | **allowing** 9:15 13:21 36:5 41:9 64:13 |
| **academy** 37:4,8 **acceptable** 58:18 | 61:18 **administrativ...** 6:23 | 82:24 84:4,9 84:16 **agents** 15:22,24 | 65:6 **allows** 41:11 73:19 |
| **accepted** 7:19 7:22,25 | **admitted** 2:25 6:7 34:25 61:5 | 21:17 24:8,19 24:24 25:1 | **alluded** 80:20 **america** 34:1 |
| **access** 24:10,11 31:14,17 33:9 65:25 66:2,18 70:21 71:1,4,9 71:13,14,15,18 71:21 72:1,2,6 72:22 73:1,14 73:19 74:15 75:13,24 | **affirmation** 88:7 **afield** 58:24 **afternoon** 84:18 **agency** 22:25 23:2 24:15,20 33:10 46:8,22 55:11 67:23 | 34:12 35:1 36:24 41:12 44:22 48:10 58:25 65:1,8 66:10,15,22 67:7 68:12 70:10 71:1,15 74:10 76:16,24 79:25 | **amount** 21:11 21:15 49:4 61:23 **amy** 2:12,14 11:6 **amyknightlaw** 2:14 **analyze** 25:1 **andor** 66:16 86:15 |
| **accessed** 73:6 **accessible** 78:9 **accessing** 72:1 76:2 | **agent** 4:6 5:5,19 6:10,19,21 7:5 7:9 8:1,3 10:25 11:9 12:16,20 | **agree** 24:1 42:19 **agreed** 8:21 **ahead** 16:23 | **andrus** 2:24 84:24 **annually** 59:21 |
| **accurate** 8:17,18 18:23 53:4,9 86:14 88:10 | 15:3 17:8 19:4 22:2 24:11 25:19,19 27:21 30:24 31:20 | 22:23 39:8 46:15 **air** 63:8 **ajo** 32:10 | **anomalies** 64:3 64:11 **answer** 5:8,18 10:18,23 12:23 |
| **acja** 88:12,22 **acting** 6:21 **active** 8:21 | 32:12 33:16 34:14 35:15,15 35:16 36:8,8,9 36:13,15 40:16 | **al** 1:7 86:7 **albeit** 24:2 **alert** 51:2,7 | 15:22 16:6,23 17:6 18:12 22:14 24:6 |
| 24:11 38:10 39:17 | 43:11 44:14 47:12,16 48:13 | 67:14 **alerts** 36:2,19 | 26:3 28:25 30:10,16 31:10 |
| **activity** 42:8 57:17,20 67:18 70:10 74:21,23 76:18,21 | 48:14,16 49:16 50:12 51:1,11 52:22 53:1 54:11,22 56:8 | 79:25 **alien** 26:23 56:19,20 57:6 57:8,14 61:1 | 32:1,5 33:14 35:6,23 37:2 41:4 42:17 |
| **actual** 50:9 | | | 43:14,18,24 44:8 45:23 46:15 49:15,16 51:18 54:11 55:24 56:3 58:3 59:19 61:7 63:23 64:24 65:8,21 66:25 67:11 68:20 75:5,15 77:25 78:18 80:15 81:11 82:14,16,20 84:10,13,23 **answers** 78:5,24 84:19 88:9 **anticipate** 38:21 **antismuggling** 7:13 **anyway** 12:14 **apparently** 24:3 **appear** 41:21 49:11 60:17,20 61:2,14,15,17 61:24 68:23 **appearances** 2:6 **appears** 11:10 63:19 **application** 3:12 3:14,15,16 41:17 81:15 **applications** 20:4 **appointed** 5:5,9 **appreciate** 84:16,18 **apprehend** 26:11 **apprehended** 16:14 27:10 60:19,19 61:12 **apprehension** 47:7,20 68:9 **apprehensions** |

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

47:5,24 55:8
68:6
**approach** 36:10
**approximately**
34:8 49:3
**april** 1:13 2:2
**arbitrarily** 30:6
**area** 30:23 34:15
40:22 41:1,7,7
41:9,10 44:3
45:15 52:3
77:9
**areas** 32:8,9,9
**arent** 78:21
**arivaca** 13:19
**arizona** 1:2,16
1:24 2:4,9,13
2:19 16:20
19:6,14 38:4
41:15 42:4
58:21,21 86:2
88:3,6,7,12,16
88:20
**arrest** 60:20,22
61:14,16
**arrested** 61:1
**arrests** 27:5,7
55:3,16 57:25
58:5,7 59:18
**arrived** 55:7
**arrives** 36:6
48:16 81:14
**arriving** 35:14
**articulate** 39:22
57:12
**aside** 54:20
**asked** 5:21 15:23
15:25 28:21
**asking** 22:7 44:1
44:1,4 68:8
74:24 81:16
**asks** 35:17
**asneeded** 48:6
**aspect** 57:11

**assign** 12:12
**assigned** 8:3,4
19:12,18 24:8
24:19,24 33:11
42:14 48:4
52:22 73:17
74:11,12
**assignment**
45:16
**assignments**
11:2
**assist** 39:13,18
42:1,5 46:1,2
62:22 67:20
78:10
**assistance** 39:19
39:20 45:25
80:23 81:25
**assistant** 2:23
**associated** 25:2
47:4 53:5
54:17,19 55:12
55:22 56:1
57:8 61:10
72:10 73:20
76:15
**assume** 6:4 62:8
**assuming** 46:17
57:3
**asterisk** 56:16
58:1
**attached** 23:17
40:21
**attachment** 6:11
37:13 84:14
**attempt** 16:17
**attempted** 47:10
**attempting**
18:25 47:9,14
**attempts** 26:24
**attend** 7:7
**attest** 42:11
**attorney** 2:8,23
**authority** 20:14

62:4 72:13,14
**authorization**
71:16
**authorized**
66:19 75:24
**automatically**
57:12
**automobile**
55:22
**automobiles**
55:14
**aware** 10:1
16:19 21:21
53:18

-----

**B**
**b** 3:9 5:6 16:23
35:5 72:13,13
88:8
**back** 7:14 27:16
65:7,10 70:9
81:22
**backscatter**
63:25 64:9
65:2
**backseat** 78:1
**base** 13:2,2,5
37:5
**based** 13:22
31:21 32:2
35:3 52:24
65:1 67:15
71:13 74:22
76:1
**basic** 13:23
**basis** 48:6 75:7
79:14
**bastron** 2:17,20
4:15 5:7 10:16
10:22 11:18,25
12:4,9,22 16:5
16:21 17:3,5
18:11 22:13,21
22:23 23:6

24:4 26:2 30:9
30:15 31:9
32:4 33:13
35:4,22 37:1
39:7 40:11
41:3 42:16
43:13,23 44:10
45:22 46:14
49:14 53:25
54:5 55:23
63:12,22 64:23
65:20 67:2,10
68:19 69:5,10
75:4,14 78:17
82:15 84:22,25
**bears** 30:6
**bed** 79:11
**began** 7:3
**behalf** 10:3
19:15,16
**belief** 74:23
76:16
**believe** 8:22 12:9
12:10 22:22,24
28:11 36:20
38:8 64:14
65:5 67:17
69:4 74:20
78:4 83:13
**believes** 78:22
**belong** 74:25
**belonged** 22:25
**belt** 79:25
**best** 30:19 88:10
**better** 4:25 5:1
5:13,16 6:1
9:18,19 36:3
74:8
**birth** 78:14
**bit** 5:15 29:6
37:11
**black** 62:21 83:9
**blast** 80:21
**board** 68:17,21

68:24 69:3,16
**bolo** 68:15
**bonnie** 2:23
11:22 62:18
69:8 80:11
**bonnies** 11:22
**border** 2:17,23
5:6 6:14,18 7:2
7:4,5,6,7,9,14
7:18 8:5 9:14
10:3,24 16:2
17:16 19:22,23
19:25 20:3,11
20:16,17 22:15
22:15,25 24:17
25:4 30:18,25
31:4,8,12,14
31:15,22 32:3
32:10,14,19
33:6,18,21,22
34:4,7,11
35:12,16 37:14
38:15 39:2,3
39:24 40:4,6
41:22 42:19
44:19 50:14
52:21 53:8
59:21 60:5
66:8,10 67:1
68:4 73:4
82:13,24 84:7
84:8
**borderline** 9:9
**bottom** 13:8,9
83:12
**boulevard** 1:24
2:13
**boundaries** 9:7
41:2,5
**boundary** 23:22
31:25 33:19,20
33:23,24,25
**box** 2:9 62:21
83:9,21

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 91

branch 48:4
bre 3:14,15,16
break 27:13,17
breakdown
   53:13
breakdowns
   53:19
bressi 1:4 2:24
   11:6 15:12,16
   16:3,7,19 35:2
   86:4
bring 84:4
brings 29:15
broadway 1:24
   2:13
broken 53:15
buildings 20:20
bus 55:17,19
   56:11
business 60:5
   83:4

**C**

c 3:10
call 38:5,5 42:24
   42:25 43:9
   45:13 48:14
   79:17 83:1
called 38:2 40:2
   40:9 41:22
   44:16 68:14
camera 13:7
   62:22 63:4,7,9
canine 25:20,21
   35:12,19 36:2
   36:4,7,9,10,18
   36:19 51:2,3,4
   51:7 77:7
canines 35:21
canopy 83:9
cant 10:20 13:15
   14:5 28:3 46:9
   46:19 62:8
   83:14

capabilities
   63:17
capability 48:9
   63:20 66:23
   72:1
capable 71:20
capacity 1:7
   86:7
capture 66:23
car 25:16 34:12
   79:1
care 60:5 84:20
career 7:3 16:12
carry 62:10
   78:13
cas 56:17,18,20
   57:22
casa 17:12
case 1:5 10:11
   18:8,9 19:11
   52:21 57:6,14
   57:16 58:17
   59:25 62:10
   63:14 76:21,22
   77:19 81:20
   86:5
cases 36:21
cassidy 2:25 6:7
castro 1:16 2:3
   88:5,20
catch 27:11
category 57:4
   59:16
cause 34:20 36:5
   36:19 38:8
   64:14,21 65:4
   72:18 76:16
   77:8 80:21
cell 66:13,20,22
   67:1,24 68:13
cellular 66:23
center 45:3
certain 30:22

