**HUMPHREY & PETERSEN, P.C.**
6063 E. GRANT ROAD
TUCSON, ARIZONA 85712
TELEPHONE: 520-795-1900

Andrew J. Petersen, State Bar No. 016699
APetersen@humphreyandpetersen.com
    Attorney for Defendants Napier, Pima County Board of Supervisors, Nanos, Roher and Kunze

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Terrence Bressi,<br><br>              Plaintiff,<br><br>vs.<br><br>Pima County Board of Supervisors, et al.<br><br>              Defendants, | Case No.: 18-CV-00186-DCB<br><br>**RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT II OF PLAINTIFF'S SECOND AMENDED COMPLAINT** |

The primary purpose of the SR86 checkpoint is immigration enforcement and the checkpoint is reasonable. Thus, this Court should deny Plaintiff's Motion for Partial Summary Judgment on Count II.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**FACTUAL BACKGROUND**

The Defendants for Pima County incorporate the facts from the Federal Defendant's Motion for Summary Judgment. In addition, the Pima County Defendants add the following facts.

1

Between 2008 and 2018, the Pima County Sheriff's Department participated in a federal grant program called Operation Stonegarden. (Plaintiff's SOF ¶37.) As part of the grant, deputies coordinated with Border Patrol Agents in high-risk areas. (Pima County SOF ¶2.) The Stonegarden program provided funding for deputies to have a presence and work in "remote areas that are difficult to patrol regularly." (Pima County SOF ¶4.) On occasion, the deputies enforced Arizona traffic laws at or near the Border Patrol checkpoint. (Pima County SOF ¶5.) The Stonegarden program was discontinued by the Pima County Sheriff's Department in 2018. (Pima County SOF ¶6.)

Operation Stonegarden is a "Homeland Security Grant Program that provides equipment and overtime funding for state, local, and tribal (SLT) law enforcement agencies (LEA) that are to be used in support of border patrol security operations." (Pima County SOF ¶1.) Under Stonegarden, the Pima County Sheriff's Department coordinated with Border Patrol to "conduct operations with the focus on vehicles circumventing the checkpoints" and "conduct joint patrols through the Border Interdiction Unit in order to monitor routes of egress." (Pima County SOF ¶3.)

The United States Border Patrol operates an immigration checkpoint near milepost 146 on State Route 86. (Federal Defendants' SOF ¶1.) Prior to the checkpoint, there are signs notifying drivers of the checkpoint. (Federal Defendants' SOF ¶3.) Border Patrol has been operating the checkpoint permanently since 2008. (Federal Defendants' SOF ¶8.) According to the Plaintiff, over 1,100 cars pass through the checkpoint every day. (Plaintiff's Motion for Partial Summary Judgment, p. 21:14-22:1.) At the checkpoint, all

drivers are stopped, and Border Patrol agents identify themselves and announce they are performing an immigration inspection. (Federal Defendants' SOF ¶24; Federal Defendants' Exhibit B, p. 79:4-15.) An agent may ask each occupant of the vehicle their citizenship or immigration statutes and look inside the open view areas of the vehicle. (Federal Defendants' SOF ¶¶25-6.) An agent may then direct the vehicle to proceed or move into the secondary inspection area. (Federal Defendants' SOF ¶29.) A trained K-9 that can target human and narcotic smuggling is sometimes also present at the checkpoint. (Federal Defendants' Exhibit B, p. 25:4-16.) The majority of stops at the checkpoint last only seconds. (*See e.g.*, Federal Defendant's Exhibit M.)

Plaintiff claims that the checkpoint violates his Fourth Amendment rights, and that the deputies violated his rights by enforcing Arizona traffic law at or near the Border Patrol checkpoint. For the following reasons, Plaintiff's Motion for Partial Summary Judgment should be denied.

**LAW AND ARGUMENT**

    **I.**    **The checkpoint does not violate the Fourth Amendment.**

The SR86 Border Patrol checkpoint does not violate the Fourth Amendment. The Supreme Court has held that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)(permitting "brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens").

The Ninth Circuit has outlined "a two-step analysis applicable to Fourth Amendment checkpoint cases." *U.S. v. Fraire*, 575 F.3d 929, 932 (9th Cir. 2009). "First, the court must determine whether the primary purpose of the [checkpoint] was to advance the general interest in crime control." *Id.* (citation and quotations omitted)(alterations in original). Second, "[i]f the checkpoint is not per se invalid as a crime control device, then the court must judge [the checkpoint's] reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Id.* (citations omitted). "This requires consideration of 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.* (citation and quotations omitted).