44:3,5 71:15
   72:9,9 73:18
   74:2
certificate 88:1
   88:20
certificates
   78:14
certified 2:3
   72:8 88:5
certify 88:6,14
   88:22
challenges 14:5
   14:7 15:9
change 21:5
   87:3,5,7,9,11
   87:13,15,17,19
   87:21
changed 83:1
changes 86:15
   86:17
characterized
   61:21
charge 6:20,21
   8:1 24:11
charged 16:14
   61:11
check 11:17 16:8
   21:24 29:10
   66:1 73:15,16
   74:10 75:17
   82:3
checking 22:8
checkpoint 3:17
   6:25 7:17 8:6,7
   8:8,10,13,16
   8:24 9:2,11,16
   9:22 10:4,11
   11:1,11 12:15
   12:25 13:6,25
   15:13,18,19
   16:9,13 17:10
   17:25 18:2,25
   19:5,13,24
   20:4,5,6,12,13

20:20,24,25
   21:2,4,8,11,13
   21:18,19,25,25
   22:1,3,6,11
   23:5,8,9,15
   24:2,8,19 25:5
   25:8,17,25
   26:12,19,24
   27:23 28:12,23
   28:25 29:3,5,9
   29:12,17,19,22
   30:2,5,5,8,14
   30:17,18,25
   31:5,7,21 32:2
   32:6,7,16,22
   33:2 34:7,13
   34:17 35:13,17
   37:8,12,16,17
   38:1,5,22,24
   39:1,5 40:8
   41:6,8,12,21
   41:25,25 42:7
   43:2,7 45:6,18
   45:19 47:1,3,5
   48:8,10 49:2
   50:5,10,13,16
   50:18,20 53:5
   53:15,19 54:20
   55:1 56:23
   58:12,23,25
   62:14,24 63:1
   63:19 64:6
   65:10,18 66:21
   70:1,11,15,20
   72:11 74:5,12
   76:15,19 77:14
   78:7 79:5,10
   79:13,17 80:8
   80:20 81:4,8
   81:13,15,24
   82:17 83:4
checkpoints
   8:21,25 13:2
   13:13,18,23

15:20 16:16
   18:23 20:8,9
   20:15,19 25:10
   27:7,9 28:19
   31:3
checks 72:9,16
   74:22 76:9,25
chief 5:10,20
   8:20 28:11,11
   59:23 60:1
child 38:6
chosen 10:12
chuckle 82:23
circumstance
   57:10
circumvent 9:15
   18:25 62:23
   63:16
citizen 47:7
   60:18,21,23,25
   61:13,17,22
   62:1,3,4 77:15
   77:18,22 78:15
   78:23 79:2,8
   81:5,18 82:18
   82:22 84:9
citizens 22:8
   26:1 60:18
   70:8
citizenship
   15:23 35:18
   36:16 37:6
   77:13 78:7
   80:15 81:11,16
claim 75:22
clarification
   84:5
clarify 27:21
   33:16 44:15
classification
   30:7
classified 57:7
clause 8:20
clear 4:19 49:13

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 92

81:10
**clearly** 41:7
**client** 15:11
  60:10
**close** 19:14
  21:14,15 29:21
  84:5
**closer** 4:11
**closeup** 83:11,13
**coconspirator**
  55:9
**cocounsel** 11:6
  60:10
**collect** 70:4,6
  77:5
**collected** 25:2
**collection** 33:8
**collections** 52:23
**colville** 1:23
  88:22,25
**com** 2:10,14,20
**come** 14:25
  27:16 31:16
  38:6 39:13,18
  42:21 45:14
  52:15 75:17
  82:17
**comes** 8:3 80:18
**comfortable**
  8:23
**coming** 4:18
  9:14 13:20
  26:16 30:21
  31:3,22 32:8
  55:10 81:3
**commander**
  7:24 43:4
  44:17,20,21,22
  45:1,5,8,10,20
**commanders**
  17:22,22
**commands** 16:1
  44:21
**commenced**

2:25
**commission** 80:8
**commodity**
  26:10
**common** 15:17
**communicated**
  39:19
**communication**
  36:7
**communities**
  42:2
**community** 42:5
**compartment**
  64:3 77:9
**compilation**
  52:10
**complete** 46:18
  73:10
**completely** 8:18
  40:20
**complied** 88:22
**comply** 81:18
  88:12
**computer** 14:15
  14:20 48:18
  52:20
**computers** 73:6
  73:14 75:25
**conceal** 47:14
  49:21
**concealed** 25:23
  26:1 36:20
  47:9,18 77:10
**concerned**  53:9
**concluded** 85:3
**conduct** 20:17
  77:9 81:5
  82:21
**confer** 60:9
**confused** 69:12
  72:5 75:19
**confusing** 44:15
**confusion** 58:9
  69:9

**consent** 64:12
  65:5 67:12
**consider** 19:23
**considered** 34:1
  56:5,13
**consolidate** 48:5
**contact** 19:14
  64:19
**continue** 18:24
  25:6 81:6,8
  82:23 83:2
**contraband**
  26:16 36:1
  48:17 64:14
**contract** 38:14
**control** 44:23
  65:6
**conveyance**
  56:14
**cooperation**
  84:19
**cooperative** 82:8
**copies** 88:11
**coprincipal** 55:5
**copy** 51:14,22
**correct** 6:15 8:7
  9:6,8 10:6
  13:14 15:13
  16:20 17:2,10
  19:18 23:24,25
  28:15 29:1,7
  31:1 35:21
  38:18 40:10,23
  45:21 49:9,10
  51:7 53:2,11
  53:16 57:5,22
  57:23 60:6
  64:17 65:3,12
  66:4,8 79:6
**corrections**
  86:15
**correctly** 9:4
  28:25 32:14
  66:5

**couldnt** 13:3
  22:17 26:6
  32:23 71:23
**counsel** 2:6 5:10
  5:21 59:23
  60:2
**count** 50:12
**counter** 50:11
**country** 36:16
  36:18
**county** 1:7 37:24
  38:6,10,14,21
  39:13 40:7
  41:24 42:7
  45:11 86:7
  88:4,7,16
**couple** 27:21
  77:11 82:3
**course** 7:7 68:25
**courses** 73:8
**court** 1:1 5:11
  5:15,24 6:1,6
  11:16,17 12:12
  59:12 86:1
**covered** 13:18
  27:22 40:22
**cr** 1:16
**crane** 62:14
**cranelike** 62:21
**create** 58:14
  83:5
**created** 12:21,24
  36:24 45:13
  46:21 51:5
  58:10,11 59:24
  73:4
**creating** 48:18
  53:2 67:13
  80:21
**credit** 51:4
**credited** 51:7
**crime** 39:11
  58:22
**crimes** 41:25

71:7
**criminal** 56:20
  56:25 57:8,8
  57:12,17,20,21
  61:19 71:19
  74:21,23 76:10
**criteria** 77:13
**crossverified**
  25:14
**csr** 1:16 88:20
**current** 21:10
**currently** 6:20
  9:20 22:18

---
**D**

**d** 3:10
**daily** 7:17
**data** 24:16 25:1
  25:2 33:8 47:1
  47:2,3,8,17,23
  47:25 48:7,14
  49:5,8 50:4,8
  50:25 51:5
  52:17,23 53:1
  53:3,15,19
  54:18 56:4,9
  57:4,25 58:10
  59:24 60:4
  65:7,9,11
  72:22
**database** 48:2
  48:11,15,20
  50:25 51:4,23
  52:1,25 67:24
  68:2,3 70:21
  70:25 71:2,4
  71:15 73:16
  74:15 75:13,25
**databases** 66:3
  68:4,13 73:6
**date** 8:19 21:19
  87:25
**dated** 11:10
  13:12

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

day 29:25 43:1
  44:4 50:6
  67:21 86:18
  88:16
days 29:24
dcb 1:5
dea 23:4 24:1
deal 84:14
dealing 46:5
  68:6 72:10
  75:9
decades 16:4
december 27:3,3
  52:5
decide 82:19
decided 28:24
decision 10:4
decisions 10:13
  10:21
declaration
  77:15,17 78:15
  86:10
declare 86:11
deemed 33:12
defendants 1:8
  2:16 86:8
defer 76:11
define 15:21
definitely 71:4
deflation 84:2
degree 24:14
deleted 51:21
dennis 2:17,20
denominating
  21:5
denominations
  21:7
department
  19:6,14 39:12
  41:16 68:16
  80:23
depending 72:24
depends 71:21
deploy 84:1

deployed 23:14
  35:12,19
deposition 1:10
  2:1,25 5:22 6:8
  6:11 8:12
  11:19,20 85:3
  86:12,16 87:1
  88:6
deputies 38:21
  39:4,25 42:13
  44:5 45:11
  46:18
deputy 6:19 8:1
  40:8 41:20
  42:4 45:19
  46:20,20
describe 47:8
describes 13:13
describing 47:12
designated
  45:15
designation 8:8
  16:23 35:6
  45:11
detailed 7:11,16
detain 42:6
  78:11
detained 29:9
detaining 81:9
detect 25:13,15
  32:7 35:24
detected 26:1
detecting 25:23
detection 25:9
  62:12,23 79:16
detects 25:22
deter 32:7
determination
  9:21,23,24
  22:7 36:25
  42:13,20 44:9
  49:25 69:17
  77:6,19
determine 29:3

30:8,13 34:24
  36:13,15 37:6
  38:9 59:1
  61:19 64:8
  66:1 81:16
  82:4
determined 9:18
  44:7
determining
  30:4 39:16
  77:13
device 79:24
  80:2 83:9,13
  83:20,24
devices 66:11,15
  66:15 73:25
  74:5,6 79:16
  84:2
dhs 5:21
didnt 10:25
  12:13 13:17
  20:18 22:20
  28:24 38:20
  39:21,22 46:20
  46:20 50:19
  65:16 72:12
differ 55:2
difference 21:7
  21:24 49:20,22
  56:21 58:4
  75:1,12
different 17:13
  22:25 24:15
  35:11 56:11
  57:4 58:19
  68:4 69:6 71:5
  73:9 82:3
  84:15
differentiate
  25:18
differentiation
  47:11
dippel 1:23
  88:22,25

direct 31:14
directed 43:4
directives 73:4
directly 9:17
  29:6 43:16
  45:17
disclosed 19:11
  53:25 54:2,9
  62:13
disclosure 18:7
discussed 29:6
discusses 30:4
discussing 28:19
  59:15
discussion 70:9
dispatch 39:19
  39:20 80:25
disposed 51:24
disseminate
  48:5
disseminated
  17:15,23
distinct 82:19
distracting
  15:24
distribution
  88:11
district 1:1,2
  86:1,2
division 2:18
document 11:9
  11:25 12:2,15
  12:16,20,24
  13:21 14:1,4,6
  14:25 15:3,6
  15:17 17:14,15
  17:17,20,21
  18:3,7,10,14
  18:18,21 26:25
  27:24,25 28:8
  28:11,14 41:15
  43:21 46:12
  49:19 58:6
documentation