The SR86 checkpoint does not violate the Fourth Amendment because (1) the primary purpose of the SR86 checkpoint is to detect and deter illegal immigration and (2) the checkpoint is reasonable.

**a. Primary Purpose**

The primary purpose of the SR86 checkpoint is to deter and detect illegal immigration. This element is sufficiently addressed by the Federal Defendants in their Motion for Summary Judgement. *See* Federal Defendant's Motion for Summary Judgment, p. 16:3-17:15.

Plaintiff claims that the "true purpose" is not immigration because the Border Patrol also seizes narcotics, and its canines are cross trained in detecting drugs as well as humans. "But, a lawful immigration checkpoint is not made unlawful by the addition of a secondary

1  purpose of drug interdiction." *United States v. Wilson*, No. 14-10568, at *2 (9th Cir. May

2  27, 2016)(citing *United States v. Soto-Camacho*, 58 F.3d 408, 411-12 (9th Cir. 1995)).

3  Simply because a "dog was trained to detect both drugs and concealed people does not

4  raise an inference of illegality." *Id.*

5  Plaintiff further suggests that to determine the primary purpose, the court must

6  "look[] at the numbers." Plaintiff's Motion for Partial Summary Judgment, p. 12:13.

7  Plaintiff then cites to two cases where the State was required to disclose the statistics of a

8  checkpoint to a defendant in a criminal case. *Id.* Neither of the cases addresses how those

9  statistics should be applied, only that it was required to disclose them in a criminal case.

10 *See United States v. Morales-Armenta*, No. CR 15-938-TUC-CKJ, at *18 (D. Ariz. Nov.

11 18, 2016); *United States v. Soto-Zuniga*, 837 F.3d 992, 1000 (9th Cir. 2016).

12 What is more, between December 2019 and November 2020, at the SR86

13 checkpoint, there were 35 immigration related events, 117 immigration arrests and only 36

14 narcotics related arrests. (Plaintiff's Exhibit 4, USBP Immigration and Narcotic Related

15 Events). And this District already upheld checkpoints with lower numbers and percentages

16 of immigration events and arrests compared to narcotics and non-immigration arrests. *See*

17 *United States v. Ruiz-Hernandez*, No. CR 16-511-TUC-CKJ, at *8 (D. Ariz. Mar. 16,

18 2017). Further, like *Ruiz-Hernandez,* "these statistics do not take into account the illegal

19 immigration arrests made in the surrounding areas, the deterrence caused by the presence

20 of the SR80 checkpoint, or the integrated, multilayered approach to border security which

21

22

considers the relationships between the border, all of the checkpoints in the sector, the ports of entry, and the Border Patrol stations." *Id.*

Plaintiff also fails to consider that the checkpoints deter human smuggling. Where once Border Patrol was able to seize large amounts of aliens, as "smugglers became aware of the effectiveness of these checkpoints, smuggling methods had to become much more advanced or they would have to avoid [the checkpoints] altogether." (Plaintiff's Exhibit 20, Tucson Sector Checkpoint Memo, p.4.) As a result of the checkpoints, "[v]ehicles that traditionally smuggled large groups of aliens may now be utilized to attempt to smuggle a single subject." *Id.* In addition, the SR86 checkpoint has already been found constitutional. *See U.S. v. Brown*, 2017 WL 6403069, \*6 (D. Ariz. Oct. 4, 2017) *recommendation adopted by U.S. v. Brown,* 2017 WL 6381424 (D. Ariz. Dec. 14, 2017).

Further, the occasional presence of Pima County Sheriff's Deputies does not change the primary purpose of the checkpoint. Of the 444 videos disclosed by the Plaintiff, only fifteen show law enforcement other than Border Patrol. (Pima County SOF ¶9.) In addition, no law or statute prohibits law enforcement from enforcing traffic laws when an officer has reasonable suspicion at or near an otherwise lawful checkpoint on an Arizona Highway. As the Supreme Court has noted, "[o]ur holding also does not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." *Edmond*, 531 U.S. at 48.