36:17 46:19
  51:25
documents 22:9
  36:12,23 37:4
  37:7,9 54:17
doesnt 22:12
  49:20,22 50:12
  54:13 57:16
  72:2 75:17
  78:2,21
dog 25:18 79:20
dogs 25:4,7,12
  25:23 35:10
doing 51:11,25
  80:14 81:12
dont 4:15 10:3
  11:13 13:6,16
  14:5 18:13
  23:10 26:6
  27:15,16 28:5
  28:6 33:15
  35:8 37:17
  38:3 42:2,6,18
  42:22 43:25,25
  48:9 50:7,11
  51:21 56:6
  58:3,16 59:17
  59:19 62:16
  63:14 65:16
  66:17 68:11,21
  72:16,25 73:2
  75:21 76:24
  78:10,10,13
  79:8 84:24
drive 49:1 70:5
driver 34:22
  35:15,17 55:19
  58:13,16 61:11
  61:13 64:13
  65:5 72:19
drivers 72:22
  73:1,15
drives 73:24
dropping 26:18

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

**drug** 23:3,13
 24:15
**due** 9:11 20:1
 74:2
**duly** 4:2 88:7
**duties** 29:18
 37:20 66:16,17
 71:6
**duty** 11:1 43:9
 43:10

**E**

**e** 2:8,8 3:11
**e3** 68:10 71:12
**earlier** 26:14
 40:20 45:15
 62:25 80:20
 81:4
**east** 1:24 2:13
 9:17
**eastwest** 31:2
**easy** 78:8
**echoey** 5:16 6:2
**effect** 38:17,18
 39:23 42:10
**effective** 10:14
**effectiveness**
 30:13
**efforts** 32:20
 78:11
**eid** 52:17
**eight** 21:12
**either** 36:20
 57:9
**elaborate** 66:12
**ellinwood** 2:8,8
 2:23 3:4 4:5,17
 4:21 5:1,3,4,17
 5:24 6:4,8,9
 11:3,8,15,21
 12:3,8,11,19
 14:9,11,24
 15:1,2 27:13
 27:20 40:13,15

44:11,13 54:4
 54:6,10 59:10
 60:9,14 62:18
 69:7,14 80:11
 80:13
**email** 3:13 12:7
**employee** 16:20
**encompasses**
 6:24 7:18,20
**encompassing**
 41:10
**encounter** 47:13
 75:9 76:14
**encounters**
 26:19 79:2
**encroachment**
 3:12,14,15,16
 19:5,10,21
 23:17,22 33:18
 40:21,22 41:7
 41:16
**endangerment**
 57:11
**endofshift** 46:18
**endofyear** 54:12
**enforce** 38:4
 42:8 46:9 75:8
**enforcement**
 10:14 20:17
 23:3,13 24:16
 37:12,15,20,21
 37:24 39:25
 41:6 42:3,8
 43:22 46:22
 48:2 63:11,13
 63:16 65:22,23
 66:3,18 70:3
 71:3 75:2,23
**enforcing** 38:25
**engaged** 69:4
**enhance** 39:1
**ensure** 29:18
**entails** 6:22
**enter** 25:1 31:17

31:24 48:19
 65:9,11 68:10
 72:2
**entered** 48:3,7
 48:15 52:23
**entering** 19:1
**enters** 50:12
**entire** 21:10
 40:22 42:9
 47:13 86:12
**entirety** 77:5
**entitled** 14:4
**entry** 50:25
 52:25 65:7
**equipment**
 20:21 21:16
 62:12 74:9,10
 79:23
**equivalent** 19:22
 19:24 31:15
 33:17,22
**errata** 86:16
 87:1
**establish** 10:4
 20:14 32:20
**established** 8:19
**establishes** 73:5
**establishing**
 13:23
**establishment**
 28:23
**et** 1:7 86:7
**ethical** 88:22
**event** 55:20 56:5
 56:6 57:2,22
 59:9 71:12,13
 84:3
**events** 48:18
 52:15 54:19,24
 54:25 55:22
 56:12,16 59:16
**everybody** 27:16
**everybodys** 72:7
**exactly** 36:13

77:4
**examination** 3:1
 4:4 64:6
**examine** 64:9
**examined** 4:3
**example** 26:11
 39:9 42:3 46:1
 47:6,18 48:12
 55:6 65:23
 70:22 72:20
 76:5 77:21
 80:19
**excuse** 35:13
**exempt** 16:10
 79:5
**exhibit** 3:8,9,9
 3:10,10,11,11
 3:12,13,14,15
 3:16,17,17,18
 3:18,19,19,20
 3:22 11:13,15
 12:15 13:12
 15:6 17:14
 18:18,22 27:23
 28:9 41:8,14
 52:4 53:2,14
 54:23 56:15
 57:25 59:20
 61:24 62:13,18
 62:20 63:23
 69:7,15 83:7
 83:16
**exhibits** 3:7
 11:18,20 53:21
**existence** 68:18
**experience** 8:2
 80:17
**expertise** 52:3
**extenuating**
 57:10
**extract** 52:24

**F**

**f** 3:11

**fact** 9:1,1 69:25
 74:23 79:2
**factors** 67:16
 78:22
**facts** 49:18
**failure** 39:13
**fair** 60:8
**fairly** 69:25
 81:19
**fall** 59:8,15
 61:18
**familiar** 9:1 10:7
 10:10,15 11:9
 12:17 19:4
 20:6 37:13
 38:13 44:16
 45:9 52:8,10
**family** 56:22,23
**far** 28:17 53:8
 53:14 58:24
**federal** 24:15,20
 31:13 58:22,22
**feel** 6:13
**field** 10:12
**figure** 52:15
**file** 71:11,12
**files** 71:9
**fill** 58:16
**find** 14:13 76:9
**firm** 2:12
**first** 4:2 47:2
 49:25
**five** 51:22
**fixed** 10:11
**flow** 18:24 20:2
 39:14 78:10
 81:8
**folks** 27:11
 61:12 81:9
**follow** 16:1
 76:11
**follows** 4:3
**followup** 82:21
**followups** 77:11

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

**foot** 9:13 63:1
**footprint** 21:10
  23:8,14,16,23
  24:3 38:24
  39:5 40:1,18
  40:25
**forbid** 76:10
**force** 24:24
**foregoing** 88:6
**form** 10:16,22
  18:11 22:13
  23:6 24:4 30:9
  30:15 31:9
  32:4 35:4,22
  39:7 40:11
  41:3 42:16
  43:13,23 44:10
  45:22 46:14
  49:14 51:14
  53:20 54:6,8
  55:23 59:20
  60:3 63:22
  64:23 67:2,10
  68:19 69:5
  75:4,14 78:17
  82:15
**forms** 54:1
  65:12
**forth** 88:22
**forthcoming**
  78:5
**found** 14:18
**foundation** 5:7
  12:22 13:2,5
  16:5,21 18:11
  26:2 30:9,15
  33:13 35:4
  37:1 65:20
  69:5
**four** 21:12 54:9
**fr** 31:12
**fr21** 31:12
**freezing** 14:15
**front** 53:7

**full** 4:6,8 80:21
  88:10
**fully** 29:25
**fun** 84:17
**function** 75:6
  83:3
**functional** 19:21
  19:24 33:17
**functions** 39:1,6
  43:3 72:9
**further** 31:18
  36:5,22 50:1
  67:14,21 70:7
  79:3 82:9
  88:14

### G

**g** 3:12 88:12,23
**general** 8:3
  28:13 41:25
  46:25 71:7
  80:8
**generate** 43:12
  46:11,16 47:3
  59:2,5 65:12
**generated** 47:1,2
  50:4,9 58:20
  59:21 60:4,4
  73:25
**getting** 11:24
  27:11 44:14
  54:22 56:8
  71:13
**gina** 1:16 2:3
  88:5,20
**give** 21:22 51:3
  51:3 58:11
  60:16 63:15
  70:25 77:7,21
**given** 12:5 50:5
  74:6
**gives** 13:10
**glad** 65:15
**go** 15:4 16:23

17:9 22:23
  29:12 36:11
  39:8 43:17
  44:3 45:16
  46:15 47:25
  48:17 51:17
  58:14 60:11
  65:10 72:16
  73:11 79:3
  81:22 82:1
  84:23
**god** 76:9
**goes** 64:5
**going** 8:21 11:3
  11:5 13:1
  16:22 26:22
  27:13,14 29:6
  29:11 39:15
  40:13 43:9
  50:5,9,15 51:9
  55:12 57:13
  59:1 60:10,16
  61:25 63:13
  65:7 70:9 76:7
  78:15,22 80:16
  82:8,20
**gonna** 81:24
  83:5
**good** 26:12 27:8
  77:15 80:9
**gotta** 72:18
**gotten** 26:8 74:8
**government**
  5:22 24:21
**governmentiss...**
  66:22
**grande** 17:12
**grant** 42:15
**granted** 33:9
**graph** 59:19
**greets** 35:15
**group** 26:11
  44:21 60:19
**guess** 12:14

43:25 54:7
  65:11 69:11
  75:11,18 84:14
**guide** 36:24
**guidelines** 67:8
**guys** 11:19 69:6

### H

**h** 3:13
**hand** 88:15
**handler** 25:20
  36:7,10
**hang** 53:25
  84:22
**happens** 36:3
  47:25 68:8,12
**hard** 4:10 5:12
  68:25 73:24
**hasnt** 83:1
**havent** 12:5 16:4
  79:21
**head** 26:7 70:17
**heading** 14:7
**headphones**
  13:16
**healthy** 84:18
**hear** 5:25 6:3
  13:3,15,17
  22:17 32:23
  50:19 51:18
  71:23
**hearing** 4:10,15
  5:12 6:5
**hell** 48:17
**help** 27:8 80:9
  81:2
**hereof** 86:16
  88:15
**hes** 79:14
**hey** 81:22
**hidden** 64:15
**hiding** 79:11
**highspeed** 84:2
**highway** 3:12,14