But here, the Pima County Deputies do not ask the immigration questions, run the checkpoint, staff the checkpoint, or search the vehicles. Border Patrol performs all of these functions. The only stops made by the Pima County Sheriff's Deputies are when they have reasonable suspicion of a crime. (*See* Plaintiff's Exhibit 11, PCSD Reports.) And "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." *United States v. Hensley*, 469 U.S. 221, 226 (1985). The deputies have stopped cars for speeding, expired plates, missing car parts, a broken windshield, obstructions to the view of the driver, and dark tint. (*See* Plaintiff's Exhibit 11, PCSD Reports.) But deputies did not make any suspicionless stops at the checkpoint. And it is suspicionless stops at checkpoints that have been questioned by the Supreme Court. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000) ("When law enforcement authorities pursue primarily general crime control purposes at checkpoints . . . stops can only be justified by some quantum of individualized suspicion.")

In addition, the number of stops made by Pima County Deputies is insignificant compared to the amount of stops by Border Patrol. Over 1,100 cars pass through the checkpoint and are briefly stopped by Border Patrol each day. (*See* Plaintiff's Motion for Partial Summary Judgment, p. 21:14-22:1.) For example, in one eight-hour shift working at the SR86 checkpoint, Deputy Roher made only four traffic stops—all for violations of Arizona law. (Pima County SOF ¶7.) Other deputies are similar. (Pima County SOF ¶8.)

The numbers show the primary purpose of the checkpoint is not altered simply because a Pima County Deputy was present.

The primary purpose of the checkpoint is immigration enforcement. The presence of Pima County Deputies enforcing traffic law at or near a Border Patrol checkpoint does not change that primary purpose.

### b. Reasonableness

Further, the SR86 immigration checkpoint is reasonable. To determine whether a checkpoint is reasonable "requires consideration of 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Fraire*, 575 F.3d at 932 (citation and quotations omitted). In this case, the gravity of the public concern and the degree to which the seizure advances the public interest is high. In fact, "[I]t has been a national policy for many years to limit immigration into the United States." *Martinez-Fuerte*, 428 U.S. at 551. And "the United States has a substantial interest in controlling the flow of illegal aliens [and] [c]arrying out a program of routine stops for brief questioning at permanent checkpoints is effective in support of this interest." *United States v. Vasquez-Guerrero*, 554 F.2d 917, 919 (9th Cir. 1977) (citing *Martinez-Fuerte*, 428 U.S. at 556); *see also United States v. Carrasco*, No. 18-50417, at *2 (9th Cir. May 13, 2020) ("A permanent checkpoint created for the primary purpose of immigration control serves a special need."(citing *United States v. Soto-Zuniga*, 837 F.3d 992, 999 (9th Cir. 2016)); *United States v. Rodriguez*, No. CR-17-01301-TUC-JAS (BGM), at *9 (D. Ariz. July 2,

1   2018)("There is a substantial public interest 'in the practice of routine stops for inquiry at
2   permanent checkpoints.'"(quoting *Martinez-Fuerte*, 428 U.S. at 556)).

3   Plaintiff makes several claims of why the SR86 checkpoint is not reasonable. Each
4   claim fails.

5           **i.**      **Location**

6   First, Plaintiff claims that the SR86 checkpoint is not reasonable because of its
7   location. Yet, in 2021 Border Patrol noted that SR86 checkpoint is "one of the best
8   locations in order for [Border Patrol] to allow the inspections of people traveling and traffic
9   coming into the United States . . .." (Plaintiff's Exhibit 1, BP Deposition p. 30:19-21.)
10  Without the SR86 checkpoint "smuggling groups would have an unobstructed route of
11  egress" to Tucson. (Plaintiff's Exhibit 20, Tucson Sector Checkpoint Memo, p. 8.) The
12  SR86 checkpoint works alongside the SR286 and Arivaca East checkpoint. (*Id.* at 4.) "Each
13  checkpoint, although they operate independently, is dependent on the other checkpoints
14  being in place in order to limit smuggling operations." (*Id.*) Contrary to Plaintiff's claims,
15  the location of the SR86 checkpoint is reasonable.

16          **ii.**      **Effectiveness**

17  Next, Plaintiff claims the SR86 checkpoint is not effective and thus not reasonable
18  because Border Patrol only made 8 immigration arrests in 2017, 81 immigration arrests in
19  2019, 51 immigration arrests in 2019, and 117 arrests in 2020. But effectiveness is
20  "measured 'by the relationship of the checkpoint to its objective, rather than by any
21  measurable results, or by any results period.'" (quoting *U.S. v. Faulkner*, 450 F.3d 466,
22

472-73 (9th Cir. 2006)). What is more, these numbers do not consider the deterrence effect of the checkpoint, the numbers of illegal immigration arrests in the surrounding areas, or the interdependence of the border checkpoints in the sector. *See. United States v. Ruiz-Hernandez*, No. CR 16-511-TUC-CKJ, at *8 (D. Ariz. Mar. 16, 2017).