3:15,16 15:13
  17:10 19:24
  20:12 31:1
  41:16 46:3
**hint** 13:10
**history** 75:17
**hold** 76:13,16,21
**holding** 80:24
**hole** 2:23 14:25
**honk** 15:24
**honking** 81:12
**hope** 33:6
**horn** 80:21
  81:12
**hour** 50:6
**hours** 21:12,12
**human** 26:19
  47:4 52:21
  64:15 69:4
  70:12
**humans** 16:15
  25:10,13,17,18
  25:19,24 26:10
  26:17 36:1,20
**humphrey** 2:24
**hundreds** 79:14
  79:14
**hypothetical**
  58:12 60:16

### I

**i44** 51:14 56:1
  58:10 59:5
  61:22 65:12
**i44s** 51:12 67:25
**id** 19:9 33:16
  37:11 46:25
  62:11 73:23
**idea** 9:23 35:7
  83:14
**identification**
  73:18 76:6
**identified** 12:4
  18:8 39:16

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

55:7 67:15
69:1 82:18
**identifies** 35:15
**identify** 33:8
64:3,11 67:12
67:21 76:8
77:4 80:2,9
81:2,17
**identifying**
74:18
**identity** 82:5
**ill** 6:4 11:22
65:14
**illegal** 30:17
34:16 76:18
**illegally** 19:1
25:10 31:17,24
**im** 4:10,10,15,19
5:11,11 8:18
8:18,22 10:1
11:3,5 13:6,15
14:12,14,14,18
15:1,1 16:21
18:17 19:15
21:21 22:17
23:10,10 25:20
25:21 27:13,14
34:3,3 40:13
41:5 43:18
44:4,4,14,15
46:17 50:19
51:9,13,15
54:7,15,20,22
55:6 56:8 57:1
57:2 59:12,17
60:10,16 63:12
66:13 68:8
71:23 72:5,23
75:18 77:15
78:15 81:23,24
82:20
**images** 66:24
68:15 69:16
**immediate**

48:25
**immigration**
22:4,5,6 27:6
34:16,17 35:17
39:1 51:6
57:18,21 60:22
61:14,16,25
62:2,3,6 64:20
71:6,9,11,12
73:16 75:6,8
75:10,13,16,18
75:22,23 77:7
82:21 83:4
**immigrationled**
34:18
**immigrationr...**
27:5 46:5
52:15 56:16
57:2 62:8 75:2
**impact** 29:8
**impacts** 29:6
**impeding** 39:11
39:14
**inception** 26:5
50:22
**incident** 48:19
56:17 58:19
62:7 72:18
**incidents** 27:5
55:7
**included** 15:15
15:16 60:21
**includes** 6:24
**including** 55:18
**incorporate** 49:3
**increase** 9:13
19:1 26:23
27:6
**increased** 26:9
**increases** 57:11
**increasing** 27:12
**indefinitely** 52:2
74:1 84:11
**index** 3:1,7

**indicate** 51:1
**indicated** 47:15
86:15
**indicating** 8:20
49:18
**indication** 34:22
**individual** 1:7
55:15 58:17
72:10 73:12
86:7
**individuals**
60:20 71:5
**info** 52:18
**information**
11:1 24:13,21
24:22 29:2
30:12,13 48:3
48:5,11,20,21
50:7 52:1,18
52:24,25 53:4
53:4,6,10 56:2
63:10,15 66:1
67:15,20 68:5
69:20,21,23,24
70:3,4,6 71:1,5
71:13 72:24
73:1,25 75:12
76:3 81:1
82:10
**infraction** 37:19
**infrastructure**
30:22
**initial** 47:13
64:19
**input** 48:11
**inside** 26:22
41:1
**inspect** 16:9
41:11
**inspecting** 38:7
**inspection** 16:10
34:15 36:6
50:3 64:10
66:17 79:5

**inspections**
30:20
**instance** 58:4
71:9,19
**instances** 16:12
**intelligence** 7:12
24:23 33:11
63:17 67:20
68:16 69:18
**intending** 62:23
**interest** 25:16
74:20
**interested** 88:14
**international**
31:25 33:25
**interrupt** 5:12
**investigate** 70:7
82:9
**investigation**
36:22 46:17
50:1
**involve** 57:17
**involved** 55:10
57:3 67:17
**involving** 59:4
**ipad** 66:13
**isnt** 17:8 30:24
39:24
**issue** 14:16 65:7
67:4 84:6
**issued** 66:22
68:13 74:9
**issues** 6:14 75:2
75:3,24
**itd** 9:19
**ive** 4:17

---

**J**

**j** 3:15 88:12,23
**january** 33:4
**jeff** 2:23
**job** 9:18
**joint** 58:13
**july** 33:4

**justification**
32:1,6
**justifications**
13:13 18:22

---

**K**

**k** 3:16
**keep** 21:16
39:14 40:18
84:10
**keeping** 42:5
**keeps** 81:3
**kept** 50:15 55:21
56:4,10 73:13
73:16 74:4
**kind** 19:17
24:20 43:12,20
44:15 46:11,12
47:10 56:11
63:20
**kinds** 56:9
**kitt** 17:1,9 29:7
**knight** 2:12,12
11:7 14:8,10
**know** 4:15 6:5
8:19 10:3
12:13 13:7
15:15 16:17,24
18:12 19:9
21:12,23 25:22
26:6,7,25 28:5
28:6,17,24
29:2,5 30:7,12
33:15 34:6
35:8 42:12,18
42:22,23 46:24
51:14,21 52:13
56:6,6 58:3
59:17,19 63:9
63:16 68:3,11
68:21,23 69:21
72:19,23,25
73:2,3 76:8,24
79:7,8 82:25

knowledge
  10:25 14:3
  18:20 28:20
  37:10 38:23
  40:3 42:11
  47:19 49:5,7,8
  49:10 50:18,21
  50:24 53:24
  54:12 56:13
known 16:3,7
  82:13
knows 79:1
  81:25

**L**

l 3:17 12:4,15
  13:12 15:6
  17:14 18:18,22
  27:23 28:9
lack 36:2
language 10:10
  10:15 18:18
  28:22 30:3,7
  33:18
laptop 13:8 72:8
laptops 65:15,17
  65:18 66:2,7
  70:20 71:8,17
  71:18 72:21
  74:15 81:1
large 62:14,21
  70:1
law 2:8,12 37:12
  37:15,23 38:4
  39:24 43:21
  46:9,21 63:10
  63:13,16 65:22
  65:23 66:3,18
  70:3 71:3 75:2
lawfully 34:24
  61:5
laws 75:8
lays 40:21
lead 31:11

leading 41:8
  67:16
leads 78:4
leave 60:15
leaves 48:1
leaving 12:12
legal 22:9 58:21
  61:6 62:4
legalization
  26:22
legally 22:10
  34:25 36:16
  82:11
letters 12:13
level 64:21
license 22:11,16
  22:19 23:4,7
  23:12,21 24:2
  24:12 25:3
  32:13,15,20,25
  33:6 65:25
  66:1 70:22
  72:22 73:1,15
  82:3
limit 51:12
  83:22
limited 10:14
  24:10 72:7
line 87:3,7,11,15
  87:19
list 62:13
litigation 74:2
little 5:13,15,16
  6:2,2 37:11
  44:14 72:5
  82:23 83:17
live 8:25 29:12
llc 1:23 88:22,25
load 48:13 68:5
loaded 67:24,25
  68:2,3
local 37:11,15
  37:23 39:24
  43:21 46:8

80:23
locate 9:22,24
  30:5
located 9:20
  23:9 30:22
  45:1,3,5
locating 30:14
location 9:2,17
  9:25 10:5,11
  20:1 21:10,13
  30:4,18 31:16
  35:13,14 36:6
  36:9 42:25
  43:5 74:11
  80:9,18 82:2
locations 20:15
  20:22 30:19
  31:13 43:2
long 4:22 7:1
  23:4 51:19
  68:17,22 78:11
longer 20:19
  46:3,4
look 46:16 63:7
looked 17:15
looking 14:14
  27:4 41:14
  54:23 70:17
  72:3,4 74:24
  75:16 82:20
lookout 67:14,14
  68:14
looks 27:15
  62:14 83:21
lot 5:1 20:21,21
  26:14,16,16
  42:3 84:13
loud 4:18
loudly 15:24
low 34:21

**M**

m 1:14 2:2,2
  3:17 27:18,19

60:12,13 80:12
  85:3
maam 5:14
machine 63:25
  64:1 65:3
madam 5:24
  11:16
main 30:22
maintain 51:22
maintained 7:8
  73:25
major 31:11
majority 29:23
  81:18
making 10:13,21
  22:6 36:24
  49:24
management
  48:4 52:22
manpower 43:1
  43:3
map 23:16 40:20
  41:1,2
marijuana
  48:13 58:13
  59:2 76:5
mark 1:7 65:16
  86:7
marked 41:7
marker 9:20
martinezfuerte
  10:8 28:22
  30:3
materials 74:13
matter 16:11
  25:16 86:13
mean 17:24
  20:13 22:5
  23:11,16,19,23
  25:22 29:8,24
  37:24 43:6
  54:24 56:18
  63:17 75:7
means 17:19

21:6 29:19
measures 39:2
mechanism 84:1
member 56:22
  56:23
memorandum
  3:9,11
mentioned
  15:12 57:5
  81:4
mere 34:15,18
  34:19,22 35:3
  64:20 74:16,24
metric 54:19
mexican 31:22
  32:3 33:20
mexicantohono
  34:7
mexico 26:13
  33:21,25 34:4
mic 4:11 27:14
microphone
  13:7
mile 9:20
milepost 9:5,22
miles 20:3 34:6
  34:8
mine 4:17
minibus 56:11
minimizing 9:19
minute 32:11
  44:12 51:9
minutes 49:3
  60:11
missing 38:6,7
  39:16
mission 20:17
moment 11:4
  45:12 50:5
motorist 39:10
  46:2 65:24
  66:21 67:9
  77:22 78:6
  79:13 80:15,16

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

80:19 81:10,14
81:16 82:10
84:6
**motorists** 21:17
30:6 67:13
77:24 81:18
**move** 4:11 15:25
21:9,9,14
26:21 27:22
78:9
**moved** 9:2,10,11
**moves** 78:24
**moving** 20:19
83:17
**multiple** 16:7
**mute** 11:4 27:14
40:13 44:11
60:11