Further, the checkpoint is effective in its objective of detecting and deterring illegal immigration. The checkpoint monitors eastbound traffic to Tucson and forces smugglers to walk in the desert further north before reaching any unobstructed roads. (Plaintiff's Exhibit 20, Tucson Sector Checkpoint Memo, pp. 1,5.) And "the longer that Tucson Station is able to keep illicit activity in the desert, the more that agents can utilize improved technology resources and traditional sign cutting methods in order to identify and interdict traffic." (*Id.* at 5.) Border Patrol has also noted that "the removal of the HWY 86 Checkpoint would allow smuggling loads moving from the west desert with an unobstructed route to the Tucson area." (*Id.* at 8.) "As smugglers became aware of the effectiveness of these checkpoints, smuggling methods had to become more advanced or they would have to avoid these roadways all together." (*Id.* at 4.) The SR86 checkpoint is effective in detecting and deterring illegal immigration.

### iii. Severity of Interference

Finally, contrary to Plaintiff's claims, the severity of the interference with individual liberty at the SR86 checkpoint is minimal. This factor is "gauged by the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, and by the subjective intrusion, measured by the fear and surprise engendered in law-abiding

motorists by the nature of the stop." *Fraire*, 575 F.3d at 934 (quoting *U.S. v. Faulkner*, 450 F.3d 466, 473 (9th Cir. 2006)).

At the SR86 checkpoint, the stops are generally only seconds long, signs announce the checkpoint, the checkpoint has been at the location for thirteen years, the agents are uniformed, and all vehicles are stopped. There is no "surprise engendered in law-abiding motorists" and the "intensity of the investigation" is slight. Agents ask a few brief questions about citizenship and may ask the possible production of a document. *See United States v. Taylor*, 934 F.2d 218, 220 (9th Cir. 1991). To be sure, canines trained to detect human smuggling and narcotic smuggling are present. But courts have repeatedly upheld the use of cross-trained canines. *See, e.g.*, *United States v. Wilson*, No. 14-10568, at *2 (9th Cir. May 27, 2016); *U.S. v. Taylor*, 934 F.2d 218, 219 (9th Cir. 1991).

Plaintiff claims that this checkpoint is different because agents wear a device on their belt that detects radiation. He also claims this checkpoint also has taken pictures of license plates in the past and the SR86 checkpoint has an x-ray machine. But the x-ray machine is never used without consent or probable cause. (Plaintiff's Exhibit 1, BP Deposition, p. 64:5-15.) And the checkpoint only used its own cameras for reading license plates in a pilot program that lasted six months in 2018. (*Id.* at 32:17-33:4.) What is more, the agents never had access to that information. (*Id*. at 33:9-10.) Finally, wearing a device on a belt that detects radiation coming from a vehicle does not interfere with a driver's individual liberty.

The public interest in securing the border against illegal entry is high. And the severity of the interference with individual liberty is low. As a result, the checkpoint is reasonable.

**CONCLUSION**

Because the SR86 checkpoint does not violate the Fourth Amendment, Pima County has not participated in any unconstitutional custom, practice, or policy. The primary purpose of the checkpoint is to deter and detect illegal immigration. And the occasional presence of Pima County Deputies at or near the SR86 checkpoint making stops with reasonable suspicion did not alter that primary purpose. Further, the brief stop at the checkpoint by Border Patrol agents is reasonable. Thus, Plaintiff's Motion for Partial Summary Judgment should be denied.

DATED this 26th day of July, 2021.

HUMPHREY & PETERSEN, P.C.

*/s/ Andrew Petersen*
ANDREW PETERSEN
Attorney for Defendants

# CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

>Ralph E. Ellinwood
>PO BOX 40158
>Tucson AZ 85717
>Attorney for Plaintiff
>
>Amy Pickering Knight
>Knight Law Firm
>3849 E. Broadway Ste. 288
>Tucson AZ 85716
>Attorney for Plaintiff
>
>Dennis Carlton Bastron
>US Attorney's Office
>405 W Congress St., Ste. 4800
>Tucson, AZ 85701-4050
>Attorney for U.S. Department of Homeland Security, U.S. Customs and Border Patrol, U.S. Office of Border Patrol, Kevin K. McAleenan, Chief Carla L. Provost, Chief Patrol Agent Rodolfo Karisch, United State of America

*s/Andrew Petersen*

H:\MHFILES\8006-6\Response to Plaintiff MSJ.docx