———— **N** ————
**n** 3:18 80:12,12
83:16,17
**name** 4:6,8,9
70:5 83:1,1
**napier** 1:7 86:7
**narcotic** 56:25
59:4
**narcoticrelated**
54:25
**narcotics** 16:15
25:15 26:16
35:21,25 57:3
57:9 70:12
**narcoticsrelated**
54:24 55:2
57:24 58:2,5,6
59:9,16
**narrative** 49:17
**nation** 7:21 9:8
20:2 26:15
31:12,23,25
32:3,8 33:19
34:1,4,9 73:1
**nationwide** 71:1

72:22
**nature** 34:17
48:25 57:13
61:20 83:6
**ncic** 71:19
**necessary** 13:24
20:16 80:16
81:13
**need** 32:11 37:5
45:12 46:8
49:25 64:21
72:15,17,19
84:5
**needs** 36:13
48:23
**needtoknow**
48:6
**network** 71:19
**never** 11:18 23:9
24:11,12,12
25:20 32:15,18
32:18 33:9
37:25 45:16
60:7
**new** 81:23
**nine** 78:19
**nod** 82:23
**nogales** 7:4,5 8:3
**noncitizens** 61:4
**noncompliant**
84:6
**nonconceal**
49:21
**nonimmigration**
58:2
**nonimmigrati...**
57:25 58:7
59:18
**nonu** 26:1 47:7
60:18,23
**notice** 6:11
**notification**
38:11
**november** 27:4

52:5
**nuclear** 80:5,7
**number** 11:13
11:16 37:12
50:4,9,15
61:11 62:9
63:24
**numbers** 14:5
26:7,9,20
55:10
**numerous** 16:12

———— **O** ————
**o** 2:9 3:18 80:11
80:12 83:7
**oath** 86:17 88:7
**object** 5:7 10:16
10:22 12:22
16:5,21,22
18:11 22:13
23:6 24:4 26:2
30:9,15 31:9
32:4 33:13
35:4,22 37:1
39:7 40:11
41:3 42:16
43:13,23 44:10
45:22 46:14,14
49:14 55:23
63:13,22 64:23
65:20 67:2,10
68:19 69:5
75:4,14 78:17
82:15
**objection** 17:3,5
22:21
**obligation** 79:4
**obligations**
88:22
**observations**
65:1
**observes** 78:1
**obtain** 37:6
**occasions** 80:25

**occupant** 79:1
**occupants** 35:18
**occur** 64:16
**occurred** 49:6
49:12
**occurs** 46:11
**odor** 25:13
35:24,25 36:22
**offer** 86:17
**office** 5:10,20
45:3 59:23
60:1 65:10
88:16
**officer** 45:25
46:3
**officers** 10:12,20
16:1 37:25
**official** 6:19
**officials** 10:12
30:4 39:25
**oh** 54:5
**okay** 5:2,23 6:4
6:13,17 7:1
8:11,16 9:4,10
9:21,24 11:3,5
11:13 12:3,8
12:11,20 13:9
13:17 14:1
15:8,11,21
16:2 17:24
18:3,14,16,21
19:4,8,17,20
20:10 21:1,5
22:2,11 23:4
23:21 24:1,9
25:7 28:14,17
28:21 29:2,11
29:15,24 30:3
33:3 34:3,6,10
34:19 35:1,20
36:2 37:11
38:13,17,20
40:16 41:18,20
44:19,25 45:5

45:9 46:10,23
47:6,21,23
48:12,22 49:22
50:4,22,25
51:9 52:4,13
52:19 53:8,13
54:22 55:17,21
56:8,15 57:1
58:24 59:6,8
59:20,24 60:3
60:8,25 61:9
62:17 63:4,24
64:2,19 65:2,7
65:14,16 66:2
66:7,10,19
67:6 68:11
69:10,15 70:25
71:8 72:12,21
73:3,13,22,24
74:4 75:11
76:23 77:1,11
77:11,21 80:1
80:4,10 83:7
83:16,16,20,24
84:4,13,13,21
84:25
**once** 9:11 34:16
36:16,18 38:5
40:3 48:1 49:1
62:9 71:20
74:18 77:3
79:4 82:6
**ones** 12:5 68:11
**oodham** 7:21
9:8 20:2 26:15
31:12,22,25
32:8 33:19
34:1,4,9 37:25
**open** 21:15
**openair** 25:22
**operate** 13:1,24
**operating** 13:1
41:20 69:19
71:21,23

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

operation 7:17
  8:17 29:22
  38:14,20 39:23
  41:20 42:10,14
  42:23 44:6
  45:10
operational
  13:21 27:9
  29:14,17,19,22
  29:25 30:19
  32:18 79:23
operationally
  6:23 20:16
operations 3:17
  6:22 7:13,17
  7:21,23 11:11
  12:15,25 13:5
  13:22,23 19:13
  27:23 28:12
  41:13 45:2,14
  75:7
oppressively
  30:6
oral 77:14,17
order 9:18 17:8
  18:9,15 21:16
  24:13,13 29:10
  30:20 31:18
  34:14 36:13
  37:5 43:3
  46:20 56:1
  64:11 73:10
  76:7 78:10
  82:4 84:1
ordered 35:2
  46:19
orders 16:1
ordinary 60:5
organizations
  33:9
original 9:2
  18:10,18
originally 9:5,22
outcome 88:15

outside 16:22
  23:22 24:3
  35:5 37:20
  38:24
outstanding
  76:10
overall 10:13,21
  19:13 44:23
oversaw 7:17
oversee 6:22
overseeing 7:12

P

p 1:14 2:2,2,9,12
  3:19 27:18,19
  60:12,13 62:18
  62:20 85:3
pack 21:8
page 3:3,8 8:12
  12:14 14:5,6,8
  14:10,12,17,24
  49:19 54:5
  87:3,7,11,15
  87:19
paper 51:13,22
paperwork
  43:12
part 18:7 46:4
  51:18 56:5,5
  57:7 69:18
  80:7
partially 79:6
particular 8:8
  12:2 15:16
  24:25 43:1,5
  44:4,24 45:7
  45:12 48:13
  52:23 53:10
  55:12 59:22
  65:24 67:4
  72:10,15 74:11
  76:3
particularly
  26:15 59:18

62:10
parties 55:9,11
  88:14
pass 47:9,10
passed 58:23
passes 79:13
passing 15:19
  66:21
passports 78:13
patrol 2:17,23
  5:6 6:14,18,19
  6:21 7:2,4,5,6
  7:7,9,15,18 8:1
  8:5 10:3,25
  16:2 17:16
  19:23 20:11,16
  22:15,15 23:1
  24:11,17 25:4
  32:10,15,19
  33:6 34:11
  35:12,16 38:15
  39:2,3,24 40:5
  42:20 44:19,21
  50:14 52:22
  53:8 59:21
  60:5 66:8,10
  68:5 73:4
  82:13,24 84:7
  84:8
patrolissued
  67:1
patrolling 42:4
patrols 37:14
  40:6 41:22
pc 2:12,24
peak 17:2,9 29:7
penalty 86:10,11
people 17:25
  18:5 27:9 29:6
  29:11 30:20
  55:15,17,19,20
  69:4 78:11,13
  83:3
percent 13:5

72:23
perfect 75:21
perform 13:22
  29:10 37:22
  39:1 43:3 72:9
performing
  37:20 39:6
  42:7 66:16
perimeter 40:22
  41:2
period 30:2 33:3
  44:24 51:12
  53:10 75:7
periods 29:16
  78:11
perjury 86:10
  86:11
permanent 20:9
  20:24 21:1,3,6
  21:18,20,24,25
permissible 18:4
permit 3:12,14
  3:15,16 19:10
  19:21 23:17,22
  40:23 41:16
permits 19:5,8,8
  19:16 33:18
  40:21
permitting
  29:20
person 16:10,12
  16:13 19:18
  34:14,24 38:7
  39:16 47:8,14
  52:20 57:10
  59:1 73:19,20
  74:19,19 75:17
  76:3,4,5,8,15
  76:19 78:4,23
  79:6,7 81:3
  82:1,1,17,25
personal 66:11
  66:20 79:24
personnel 17:19

42:20,22
persons 42:6
  76:20 82:4,25
pertinent 48:19
petersen 2:24
phone 66:13,20
  66:23,23 67:1
  70:10
phones 67:4,24
  68:13
photograph
  66:20 67:9
  70:10
photographs
  3:17,18,18,19
  3:19,20 65:14
  65:17 67:23
  68:12,23 69:3
phrase 19:21
phrases 19:9
pick 38:6
picked 79:9
pickup 56:10
picture 62:13,16
  83:20
pictures 69:1
pilot 32:17,25
  33:3,5,10
pima 1:7 37:24
  38:6,10,14,21
  39:13 40:7
  41:24 42:7
  45:11 86:7
  88:4,7,16
place 49:18 50:2
  74:10,21 76:18
places 45:2
plain 77:25 78:1
  82:20
plaintiff 1:5 2:7
  2:24 86:5
plate 22:11,16
  22:19 23:5,7
  23:12,21 24:2

24:12 25:3
32:13,15,20,25
33:6 65:25
82:3
**plates** 70:22
**please** 4:7 54:16
59:13 62:19
80:11
**pllc** 2:8
**point** 39:10 46:3
49:24 61:20
74:7 79:8
80:24 81:14,25
82:7 84:15,15
**points** 7:20
**pole** 83:21
**police** 37:25
58:10
**policies** 37:14
73:12
**policy** 39:3
**portion** 20:22
49:17
**position** 6:17 7:9
7:22 8:1 40:6,6
84:7
**possess** 65:9
**possibility** 26:12
**possible** 29:19
**possibly** 39:14
67:17
**posted** 69:2,25
**poster** 69:2,20
69:23
**practice** 66:19
**prd** 79:24
**preparation**
88:11
**prepare** 12:2,6
**prepared** 19:10
27:25
**preprimary**
35:13 41:9
66:16

**presence** 37:16
37:17,18
**present** 2:22
6:18 9:25 10:5
11:6 20:8
50:23
**presented** 53:12
**preserved** 51:12
51:14
**presumably**
25:17 61:1
**pretend** 75:21
**pretty** 8:22
34:21
**prevent** 83:2
**preventing**
27:11
**primarily** 34:17
36:21 74:11
**primary** 22:3
29:18 34:11,15
34:22 35:11,14
36:6,8,15 49:6
49:12,23,25
66:16 70:14
75:6,22 78:8
82:2 83:3
**principal** 55:4,9
61:10,11,22
**print** 48:20
**prior** 35:14,19
60:7 79:2
**probable** 34:20
36:4,19 38:8
64:14,21 65:4
76:16 77:7
**problem** 4:19,21
14:21 70:19
**problems** 6:5
**procedure** 13:1
**proceed** 77:6
82:14
**proceeding**
88:10

**process** 36:11
48:16 57:7,14
64:12
**produce** 78:6
**produced** 43:21
**production**
88:11
**professional** 2:5
88:6
**program** 26:14
32:17,21 33:1
33:3,5,10
69:19
**promoted** 7:8
**promptly** 48:23
**proof** 78:7
**proper** 36:17
**property** 66:7
**propounded**
88:8
**prosecute** 59:1
**prosecution**
58:18 59:6,7
**protective** 18:8
18:15
**protocols** 48:22
67:8 73:3
**prove** 55:11
**provide** 72:21
72:24 76:6
82:10
**provided** 6:10
**providing** 53:6
**public** 27:12
39:12
**pull** 52:18 56:2
**pulled** 55:17
**pulls** 81:10
**purpose** 22:3
25:7 27:8
31:20 33:5
40:2 42:1 52:1
61:6 70:1,14
75:22

**purposes** 34:18
75:13
**pursuant** 44:6
88:8
**put** 28:24 29:3
62:18 68:21
69:8,16 80:11
**putting** 67:19
69:13

**─── Q ───**

**qualify** 31:7
**question** 5:19
8:6 13:18
18:13,17 19:22
29:15 36:23
39:21,22 44:1
46:10 47:16,17
59:13 61:3,5,7
63:18 66:12
75:11,19,23
77:1 79:12
80:15 81:11,22
84:10
**questioned**
81:21
**questioner**
75:21
**questions** 15:22
46:25 82:20,22
84:14,23,24,25
88:8
**quickly** 81:19
**quite** 51:15

**─── R ───**

**r** 3:20 69:7,15
88:8
**radiation** 79:24
79:25 80:3
**radio** 80:25
**ralph** 2:8,8
**ran** 20:17
**range** 63:9

**raw** 53:1,3,14
**reached** 5:9,21
**read** 85:1 86:12
86:13
**reader** 23:21
32:21
**readers** 22:12,16
22:19 23:5,7
23:12 24:2,12
25:3 32:13,15
32:25 33:7
**really** 20:18,24
24:23 84:16
**reason** 9:6 16:9
34:12 38:4
40:7,9 58:25
67:4 69:23
76:2 79:3 87:5
87:9,13,17,21
**reasonable**
64:25 76:4,17
**recall** 70:7
**received** 17:20
24:16 54:18
**recognize** 16:11
**record** 4:7 11:5
27:18,19 60:12
60:13 69:11
73:13,16,20,21
88:10
**records** 38:7
71:19 72:7,16
74:4,6,22
76:15
**recycled** 26:13
**red** 18:14 83:21
**redirect** 85:1
**reduced** 88:9
**ree** 2:10
**refer** 8:9 20:4,8
21:1,3,23
62:25 76:7
77:20
**reference** 27:1

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

33:19 35:2
49:11 74:14
**referenced** 3:22
**referred** 76:20
**referring** 20:7
20:23 33:20
46:7 60:23
63:2 71:11
**refers** 22:1
**refuse** 84:10
**refuses** 80:15
81:11
**regard** 15:12
18:9 20:12
34:10 35:10
37:7,15 53:15
56:4,10
**registered** 2:4
88:6
**regular** 15:18
79:13
**regularly** 54:14
**regulation** 37:22
**regulations**
38:25 48:22
**regulatory** 80:7
**relate** 58:2
**related** 56:12
88:14
**relates** 57:2
**released** 80:16
81:13
**relevant** 63:14
**remain** 18:23
22:10 34:25
36:18 45:25
62:5 82:11
**remained** 7:5
**remains** 82:2
**remember** 70:22
**remembering**
28:25
**remotely** 84:2
**removal** 21:16

**remove** 21:9,13
**removing** 46:2
**repeat** 5:18
54:16 59:13
**rephrase** 75:20
**report** 43:9
46:11,17,18,21
47:12,15,17
48:21 49:17,19
54:12 58:10
**reported** 1:16
11:1
**reporter** 2:4,5
5:11,15,24 6:1
6:6 11:16,17
12:12 59:12
88:1,5,6
**reporting** 43:15
43:19
**reports** 19:15,19
54:14
**representative**
84:8
**represented**
53:14
**request** 37:19
39:11,18 40:4
43:11,21 44:7
45:24 59:23
65:25 80:22
81:19
**requested** 60:1
**requests** 19:10
19:20
**required** 13:24
42:24 45:8
74:14 75:12
77:16 78:6
**requirement**
24:25 45:10
54:13 82:24
**requirements**
43:16,19 53:6
82:6

**requires** 21:11
34:11
**reservation**
33:23,24
**reserved** 88:13
**resident** 61:4
70:8
**resources** 10:14
**respective** 43:17
**respond** 37:18
38:11 39:15,20
42:6 45:8,17
81:21
**responded** 40:4
44:5 46:1
**responding** 82:8
**response** 13:17
41:23
**responsibility**
19:3
**responsible**
10:13,21
**rest** 79:20
**restarted** 14:22
**restrict** 30:17
**restricted** 71:2
**result** 9:14 26:9
30:21 39:15
43:21 51:2
75:9
**results** 67:20
**return** 48:10
**returned** 7:14
**review** 54:14
78:25 88:13
**revised** 88:12
**right** 8:13 9:9
10:8 11:23
12:17 18:10
28:19 29:13
48:7 54:4,21
55:19 72:14
83:12 88:13
**risk** 27:12

**road** 2:18 9:16
30:25 31:2,8
31:17 81:19
**roads** 9:15,16
31:3,11
**roberto** 1:11 2:1
3:3 4:1,8,9
86:20 87:25
88:8,13
**role** 35:10
**route** 6:25 8:7,9
10:5 17:13
18:1 20:5,25
22:3 23:8,14
23:15 28:23
29:17 30:8
31:13,15,18,21
32:22 33:1
45:18 49:2,4
50:17 70:14
**routine** 19:17
81:5
**routinely** 29:12
76:23,24
**rpr** 1:16 88:20
**rrf** 88:25
**rules** 73:5,10
**run** 73:20 75:16
76:25 82:2
**running** 72:16
73:20 74:22
76:9
**runs** 73:15
**ruse** 16:16
**ryan** 2:24 84:22

———————
**S**
**s** 26:1 34:25
39:12 47:7
60:18,18,21,23
60:25 61:11,17
62:1 77:15
78:15 81:5,17
84:9 88:8

**safe** 21:17,17
42:5
**safely** 41:11
**safety** 39:2,12
**sasabe** 13:20
31:4
**satisfied** 34:23
77:24 82:6,24
84:9
**save** 86:14
**saw** 9:13
**saying** 8:22,23
31:20 54:15
**says** 18:15 41:7
52:14 54:23
56:17 57:24
58:13 77:22
83:22
**scale** 34:20
**scan** 64:13
**scattershot**
79:18
**scenario** 59:15
**schedule** 44:2
45:13 51:24
**scope** 16:22 35:5
**screen** 13:10
14:23 54:21
62:20
**search** 72:14,24
76:21 77:9
81:6
**second** 40:14
**secondary** 15:25
34:10,12,15
35:2,11 36:5,8
36:9,9,14,25
38:8 41:10
49:6,12,23,25
50:2,3 58:17
64:10,16,22
65:1,2 66:16
76:20 77:2,3,8
77:20,23 78:9

78:25 82:1,9
section 14:4
15:8,11
sector 2:18 7:12
7:15 9:13
13:19 24:23
28:10 33:11
44:25 69:19
sedan 56:10
see 4:24 14:5
15:3,6,8 16:11
18:24 25:4,19
52:6 53:6
57:16 62:20
63:24 70:16,16
77:10 83:7,10
83:22
seeing 15:1
54:20
seen 19:1,7
26:23 27:2
28:8,11 54:18
58:1 60:7
65:17 81:23
seized 56:7
seizes 48:13
seizure 47:4,5,22
48:14 49:6,11
49:18,23 51:1
53:5 55:25
56:24,25 57:9
57:15 61:19
68:9
seizures 47:24
50:2 51:6
54:20 68:7
selected 7:6
selection 7:7
send 11:19,23
34:12,14 36:13
36:25 64:21
77:8 82:8
sending 64:25
sense 78:2,21

sensitive 63:13
63:17 70:4
sent 17:21 26:12
26:25 77:2
sentence 13:3
separate 56:4
separated 47:17
49:5,8
september 7:25
11:10 13:12
14:2 28:1,9,18
serve 27:7
serving 6:20
set 11:18,19
88:15,22
setting 13:22
seven 29:24
share 14:23 18:4
shared 24:22
68:15
sharing 24:21
sheet 86:16 87:1
shelter 83:10
sheriff 1:7 37:24
40:7 86:7
sheriffs 38:21
39:25 40:7
shes 51:11 62:17
80:14
shift 44:22,22,24
48:25
short 21:15
27:13 29:16
shorthand 2:4
88:5,9
show 14:23
61:21 65:15
showing 74:6
shows 58:12
shut 14:22
sign 42:22 83:21
85:1
signature 88:13
signed 86:18

significant 9:13
21:11 26:20,23
49:4
significantly
26:9
simply 41:21
47:9
single 79:12
sir 4:8,25 5:9,20
5:22 6:12,16
7:4 8:5,10,15
8:18 9:3,6,6,9
9:23 10:1,6,9
10:17,19,24
11:1,12 12:18
12:24 13:6,8
13:21 14:3,14
14:19,22 15:5
15:7,10,14
16:7,25 17:7
17:11,18 18:2
18:6,13,20,24
19:3,7,19 20:1
20:7,19,25
21:4,21,23,25
22:4,6,15,19
23:9,18,20,25
24:5,7 25:6,14
25:15,20 26:4
26:6 28:2,3,3,5
28:5,16,20
29:1,4,10,14
29:23 30:1,11
30:23 31:1,6
31:25 33:15
34:2,5,16 35:7
35:9 37:4,10
38:3,12,16,19
38:23 40:3,12
40:17,24 41:6
42:11 44:18
47:19 48:9
49:7,10 50:7
50:11,13,18,21

50:24 51:8,13
52:7,9,12 53:7
53:12,17,22
54:17,18 55:16
57:5,19,23
58:3,8 59:4,17
60:2,7 61:3,16
62:16 63:3,5,7
63:10,25 64:7
64:18,25 65:4
65:13 66:6,9
66:12 67:5
68:1,9 70:15
70:24 71:20
72:7,16,20,23
73:11,23 75:19
76:22 77:3
78:20 79:7,19
80:8,8 83:8,14
83:15,19,23
84:12
sit 50:12
site 49:23 72:3
sits 79:24
sitting 80:20
84:17
situation 45:7
46:6 47:13
77:5 83:5
situations 80:22
six 21:12 37:13
skill 88:10
smoking 58:13
smuggle 80:6
smuggled 25:10
smuggler 67:22
68:15 70:11
smugglers 69:1
smuggling 16:14
24:13 26:19,24
33:8 55:12
56:20,20 57:6
57:8 60:18
61:1 67:18,18

69:4 70:12,12
70:15
sniff 25:23 35:21
somebody 6:10
30:1 38:9 43:6
43:8 48:4
58:12 67:13
78:2 79:9,10
79:11 80:5
81:23 84:9
sorry 5:11,11
13:6,15,16
14:15 15:18
19:16 22:17,24
23:10 28:5
34:23 44:14
46:14 50:19
59:12 70:18
71:24 73:23
sort 47:4 57:9
58:17 73:22
sound 4:21,25
5:1,13,15 6:2
6:23 80:3
source 52:13
80:3
south 2:18 26:13
33:24
speak 25:21
50:17 83:25
speaking 59:10
special 7:23
specific 10:25
17:17 19:18
28:10,13 36:12
37:7 40:2,9
46:5 47:8 56:6
71:6,15 72:18
73:18,18 76:2
77:1
specifically
15:12 19:13
24:24 36:24
38:1 39:25
40:9

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 103

**speed** 83:22
**spell** 36:12
**spend** 84:18
**spoken** 15:23
**sr286** 31:4
**sr86** 8:14 13:19
  17:25 19:5
  23:5 25:5,25
  30:14,24 31:7
  32:2,16 34:7
  34:13 37:8,12
  37:16 38:1
  40:1 41:21
  42:14 43:7
  44:5,9 45:6,19
  47:1 48:1,8
  50:19 53:15,19
  58:25 60:20
  62:12 63:21
  65:9,16,17
  66:11 68:8,17
  70:1,10,20
  73:7 74:6
  79:17,21
**ss** 88:3
**staff** 17:23,24
  18:1
**stages** 26:14
**standard** 12:25
  74:14
**stands** 56:19
**starting** 20:23
**state** 2:4 4:6
  6:25 8:7,9 10:4
  18:1 20:5,25
  22:3 23:8,14
  23:15 28:23
  29:17 30:8
  31:14,17,21
  32:21 33:1
  37:22,25 45:17
  49:2,4 50:17
  70:14 71:5
  76:11 88:3,6,7

88:16
**statement** 42:9
**states** 1:1 2:17
  5:6 6:14,18 7:4
  10:7,11 16:2
  19:2,23 22:8
  22:10 24:17
  25:11 26:22
  30:21 31:19
  33:21 34:1
  35:16 61:7,13
  61:22 62:4,5
  70:8 77:18
  78:23 79:7
  82:12,18,22
  86:1
**station** 6:20,22
  6:24 7:4,6,16
  7:18,20,22 8:2
  8:4,5,24 17:18
  19:16 22:1
  24:8,25 32:9
  32:10 33:10
  42:24 43:8,17
  45:4 48:11,16
  49:2 51:23
  54:13
**stations** 19:2
**statistic** 54:19
  58:15 59:3
  61:21 62:1,2
**statistical** 60:17
**statistics** 27:1
  30:12 52:8,11
  52:14 54:3
  55:21 60:16
  61:25 65:12
**stats** 3:9,10,10
  3:11 52:5
  54:17
**status** 8:24
**statutes** 88:12
**stay** 84:18
**stayed** 7:8

**steady** 18:24
**stonegarden**
  38:14,20 39:23
  41:21 42:1,10
  42:15,23 44:6
  45:10 46:1,4
**stop** 11:3 15:24
**stopped** 20:7,18
  29:9
**store** 48:17
**story** 58:19
**structure** 62:21
**subject** 18:8,15
  64:6 81:2
**subjects** 62:23
**submit** 43:16
**submits** 19:15
**submitted** 19:19
**successful** 25:23
  32:21,24 33:1
**suffice** 77:18
  78:16,20
**sufficiently** 4:16
**suite** 2:13
**suited** 9:19
**summaries**
  53:18
**summary** 53:2
  54:19 60:17
**supervising** 18:5
**supervisor** 7:16
  7:20,23 8:4
  18:4 19:12
  42:25 43:4,6
  44:9 45:14
  80:18 81:24
**supervisory** 7:9
  17:23,24 18:1
**support** 40:4
  41:12 46:8
**supporting**
  39:13
**supposed** 11:2
**sure** 4:19 27:2

32:13 40:19
  43:18 49:13
  54:15 57:1
  70:17 72:23
**suspect** 81:2
**suspected** 67:22
  68:15
**suspects** 69:21
  69:22,24 70:5
**suspicion** 34:16
  34:18,19,22
  35:3 64:20,25
  74:16 76:4,17
**suspicions** 74:24
**swan** 2:18
**sworn** 4:2
**system** 51:15,17
  51:17,20,22
  52:18 53:4
  65:25 66:18
  73:17,19 74:9
**systems** 72:1

**T**

**tablets** 71:25
**tactical** 7:7,10
  7:13,14,15
  20:5,8,12,15
  20:20,22,24
  21:6,25 45:2
  45:14
**tactically** 30:19
**take** 17:12 21:13
  21:17 27:13,15
  27:17 48:12
  50:2 51:9
  66:20 68:12
  71:16,17 76:7
  79:12 84:20
**taken** 2:2 67:23
  86:12 88:7,9
**talk** 6:13 19:9
  20:10 37:11
  61:4 62:11

79:23
**talked** 27:24
  28:12 40:20
  47:23 62:25
  65:11 70:19
  79:16,21
**talking** 8:11,13
  17:14 28:21
  32:12 33:17
  34:3 40:25
  41:1,5 54:1
  55:14,15 66:13
  69:6 70:12
  74:18 76:1
**task** 24:24
**team** 7:8,10,14
  7:15 52:23
**technical** 44:23
**technological**
  14:16
**technology**
  73:11
**tell** 10:20 14:5
  25:25 26:6
  27:25 28:3
  34:11 39:3
  47:1 49:20,22
  51:16 56:17
  58:4 62:9
  63:20 83:14
**tells** 37:5
**temporarily**
  29:9,21
**temporary**
  20:15
**ten** 78:19
**teran** 1:11 2:1
  3:3 4:1,6,9,9
  5:5,19 6:10
  11:9 12:16,20
  15:3 17:8 19:4
  22:2 27:21
  30:24 31:20
  32:12 33:16

40:16 43:11
44:14 47:16
49:16 51:11
54:11,22 56:8
59:14 60:15
63:12,19,24
69:16 70:16
73:13 77:12
80:14 84:4,17
86:20 87:25
88:8,13
**term** 20:6,11
40:18 44:16
70:11
**terms** 34:12
47:24
**terrence** 1:4
2:24 86:4
**testified** 4:3
35:20
**testify** 32:14
**testifying** 10:3
**testimony** 37:23
**thank** 5:3 8:6
84:20
**thanks** 69:13
**thats** 14:18
23:22 36:19
38:11,17 39:15
41:6,7,9 46:7
46:24 47:16
49:10 52:2,3
53:20 55:10
56:24 57:5,6
57:11 58:18,18
58:18,19 62:3
62:5,6,9 63:14
66:4 67:12,14
69:12 72:7,7
72:19 75:7,9
76:11 79:12
80:22 82:17
83:5
**thereof** 88:15

**theres** 20:24
21:24 26:12
29:20,20 30:1
36:7 38:3,4,9
38:10 39:10
41:18 42:3
44:22,22 49:20
49:20 50:8
54:12 56:3,3
56:16 59:6,7
64:11 72:17,18
73:9,11,12
74:9,20,23
75:18,18 76:17
77:10 81:7,7
82:3 83:20
**thereto** 88:9
**theyll** 43:16 82:4
**theyre** 25:9,14
35:24 37:21
39:15 42:24,24
46:5 51:6,15
51:16,19,21
54:5,6 56:23
59:1 65:22,22
66:25 67:17
68:3 72:10
77:22 79:8
80:24 81:11,12
81:17,20,21
82:7,11,13,14
82:19
**thing** 33:16
46:10
**things** 27:22
47:24 66:14
69:6 71:9
78:14
**think** 54:9 58:24
63:14
**thinking** 69:12
**thorough** 77:9
**thought** 11:21
11:23

**threat** 80:9
**three** 7:20 13:13
13:18 18:23
54:2
**throw** 58:14
**time** 4:10 5:12
6:18 8:24
10:24 16:1
20:8,13 21:14
21:15,17 22:20
29:16,23 39:10
39:23 42:5,9
44:24 45:12
46:13 49:1
50:6 51:12,15
51:16 53:5,10
56:7 71:22
74:7,8 78:11
78:20 79:12
84:15
**timeframe** 9:12
26:4 51:13
52:24
**times** 15:19,24
15:25 16:11,16
17:23 29:21
76:9,14 77:18
78:19 79:15
**tire** 84:1
**title** 6:19 11:10
15:9 21:20
**today** 12:13
**tohono** 7:21 9:8
20:2 26:15
31:12,22,25
32:8 33:19,25
34:4,8 37:25
**told** 14:12,18
28:24 45:15,20
**tool** 25:9 32:18
65:23 66:17
**tools** 71:3 82:3
**top** 13:8 26:7
57:21 70:16

83:20
**total** 51:16 55:8
61:23
**track** 32:19 50:7
50:15 55:25
74:12
**tracking** 27:9
74:8
**traditional**
78:22
**traffic** 9:12,13
9:15,19 16:17
18:25 19:1
20:1 29:20
30:21 31:16,16
31:21,24 32:2
32:7 39:11,14
39:14 42:2
46:9 49:4 63:1
78:10 80:24
81:8
**trailer** 21:9
**trained** 25:12
35:21,24
**training** 37:3,3,8
71:16 73:8,9
73:12 74:13
80:17
**trainings** 73:9
**transcript** 86:12
88:10,11,12
**transfer** 7:19
**transportation**
19:6,15 41:16
**transporting**
56:22
**transports** 56:23
**travel** 22:10
36:17 62:5
82:11,11
**traveler** 15:17
15:18
**travelers** 22:7
**traveling** 16:8,8

16:15 17:11,12
25:16 30:20
79:9
**travels** 16:13
**trigger** 77:22
**trip** 77:23
**trooper** 39:12
**trouble** 83:17
**truck** 56:10
79:11
**true** 17:8 30:24
39:24 42:9
86:14 88:10
**trunk** 57:10
**truthful** 78:24
**try** 4:14 13:4
35:1 75:20
**trying** 44:15
54:7 62:17
70:4 77:4,5
80:6 83:2 84:4
**tubac** 42:4
**tube** 4:22
**tucson** 1:24 2:9
2:13,18,19
6:20,21,24
7:12,15,16 8:1
8:5,24 9:13
13:19 17:9,11
17:17 19:2,16
22:1 24:7,8,23
24:25 27:23
28:10,13 29:13
32:9 33:10,11
43:8 44:25
45:4 48:10
49:2,4 54:13
65:10 69:19
**turn** 4:24
**turned** 4:16,17
**tus** 3:17 11:10
12:15
**two** 21:7 31:11
45:2 64:11

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

69:6
**type** 37:19,22
42:8 56:17
59:4 62:14
67:18 72:24
74:19,21 76:18
**typewriting** 88:9

**U**

**u** 34:25 39:12
60:18,21,25
61:11,17 62:1
77:15 78:15
81:5,17 84:9
**uhhuh** 83:23
**unable** 25:21
51:16 84:13
**unaware** 51:13
51:19
**unconcealed**
47:18
**uncooperative**
15:19,21 39:9
46:2 65:24
80:19
**understand** 8:16
9:4 18:13
23:10 32:14
37:14 39:21
40:19 43:25
49:1 57:1
73:10 75:21
81:5
**understanding**
45:17 65:8
66:5 86:16
**understood**
43:18 44:8
54:15
**undocumented**
55:18 60:24
61:6,8,9,9,23
**unfortunately**
26:10

**unit** 7:12 17:22
24:23 33:11
**united** 1:1 2:17
5:6 6:14,18 7:3
10:7 16:2 19:2
19:23 22:8,10
24:17 25:11
26:22 30:21
31:18 33:21
34:1 61:7,13
61:22 62:4,5
70:8 77:17
78:23 79:7
82:12,18,22
86:1
**units** 7:13
**university** 16:20
**unlimited** 71:14
**unmute** 11:5
**unnecessarily**
78:12
**unreasonably**
81:9
**unsuccessful**
33:12
**unwarranted**
83:5
**updated** 14:1
18:22
**upper** 48:4
52:22
**uptodate** 53:9
**usa** 3:9,11,12,13
**usage** 73:5
**usdoj** 2:20
**use** 8:13 19:8,21
25:6 31:17
33:6 35:10
38:21 40:19
59:21 62:22
63:7 66:11,15
66:17,20 67:7
70:11 71:3
72:8 73:11

74:15 80:2,25
82:4,21
**user** 73:18,23
**username** 73:22
**usual** 48:24
**usually** 48:24,25
67:12

**V**

**vague** 4:13
**various** 19:10
73:5
**vast** 29:22
**vehicle** 16:10,11
25:24 35:18
36:4,5,6,10,14
36:21,25 38:8
47:5 50:1,11
50:12 55:5,12
56:4,7,11
61:12 64:4,5,8
64:13,15,21
65:1,6 66:1
67:16,19 70:5
74:25 76:5
77:8,10 79:6
81:1,6
**vehicles** 27:10
27:12 41:11
50:5,9,15 56:1
56:9 77:2
**vehicular** 9:15
**venues** 73:9
**versus** 10:7
**videoconference**
1:10 2:1,3 6:7
**view** 77:25 78:1
82:20
**viewing** 14:25
**violation** 57:18
57:21 62:6
64:20 76:12
77:7
**visible** 70:1

**volume** 4:16,25
**vs** 1:6 86:6

**W**

**wadman** 2:23
**wait** 67:21
**walking** 26:18
**want** 27:21
32:13 40:18
49:13 60:9
**wanted** 68:17,24
69:2,3,20,23
76:10,15,21
**wanting** 76:6
**wants** 35:6
84:23
**warrant** 38:10
39:17
**warrants** 76:11
**wasnt** 8:23
18:10 26:17
28:4 70:17
**watch** 7:23
17:22 43:4
44:16,20,21
45:1,5,8,10,20
**wave** 16:17
**way** 4:18 41:9
55:25 79:10
82:7 84:17
88:14,14
**ways** 64:11 81:7
**weapon** 80:5
**weather** 29:20
**wed** 80:25
**week** 29:24
**weigh** 48:17
**went** 7:11 8:17
8:25,25 11:2
20:23
**weve** 16:7 26:8
26:23 27:22,24
29:5 53:25
59:15 63:23

69:15 74:8
79:16 81:23
**whats** 21:6 31:5
53:12 56:21
68:14
**whos** 19:12,14
43:8
**willing** 15:22
39:17 81:21
82:1,10
**witness** 3:3 4:20
4:24 5:2,6,13
5:22 12:18
59:10 88:8,8,9
88:13,15
**wont** 58:22 69:8
**word** 36:3
**words** 52:14
58:11 60:21
73:14 74:5,16
77:14
**work** 19:17
21:11 29:11
45:17 46:20
79:10
**worked** 38:24
44:6
**working** 13:7,11
14:20 41:24
**workplace** 17:1
**works** 16:3
64:12
**worth** 54:2
**wouldnt** 41:24
53:3 72:3
**writes** 47:12
**writing** 48:18
**written** 43:20
46:11 73:3
**wrong** 57:4

**X**

**x** 48:14
**xray** 63:20 64:1

Deposition of ROBERTO TERAN
BRESSI v. NAPIER

Page 106

| | | | |
|---|---|---|---|
| 79:18 | **1129** 88:25 | **2019** 7:25,25 | 2:14 |
| | **11302017** 3:10 | 27:3 41:19 | **5208849041** |
| **Y** | **11302018** 3:11 | 52:5 | 1:25 |
| **yeah** 15:1 58:20 | **11302019** 3:9 | **2020** 27:4 | |
| 63:12 | **11302020** 3:10 | **2021** 1:13 2:2 | **6** |
| **year** 21:22 26:8 | **117** 27:4 | 88:16 | **6** 5:6 16:23 35:5 |
| 41:18 | **12** 1:14 2:2 3:17 | **21** 27:6 | 88:23 |
| **yearly** 19:19 | **1212016** 3:10 | **23** 60:9,12 | **62** 3:19 |
| **years** 16:8 20:17 | **1212017** 3:11 | **2430** 2:18 | **63** 3:19 |
| 26:8,21 38:18 | **1212018** 3:9 | **24hours** 29:25 | **69** 3:20 |
| 51:22 53:20 | **1212019** 3:10 | **27** 11:10 13:12 | |
| 54:1,2,9 | **121418** 3:13 | 14:2 28:1,9,18 | **7** |
| **youll** 6:5 | **1309** 1:24 | 54:24,25 55:6 | **7** 14:8,10,12,17 |
| **yourbestdefense** | **145** 9:5,22 | 55:17,19,20 | 14:24 27:7 |
| 2:10 | **147** 9:20 | **288** 2:13 | **7206** 88:12,23 |
| **youre** 4:13,22 | **15** 27:16 | **29** 1:13 2:2 | |
| 8:22 10:7 13:9 | **16** 27:19 | 60:13 | **8** |
| 17:11,12 27:4 | **17th** 88:16 | | **8085** 31:5 |
| 44:1 46:7 | **18** 2:2 85:3 | **3** | **83** 3:18,18 |
| 51:19 63:2 | **18cv00186** 1:5 | **3** 2:2 85:3 | **85711** 2:19 |
| 71:11 73:17 | **18cv00186dcb** | **30** 5:6 16:23 | **85716** 2:13 |
| 79:6 81:19 | 86:5 | 35:5 52:5 | **85717** 2:9 |
| **youve** 35:20 | **19** 31:13 52:15 | **300** 69:1 | **85719** 1:24 |
| | | **3137** 3:15 | **86** 6:24 8:7,9 |
| **Z** | **2** | **3146** 3:14 | 10:5 15:13 |
| **zone** 37:21,21 | **2** 60:9,12,13 | **3155** 3:16 | 16:9 17:10 |
| 41:6 | 88:12 | **35** 27:5 58:1,7 | 18:1 19:24 |
| **zoom** 2:3 | **20** 1:14 2:2 | **36** 55:8 58:6 | 20:5,12,25 |
| | 86:18 | **3849** 2:13 | 22:1,3 23:8,9 |
| **0** | **2002** 7:4 | | 23:14,15 24:8 |
| **0059** 3:12,13,13 | **2003** 7:6 8:19 | **4** | 28:23 29:17 |
| **0065** 3:13 | 28:12,14,18 | **4** 1:5 3:4 86:5 | 30:8 31:1,15 |
| **0276** 3:11 | **2008** 7:9 8:17,22 | **40** 49:3 | 31:18,21 32:22 |
| **0279** 3:11 | 9:12 26:5 | **40158** 2:9 | 33:1 37:17 |
| **0319** 3:9 | 50:22 | **41324** 88:8 | 45:18 49:2,4 |
| **0333** 3:9 | **2010** 7:11 68:25 | | 50:17 70:14 |
| **05** 27:15 | **2014** 7:19,19 | **5** | |
| **06** 27:16,18 | **2015** 20:11,18 | **50989** 1:16 | **9** |
| | 27:6 | 88:20 | |
| **1** | **2016** 11:10 | **52** 3:9 34:8 | |
| **1** 1:7 27:15,15 | 13:12 14:2 | **5204132323** | |
| 27:16,16,18,19 | 20:11 28:1,9 | 2:10 | |
| 52:5 86:7 | 28:18 | **5207483000** | |
| 88:12,12,23,23 | **2018** 33:4,4 52:5 | 2:19 | |
| **100** 20:2 72:23 | | **5208788849** | |