GLENN B. McCORMICK
Acting United States Attorney
District of Arizona
DENNIS C. BASTRON
Assistant U.S. Attorney
Arizona State Bar No. 027294
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Dennis.Bastron@usdoj.gov
*Attorney for the Federal Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Terrence Bressi,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>Pima County Sheriff Mark Napier, et al.,<br><br>                    Defendants. | No. CV-18-186-TUC-DCB<br><br>**RESPONSE TO PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

The Federal Defendants, as authorized by LRCiv 56.1(d), respond as follows to Plaintiff Terrence Bressi's partial motion for summary judgment as to Count 2. This Court should deny Bressi's motion.

The Federal Defendants support their motion with the following memorandum.

1

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

After reading Bressi's introduction, one might believe that *Martinez-Fuerte* is a long-forgotten case, one that is on the books but out of touch, in desperate need of revisiting—as if no one has thought to challenge the constitutionality of a Border Patrol checkpoint in 45 years. *See* Doc. 104 at 6:2-7:17. That would be wrong.

*Martinez-Fuerte* is alive and well. The Supreme Court itself has cited *Martinez-Fuerte* many times since 1976. *See e.g. Ashcroft v. al-Kidd*, 563 U.S. 731, 737 (2011); *Illinois v. Lidster*, 540 U.S. 419, 424 (2004); *City of Indianapolis v. Edmond*, 531 U.S. 32, 34 (2000); *Chandler v. Miller*, 520 U.S. 305, 308 (1997); *Whren v. U.S.*, 517 U.S. 806, 818 (1996). These are not citations to minor points of law in the decision, but express restatements of the case's central holding—that suspicionless stops at U.S. Border Patrol immigration checkpoints are constitutional. Nowhere in his motion has Bressi cited an authority hinting that *Martinez-Fuerte* has lost its force. There are no calls from concurring or dissenting justices for *Martinez-Fuerte* to be narrowed or overturned, no criticism of it in lower court opinions.

In fact, people *have* thought to challenge Border Patrol checkpoints. Circuit courts and district courts have rejected those challenges over and over again, relying on *Martinez-Fuerte* to hold that modern U.S. Border Patrol checkpoints have illegal immigration as their primary purpose and that this important government interest outweighs the minor intrusion checkpoints pose to the traveling public. *See e.g. U.S. v. Carrasco*, 813 Fed. Appx. 275, 276–77 (9th Cir. 2020) (unpublished), *cert. denied,* 141 S. Ct. 411 (2020) (Highway 111 checkpoint); *U.S. v. Avery*, 804 Fed.Appx. 279, 279-80 (5th Cir. 2020) (unpublished), *cert. denied,* 141 S. Ct. 826 (2020) (Falfurrias checkpoint); *U.S. v. Yasin*, 792 Fed.Appx. 315, 316 (5th Cir. 2020) (unpublished) (a Texas Border Patrol checkpoint); *U.S. v. Moreno-Vargas*, 315 F.3d 489, 489–90 (5th Cir. 2002) (Sarita checkpoint); *U.S. v. Soto-Camacho*, 58 F.3d 408, 411 (9th Cir. 1995) (Jacumba checkpoint); *U.S. v. Alatorre-Verdugo*, 2018 WL 6729664, *7 (D. Ariz. June 11, 2018), *report and recommendation adopted,* 2018 WL 6727292 (D. Ariz. Dec. 21, 2018)

(I-19 checkpoint); *U.S. v. McCowan*, 2018 WL 1026784, *11 (D. Ariz. Feb. 2, 2018), *report and recommendation adopted,* 2018 WL 993756 (D. Ariz. Feb. 21, 2018) (Federal Route 15 checkpoint); *U.S. v. Brown*, 2017 WL 6403069, *6 (D. Ariz. Oct. 4, 2017), *report and recommendation adopted,* 2017 WL 6381424 (D. Ariz. Dec. 14, 2017) (State Route 86 checkpoint); *U.S. v. Audelo-Marquez*, 2017 WL 5514359, *22 (D. Ariz. Sept. 5, 2017), *report and recommendation adopted,* 2017 WL 5496222 (D. Ariz. Nov. 16, 2017) (I-19 checkpoint); *U.S. v. Ruiz-Hernandez*, 2017 WL 1047236, *11 (D. Ariz. Mar. 17, 2017), *affirmed,* 751 Fed.Appx. 1022 (9th Cir. 2019) (unpublished) (State Route 80 checkpoint); *U.S. v. Ruiz*, 2017 WL 1031137, *14 (D. Ariz. Mar. 16, 2017) (I-19 checkpoint); *U.S. v. Romero-Cubillas*, 2015 WL 5674891, *3 (D. Ariz. Aug. 10, 2015) *report and recommendation adopted by*, 2015 WL 5679720 (D. Ariz. Sept. 25, 2015) (I-19 checkpoint); *U.S. v. Gasca-Castillo*, 2007 WL 173888, *6 (S.D. Cal. Jan. 8, 2007) (Highway 86 checkpoint); *U.S. v. Torres-Laranega*, 2004 WL 7337430, *4 (D.N.M. Dec. 2, 2004) (Las Cruces checkpoint); *U.S. v. Waldron*, 178 F.Supp.2d 738, 742 (W.D. Tex. 2002) (Sierra Blanca checkpoint); *Cf. U.S. v. Wilson*, 650 Fed.Appx. 538, 539 (9th Cir. 2016) (unpublished) (State Route 80 checkpoint); *U.S. v. Palacios-Demetrio*, 930 F.2d 35, 1991 WL 35244, *1 (10th Cir. 1991) (N.M. Highway 26 checkpoint); *U.S. v. Muniz-Melchor*, 894 F.2d 1430, 1436 (5th Cir. 1990) (a temporary checkpoint); *U.S. v. Vasquez-Guerrero*, 554 F.2d 917, 920 (9th Cir. 1977) (Oak Grove checkpoint); *U.S. v. Garza*, 539 F.2d 381, 382 (5th Cir. 1976) (Falfurrias checkpoint); *U.S. v. Lopez*, 2017 WL 2547302, *3 (S.D. Cal. June 13, 2017) (Highway 86 checkpoint); *U.S. v. Ruiz-Perez*, 2012 WL 1078887, *1 (D. Ariz. Mar. 30, 2012) (I-19 checkpoint); *Marrufo v. U.S.*, 2007 WL 1500544, *1 (S.D. Cal. May 21, 2007) (a California Border Patrol checkpoint); *U.S. v. Rodriguez-Herrera*, 2002 WL 35649933, *3 (D.N.M. May 10, 2002) (Highway 54 checkpoint). Against this overwhelming consensus of authority, which includes a challenge to this exact checkpoint, *see Brown*, 2017 WL 6403069, at *6, Bressi offers no case where a court concluded that a Border Patrol checkpoint was unconstitutional because it had general crime control as its primary purpose.

## I.   FACTUAL BACKGROUND

### A.   Checkpoints are part of a layered approached to border security, and the State Route 86 checkpoint is the only checkpoint between the Tohono O'odham Nation and metro Tucson.

Border Patrol checkpoints like the one on State Route 86 are part of Border Patrol's layered approach to border security. *See Federal Defendants' Controverting Statement of Facts re: Response to Plaintiff's Partial Motion for Summary Judgment* at ¶ 1 ("*CSOF* 1.") The first layer of defense is the border wall and the ports of entry. (*Id.*) Unfortunately, to avoid detection, many people who cross the border illegally do so on foot between the ports. (*CSOF* 2.) Traveling on foot is impractical and often dangerous, so at some point close to the border, people who cross illegally need to get in a vehicle and travel on a roadway. (*CSOF* 3.)

Checkpoints are placed strategically throughout Southern Arizona on roads leading away from the border and toward major metropolitan areas to minimize opportunities for circumvention. (*CSOF* 4.) The goal is to create a system requiring anyone who crosses the border illegally and gets in the vehicle near the border to travel though a checkpoint before they travel very far into the United States. (*Id.*) Indeed, checkpoints provide a safe place for Border Patrol to detect and apprehend migrants. (*CSOF* 5.) They also have a deterrent effect. (*CSOF* 6.) By making it more difficult to come into the country illegally, checkpoints deter the initial illegal entry. (*Id.*) For people who still attempt to cross illegally, checkpoints might force them to stay on foot longer, making it easier and safer for Border Patrol to apprehend them in the desert and off the road. (*Id.*)

Agent Roberto Teran, a 19-year Border Patrol veteran who currently serves as the Acting Patrol Agent in Charge of Tucson Station, believes that more people would cross the border illegally without checkpoints because they would be able to get into vehicles a short distance into the United States and drive undetected into the interior of the country. (*CSOF* 7.) Border Patrol would be limited to roving patrol stops, which is more dangerous because drivers involved in smuggling often flee from agents to avoid traffic stops. (*Id.*)

The State Route 86 checkpoint is strategically placed to the east of the Tohono O'odham reservation at a location designed to minimize opportunities for circumvention. (*CSOF* 8.) There are 63 miles of international border within the Tohono O'odham reservation. (*CSOF* 9.) That area of the border can be porous and vulnerable to border crime. (*Id.*) The State Route 86 checkpoint is the only checkpoint between the Tohono O'odham reservation and metro Tucson. (*CSOF* 10.) Without the checkpoint, anyone who crosses the border illegally within the Tohono O'odham reservation would be able to get into a vehicle close to the border and drive on an unobstructed path to Tucson, and from Tucson, anywhere in the United States. (*Id.*)

**B.  The United States is currently facing a surge in illegal immigration, and the surge is being felt in Southern Arizona, where the State Route 86 checkpoint is located.**

The nature of illegal immigration is constantly changing due to the economy, conditions south of the border, and the priority of transnational criminal organizations, among other things. (*CSOF* 11.) For example, for most of this century, the typical undocumented border crosser was a single Mexican national, usually an adult male. (*Id.*) But in 2019, there was a rise in family units crossing the border. (*Id.*) There has also been an increase in the number of people coming from Latin America, and from all over the world. (*Id.*)

The United States is currently seeing a sharp increase in illegal immigration. (*CSOF* 12.) In June 2021, Customs and Border Protection recorded 188,829 encounters, the highest number of monthly encounters in at least four years. (*Id.*) The total number of encounters through the first nine months of Fiscal Year 2021 was 1,119,204—more than double the number of encounters during the entire Fiscal Year 2020, and higher than the annual number of encounters since at least Fiscal Year 2018. (*Id.*)

This national rise in illegal immigration has affected Border Patrol's Tucson Sector. (*CSOF* 13.) Border Patrol encounters here have more than tripled since last year, up 206.1% year-to-date over Fiscal Year 2020. (*Id.*)

**C.   Border Patrol regularly uses canines cross-trained to detect concealed humans and narcotics at the checkpoint. X-rays, license-plate readers, radiation-detection devices, criminal databases, and local law-enforcement are not part of any routine inspection.**

Border Patrol often uses canines at the checkpoint. (*CSOF* 14.) These canines are trained to detect both concealed humans and narcotics. (*Id*.) The canines generally conduct exterior sniffs in the "pre-primary location," that is, right before the vehicle arrives at the primary agent. (*CSOF* 15.) The exterior sniffs take only a matter of seconds. (*Id*.)

Another tool available at the checkpoint is a backscatter machine. (*CSOF* 16.) This machine, which x-rays vehicles to help Border Patrol agents identify anomalies inside hidden compartments, is not part of the routine inspection. (*Id*.) Agents can only use the backscatter machine in the secondary inspection area, and they must have the owner's consent or probable cause to believe a human or other contraband is hidden inside the vehicle. (*CSOF* 17.)

Contrary to Bressi's assertions, there are currently no license-plate readers within the boundaries of the State Route 86 checkpoint. (*CSOF* 18.) The DEA has a license-plate reader near the checkpoint, but not inside the checkpoint. (*CSOF* 19.) Any information captured by the DEA license-plate reader is not available to the Border Patrol agents at the checkpoint. (*CSOF* 20.) It is possible that DEA might share intelligence from those license-plate readers with agents assigned to a Border Patrol intelligence unit because agencies sometimes work together on task forces. (*Id*.) But Border Patrol agents do not analyze the data from the DEA license-plate reader, and the agents working the checkpoint cannot view it. (*Id*.) Border Patrol once had a pilot program involving its own license-plate readers, but even then, the data was not shared with agents working the checkpoint. (*CSOF* 21.) The pilot program was for the first half of 2018. (*Id*.)

Border Patrol agents at the checkpoint have laptops and cell phones. (*CSOF* 22.) Both portable devices can access law-enforcement databases. (*Id*.) The databases include Border Patrol's e3 system of recording immigration-related events. (*Id*.) A Border Patrol agent would only use a law-enforcement database to look up information about an

1    individual if the agent had a specific need. (*CSOF* 23.) Agents do not run a records check

2    during the typical checkpoint stop. (*Id.*)

3        Border Patrol agents at the checkpoint also wear personal radiation-detection devices

4    on their belts. (*CSOF* 24.) The device would help an agent detect a weapon of mass

5    destruction if one happened to go through the checkpoint. (*Id.*)

6        Finally, contrary to Bressi's claims, local law-enforcement agencies do not have a

7    regular presence at the State Route 86 checkpoint. (*CSOF* 25.) Border Patrol's official

8    policy allows agents to call local law-enforcement agencies to the checkpoint for a specific

9    reason. (*CSOF* 26.) Examples of reasons to call local law-enforcement might be to deal

10   with an uncooperative motorist, determining there was a missing person, or if Border

11   Patrol had identified an active warrant. (*Id.*) Contrary to Bressi's assertions, however,

12   Operation Stonegarden did not anticipate the use of Pima County Sheriff's deputies within

13   the checkpoint. (*CSOF* 27.) The program no longer includes the Pima County Sheriff's

14   Department. (*Id.*)

15       During discovery, Bressi produced 555 videos of him driving through the State Route

16   86 checkpoint. Through interrogatories, the Federal Defendants asked him to identify any

17   videos showing Pima County Sheriff's deputies at the checkpoint. Bressi identified only

18   12 videos. (*CSOF* 28.) In two of those videos, Pima County Sheriff's deputies were called

19   specifically to assist with Bressi. (*CSOF* 29.) Thus, Bressi produced only ten videos of

20   Pima County Sheriff's Department vehicles at the checkpoint for some reason other than

21   to deal with him. In other words, Bressi has only seen deputies on 1.8% of the occasions

22   he has driven through. None of those videos show deputies speaking to drivers as part of

23   the routine inspection in the primary lane. (*CSOF* 30.)

24   **D.  The vast majority of the time, Bressi is waived through the checkpoint. When**
     **an agent asks him questions or a canine is present, Bressi still generally gets**
25   **waived through within a matter of seconds.**

26       The best evidence of how Bressi's checkpoint encounters unfold are Bressi's own

27   videos. To give the Court a larger sample size of what happens when Bressi drives

28   through, the Federal Defendants filed a copy of Bressi's video from each checkpoint

7

encounter within a year of March 13, 2020, the last time Bressi drove through the checkpoint. (*CSOF* 31.) There are 60 videos. (*Id*.) In 43 of the videos, Bressi is waived through the checkpoint without being greeted, asked a question, or waiting for a canine sniff. (*CSOF* 32.) In eight of the videos, Border Patrol agents start to greet Bressi, announce their intention to perform an immigration inspection, or ask a question about his citizenship, but Bressi is otherwise waived through within a matter of seconds. (*CSOF* 33.) Three times a canine conducts an exterior sniff in pre-primary, but again, Bressi is waived through in a matter of seconds. (*CSOF* 34.)

Only six videos show anything more than an exceedingly brief stop. On May 15, 2019, an agent who was apparently not familiar with Bressi asked him whether he was a U.S. citizen. (*CSOF* 35.) Bressi refused to answer or roll down his window, honking his horn instead. (*Id*.) The agent asked a supervisor what to do with this uncooperative driver. (*Id*.) The supervisor recognized Bressi and told the primary agent to waive him through. (*Id*.)

Just over a week later, on May 24, 2019, Bressi was waived through without incident, but noticed Arizona DPS officers standing inside the checkpoint using a radar device to detect speeding. (*CSOF* 36.) He pulled over to record the DPS officers and eventually argued with them about what they were doing. (*Id*.)

On June 4, 2019, Bressi arrived at primary, where a canine began an exterior sniff. (*CSOF* 37.) Bressi honked his horn while the canine was sniffing. (*Id*.) The exterior sniff was completed in a matter of seconds, and the agents waived Bressi through. (*Id*.) Bressi refused to leave, however, preferring to stay and argue with agents. (*Id*.) He eventually asked a supervisor to write down the name and badge number of a higher-ranking supervisor, leaving only after the supervisor handed him a piece of paper. (*Id*.) The encounter lasted a few minutes. (*Id*.)

The July 1, 2019 video is actually Bressi driving west past the checkpoint, not east through it. (*CSOF* 38.) He only turned on his camera to document the presence of Tohono O'odham Police at the checkpoint. (*Id*.) Two days later, on July 3, 2019, the checkpoint was apparently closed. (*CSOF* 39.)

1    On September 10, 2019, an agent removed his phone to video Bressi for several
2    seconds after Bressi started yelling at him. (*CSOF* 40.) The encounter lasted about a
3    minute. (*Id*.)

4    **II.  ARGUMENT**

5    Bressi's claim is one for injunctive relief. Although he never requests a specific
6    injunction, he presumably seeks either an order requiring Border Patrol to shut down its
7    State Route 86 checkpoint or an order that would result in this Court overseeing State
8    Route 86 checkpoint operations. Either form of injunction would be a significant intrusion
9    into policy areas more appropriately left to the political branches of government.

10    Matters of immigration law and immigration enforcement, especially because they
11    overlap with national security, implicate separation-of-powers principles. *See Trump v.*
12    *Hawaii*, 138 S.Ct. 2392, 2419 (2018). Congress, for its part, has broad power over
13    naturalization and immigration, *see Matthews v. Diaz*, 426 U.S. 67, 80 (1976); the
14    Executive Branch must have flexibility "to respond to changing world conditions" that
15    concern national security, *see Trump*, 138 S.Ct. at 2420. Indeed, "when it comes to
16    collecting evidence and drawing inferences on questions of national security, the lack of
17    competence on the part of the courts is marked." *Id.* (quoting *Holder v. Humanitarian Law*
18    *Project*, 561 U.S. 1, 34 (2010)). Thus, when reviewing Executive Branch decisions
19    concerning national security, courts apply, at most, rational basis review. *See id.*

20    **A.  This Court should conclude that the primary purpose of the State Route 86**
21    **checkpoint is immigration enforcement because the location and the routine**
      **inspection are rationally related to immigration.**

22    The central question this Court must decide—whether the checkpoint serves a valid
23    programmatic purpose, on the one hand, or functions as a general crime control device,
24    on the other—requires that sort of deference. Courts reviewing Border Patrol checkpoints
25    look broadly at the big-picture facts about the checkpoint—where it is located and what
26    the typical inspection looks like—and consider whether the location and the typical
27    inspection are rationally related to immigration enforcement. *See e.g. Audelo-Marquez*,
28    2017 WL 5514359, at *22-23 (focusing on the location of the checkpoint on I-19 and the

1   fact that the initial questioning was about the defendant's immigration status); *Ruiz-*
2   *Hernandez*, 2017 WL 1047236, at *11-12 (reasoning that "the nature of the original
3   question asked" supported the conclusion that the primary purpose of the checkpoint was
4   immigration, and later, pointing to the location "considering its proximity to the
5   international border"); *Torres-Laranega*, 2004 WL 7337430, at *4 (focusing on the
6   location of the Las Cruces checkpoint, which is less than 60 miles from the border, and
7   declining to place weight on advertisements about the amount of drugs seized). Even in
8   non-Border Patrol cases, the analysis on whether a checkpoint serves a valid
9   programmatic purpose focuses on these big-picture facts about the checkpoint. *See Illinois*
10  *v. Lidster*, 540 U.S. 419, 423 (2004) (reasoning that the police officers were asking vehicle
11  occupants for their help in providing information about a crime); *U.S. v. Fraire*, 575 F.3d
12  929, 933 (9th Cir. 2009) (noting that "the checkpoint was situated at an entrance to the
13  park"); *U.S. v. Faulkner*, 450 F.3d 466 (9th Cir. 2006) (reasoning that what happened
14  during the routine stop—about 20 seconds of informing vehicle occupants of new
15  regulations and handing them a litter bag—supported the conclusion that its primary
16  purpose was preventing littering).

17      Here, the location of the checkpoint and the typical inspection are both rationally
18  related to immigration enforcement. The checkpoint is located slightly to the east of the
19  Tohono O'odhman reservation. Two major roads connect the border to State Route 86,
20  which is just about 50 miles north of the border. *See* Doc. 141 at 3 ¶ 15 (citing Agent
21  Teran's deposition at 31:20-25). Any person who crosses the border illegally and gets into
22  a vehicle in that area will have to pass through the State Route 86 checkpoint to get to
23  metro Tucson. The checkpoint was placed there after Border Patrol noticed a rise in illegal
24  border activity on the reservation, and it was moved about a mile to the east after Border
25  Patrol noticed another rise in illegal activity on a road circumventing the checkpoint. *See*
26  Doc. 141 at 2 ¶ 9, 3 ¶ 18. Thus, the location of the checkpoint is rationally related to
27  immigration enforcement.

28

1       The typical inspection conducted at the checkpoint is also rationally related to the

2   goal of stopping illegal immigration. The checkpoint is manned by Border Patrol agents,

3   who are immigration officers. By policy and according to their training, agents look inside

4   the plain view areas of the vehicle, identify themselves as immigration officers, and ask a

5   question or two about the citizenship of each occupant in the vehicle. *See* Doc. 141 at 4

6   ¶¶ 22-28. If a canine is present, the canine who is trained to detect concealed humans will

7   conduct a brief exterior sniff of the vehicle. All of this takes a matter of seconds before

8   the vehicle is allowed to proceed, and it is all rationally related to immigration

9   enforcement.

10      Because both the location of the checkpoint and the typical inspection are rationally

11  related to the valid programmatic purpose of immigration enforcement, this Court should

12  conclude—as it already has in 2017—that the primary purpose of the State Route 86

13  checkpoint is immigration enforcement. *See Brown*, 2017 WL 6403069, at *6.

14      **B.  This Court should decline Bressi's invitations to second-guess policy decisions and strictly scrutinize every specific law-enforcement tool or practice that is available or has ever been used at or near the checkpoint.**

15

16      Rather than argue that the location of the State Route 86 checkpoint and the typical

17  inspection are not rationally related to the purpose of immigration enforcement, Bressi

18  invites the Court to second-guess policy decisions and to strictly scrutinize every specific

19  law-enforcement tool or practice that is available or has ever been used at or near the

20  checkpoint. This Court should decline those invitations.

21      To begin, Bressi criticizes many aspects of the United States' national strategy of

22  border security that are plainly beyond the scope of what this Court can consider. His

23  introduction includes critical political commentary about the growth of Border Patrol and

24  the creation of the Department of Homeland security after September 11, 2001. *See* Doc.

25  104 at 6:9-7:2. He later contends that Border Patrol would do just fine with one checkpoint

26  in Southern Arizona—the one on I-19. *See id.* at 19:14-21:2. Decisions about the size of

27  Border Patrol, the creation of Department of Homeland Security, and the number of

28  checkpoints needed to effectively secure the border are policy decisions left entirely to the

1    discretion of the political branches of government. *See Trump*, 138 S.Ct. at 2418-19. This

2    Court should decline Bressi's invitation to second-guess those decisions.

3          This Court should also decline Bressi's invitation to strictly scrutinize every specific

4    law-enforcement tool or practice that is available or has ever been used at or near the

5    checkpoint. Again, that is not the appropriate analysis on the question whether a particular

6    checkpoint serves a valid programmatic purpose. Moreover, as argued below, in his

7    attempt to characterize the State Route 86 checkpoint as a general crime control device,

8    Bressi takes facts out of context, relies on unsound logic, and fails to support his arguments

9    with case law.

10   ### 1.  Statistics are misleading because they cannot measure deterrence; they are subject to manipulation by cartels; and the nature of illegal immigration is constantly changing.

11

12         Bressi's main argument about the primary purpose of the checkpoint is based on

13   statistics. *See* Doc. 104 at 12:11-13. In interpreting the statistics, however, Bressi neglects

14   to mention that the number of immigration arrests outnumbered the number of narcotics

15   arrests at the checkpoint in 2018, 2019, and 2020—three of the four years in the record.

16   *See* Doc. 105 at 3:5-11.

17         In any event, this Court should not place too much weight on statistics. Although the

18   Ninth Circuit has reversed and remanded a criminal case where the district court did not

19   allow any discovery into arrest statistics at a particular checkpoint, *see U.S. v. Soto-*

20   *Zuniga*, 837 F.3d 992, 1002 (9th Cir. 2016), statistics are not a good reflection of the

21   primary purpose of a checkpoint. This Court, recognizing that limitation, has rejected

22   challenges to checkpoints based on statistics showing that immigration arrests were even

23   with or outnumbered by narcotics arrests.[1] *See McCowan*, 2018 WL 1026784, at *12

24   (rejecting a challenge to the Federal Route 15 checkpoint when narcotics- and

25   immigration-related events and arrests were about even); *Brown*, 2017 WL 6403069, at

26

27   _____

28   [1] Illegal drug interdiction may be carried out at immigration checkpoints, though not as the primary purpose. *U.S. v. Ventura*, 447 F.3d 375, 378 (5th Cir. 2006); *see also Wilson*, 650 Fed.Appx. at 539.

*6 (rejecting a challenge to the State Route 86 checkpoint during a year when narcotics related events and arrests outnumbered those for immigration); *Ruiz-Hernandez*, 2017 WL 1047236, at *11 (rejecting a challenge to the State Route 80 checkpoint when narcotics events and arrests outnumbered those for immigration during a 21-month time period). Bressi cited no case where a Border Patrol checkpoint was held to be unconstitutional because the number of narcotics arrests was too high.

Statistics can be misleading because "they do not take into consideration any deterrence caused by the checkpoint." *Ruiz*, 2017 WL 1031137, at *14; *see also Brown*, 2017 WL 6403069, at *6 (recognizing that statistics do not measure deterrence); *Ruiz-Hernandez*, 2017 WL 1047236, at *11 (same). The checkpoint is working, of course, when the agents stationed at the checkpoint apprehend illegal immigrants. The checkpoint is also working, however, if by making the path more difficult it deters prospective immigrants from entering the United States illegally. The checkpoint is working still if it forces immigrants who come into the country illegally to remain on foot, making it easier and safer for roving patrol agents to find and apprehend them in the desert. The Supreme Court recognized this sort of deterrence as a key purpose of Border Patrol checkpoints in *Martinez-Fuerte*.[2] 428 U.S. at 557 (noting that checkpoints can force illegal immigrants off major highways making "them more vulnerable to detection by roving patrols"). But it cannot be measured in statistics.

Moreover, if the rule were that Border Patrol checkpoints are legal only if immigration arrests make up a certain percentage of the total arrests, cartels would gain the ability to shut down checkpoints. *See Ruiz*, 2017 WL 1031137, at *14. Cartels "could arrange for significant narcotics trafficking through a specific checkpoint until it was deemed unconstitutional," and then more freely smuggle both humans and narcotics through that area. *Id.*

---

[2] Bressi contends that *Martinez-Fuerte* only considered whether Border Patrol was "intercepting smuggling traffic at the checkpoints themselves." *See* Doc. 104 at 11:8-9. His interpretation of *Martinez-Fuerte* is belied by the language that Bressi quoted just before, where the Supreme Court recognized the deterrent effect of checkpoints. *See id.* at 11:4-8.

1    Finally, illegal immigration is constantly changing. Even if cartels were not

2    manipulating data, a change in the ratio of narcotics smuggling versus human smuggling

3    events in a single year, or over the course of a few years, may be temporary. For example,

4    if this Court had held that the State Route 86 checkpoint was unconstitutional in 2017

5    because narcotics arrests outnumbered immigration arrests for one year, *see Brown*, 2017

6    WL 6403069, at *6, the checkpoint would not be there today as the country faces a surge

7    in illegal immigration.

8    For those reasons, this Court should not place too much weight on arrest or event

9    statistics. The statistics do not warrant a finding that the primary purpose of the checkpoint

10   is something other than immigration enforcement.

11
         **2.    The use of canines does not alter the analysis because brief canine
             exterior sniffs to not implicate the Fourth Amendment and Border
12           Patrol's canines detect concealed humans in addition to narcotics.**

13   Bressi argues that the presence of canines at the State Route 86 checkpoints takes this

14   case outside the scope of *Martinez-Fuerte*. *See e.g.* Doc. 104 at 15:7-9. But the presence

15   of a canine does not change the analysis because a canine exterior sniff does not implicate

16   the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). Thus, the Supreme

17   Court has held that law-enforcement officers may use a trained detection canine during an

18   otherwise lawful traffic stop. *See id*. Applying this rule to Border Patrol checkpoints, the

19   two other circuit courts with southwestern border states in their jurisdiction have

20   concluded that Border Patrol may use their cross-trained detection canines—that is,

21   canines trained to detect both concealed humans and narcotics—at checkpoints without

22   violating the Fourth Amendment, as long as the canine search does not unreasonably

23   prolong the stop. *See U.S. v. Tello*, 924 F.3d 782, 787 (5th Cir. 2019) (holding that Border

24   Patrol did not violate the Fourth Amendment when its canine alerted to concealed humans

25   in the defendant's tractor-trailer at a Border Patrol checkpoint); *U.S. v. Forbes*, 528 F.3d

26   1273, 1277 (10th Cir. 2008) (reasoning that a legal canine search at a Border Patrol

27   checkpoint was an "independent source" for finding contraband). Indeed, this Court has

28   routinely rejected the argument that Border Patrol's use of cross-trained detection canines

14

1   turn Border Patrol checkpoints into unconstitutional general crimes checkpoints. *See*

2   *Alatorre-Verdugo*, 2018 WL 6729664, *6 ("The presence of canines which are cross-

3   trained to sniff out narcotics and concealed humans, does not unconstitutionally broaden

4   the purpose of the checkpoint."); *Audelo-Marquez*, 2017 WL 5514359, at *22 ("[T]he fact

5   a 'dog was trained to detect both drugs and concealed people does not raise an inference

6   of illegality.'"); *Ruiz*, 2017 WL 1031137, at *14 (rejecting the defendant's argument that

7   the use of cross-trained canines turned the I-19 checkpoint into a general crimes

8   checkpoint); *Cf. Wilson*, 650 Fed.Appx. at 539. Once again, Bressi cites no contrary

9   authority. Thus, the use of canines at the State Route 86 does not alter the analysis.

10
11
    ### 3. Bressi vastly overstates the presence of the Pima County Sheriff's Department at the State Route 86 checkpoint.

12      In portraying the State Route 86 checkpoint as a general crimes checkpoint, Bressi

13   vastly overstates the presence of the Pima County Sheriff's Department at the State Route

14   86 checkpoint. *See* Doc. 104 at 16:8-17:5. To be sure, there is no law or policy that

15   prevents Border Patrol from calling a local law-enforcement agency when a specific need

16   arises. But Bressi is wrong to suggest that Pima County Sheriff's deputies routinely locate

17   themselves at the checkpoint to inspect drivers.

18      The best way to quantify the Pima County Sheriff's Department presence at the

19   checkpoint is by looking at Bressi's videos. He has 555 videos of himself driving past the

20   checkpoint. Yet he identified only 12 videos during discovery showing Pima County

21   Sheriff's deputies at the checkpoint. In two of those videos, the Pima County Sheriff's

22   deputies responded only after Border Patrol called them to respond to Bressi. When those

23   two videos are removed from the equation, Bressi is left with only 10 videos showing a

24   Pima County Sheriff deputy located at the checkpoint—10 out of 555 videos, or about

25   1.8% of the time. None of those videos show a Pima County Sheriff's deputy interacting

26   with drivers in the primary lane of travel, except that Deputy Roher came over to the

27   primary lane to deal with Bressi on April 10, 2017, after it appeared that Bressi was again

28   illegally blocking a public roadway.

Bressi's evidence is not to the contrary. Although Bressi produced incident reports suggesting that Pima County Sheriff's deputies had located themselves within the checkpoints, the evidence shows that these were rare and isolated incidents from several years ago. For example, Bressi produced records suggesting that a deputy stationed him or herself at or near the checkpoint for a few hours 8 times in 2013, 14 times in 2014, 1 time in 2015, 3 times in 2016, and 6 times in 2017. (*CSOF* re: Plaintiff's SOF #41.) There is no record of a Pima County Sheriff deputy stationing him or herself at or near the checkpoint in over four years—not from the incident report or from Bressi's videos.

In the end, Bressi cites no case suggesting that the presence of a local law-enforcement agency at the checkpoint around 1.8% of the time transforms the checkpoint from one whose primary purpose is immigration to one whose primary purpose is general crimes. These relatively rare appearances by Pima County Sheriff's deputies at the checkpoint from several years ago do not change the analysis.

### 4. Bressi refers to a few other law-enforcement tools that are not used as part of the routine checkpoint inspection and therefore do not alter the primary purpose of the checkpoint.

In his motion, Bressi also mentions license-plate readers, *see* Doc. 104 at 15:1-2; a backscatter (or x-ray) machine, *see id.* at 23:14-19; law-enforcement databases, *see id.* at 14:22-15:1; and radiation-detection devices, *see id.* at 9:12-15. None of these are part of the routine inspection and do not alter the primary purpose of the checkpoint.

On license-plate readers, there are none in the checkpoint. The DEA has a license-plate reader near the checkpoint, but the information from that reader is not used by Border Patrol agents working the checkpoint. Although Agent Teran could not rule out that information from the DEA license-plate reader was ever shared with any part of Border Patrol (the agencies sometimes form joint task forces and share intelligence), the data from those readers is not available to regular Border Patrol agents operating the checkpoint. To be sure, license-plate readers do not implicate the Fourth Amendment because there is no reasonable expectation of privacy in one's license plate. *See U.S. v. Diaz-Castaneda*, 494

F.3d 1146, 1151 (9th Cir. 2007). Bressi has cited no case suggesting that a license-plate reader located near a Border Patrol checkpoint changes the purpose of the checkpoint.

On the backscatter (or x-ray) machine, that tool is used only in the secondary inspection area after Border Patrol agents have consent to use it or probable cause to believe humans or contraband are hidden in a vehicle compartment. There is no evidence that the backscatter machine is used routinely as part of the typical inspection, and Bressi has cited no authority to suggest that the presence of a backscatter machine changes the primary purpose of a Border Patrol checkpoint.

Regarding law-enforcement databases, again, these databases are not used as part of the typical inspection in the primary lane of travel. They allow agents to access Border Patrol's immigration database, and likely other broader criminal databases. Again, Bressi cites no authority suggesting that Border Patrol agents should not have access to law-enforcement databases at immigration checkpoints. In fact, it would be absurd to impose a rule barring Border Patrol agents from having access to law-enforcement databases at checkpoints.

Finally, the radiation-detection devices simply sit on an agent's belt. The device would alert an agent if someone was driving through the checkpoint with radioactive material. The devices do not slow down the typical inspection at the checkpoint. Again, Bressi cited no authority for the proposition that radiation detection devices transform the purpose of a Border Patrol checkpoint, and again, it would be absurd to have a rule barring Border Patrol agents from wearing them.

> **5.  The other miscellaneous matters that Bressi raises still do not alter the analysis.**

Bressi points to a few other miscellaneous items in his quest to redefine the purpose of the Border Patrol checkpoint—the fact that Border Patrol is involved in collecting and sharing intelligence, *see* Doc. 104 at 11:10-13; that Border Patrol sometimes advertises their narcotics seizures, *see id.* at 15:13-15; and that Agent Teran did not know the name

of the specific individual who established the State Route 86 checkpoint, *see id.* at 18:18-19. None of these points change the analysis.

There is no reason to consider whether Border Patrol, as an agency, collects and shares intelligence. Intelligence could be related to either human smuggling or drug smuggling, so it is not clear how it would change the analysis. Further, the argument that Border Patrol being involved in intelligence somehow impermissibly changes the purpose of its checkpoints is contradicted by *Soto-Camacho*, where the Ninth Circuit held that Border Patrol could permissibly locate a specific temporary checkpoint based on intelligence about narcotics. 58 F.3d at 409-10.

There is also no reason to place too much weight on Border Patrol's occasional advertising of its narcotics busts. At least one district court has rejected an argument that advertisements like that suggest that the primary purpose of a checkpoint is drug interdiction. *See Torres-Laranega*, 2004 WL 7337430 at *4. Bressi has cited no authority to the contrary.

Finally, there is no significance to the fact that Agent Teran could not name the person who originally decided to establish the State Route 86 checkpoint or choose its specific location. For this argument, Bressi cites only *Martinez-Fuerte*, but nowhere in that case did the Supreme Court reason that a Border Patrol checkpoint was constitutional only if the current Border Patrol commanders could name the person who originally established the checkpoint.

**C. Bressi produced no evidence that the State Route 86 imposes a greater burden on travelers than the Border Patrol checkpoint at issue in *Martinez-Fuerte* or the dozens of other Border Patrol checkpoints that have been upheld over the years.**

Once this Court determines that the primary purpose of the State Route 86 checkpoint is immigration enforcement, it should balance the "need to make routine checkpoint stops" against the "intrusion on Fourth Amendment interests." *U.S. v. Martinez-Fuerte*, 428 U.S. 543, 557-58 (1976); *see also Faulkner*, 450 F.3d at 472 (weighing the gravity of the public concerns served by the checkpoint, the degree to which the checkpoint advances the public

18

interest, and the severity of the interference with individual liberty). As the Supreme Court recognized in *Martinez-Fuerte*, "[i]t has been national policy for many years to limit immigration into the United States," 428 U.S. at 552, and "maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border," *id.* at 556. Thus, the focus of the balancing test is on the limited intrusion on the motorists' right to free passage without interruption." *Id.* at 557-58 (internal quotation marks omitted).

The undisputed evidence is that a typical inspection at the checkpoint consists of a Border Patrol agent looking inside the plain view areas of the vehicle and asking one or two questions about citizenship to each vehicle occupant. If a canine is in the area, it will also perform an exterior sniff of the vehicle. This is exactly the type of limited intrusion that falls within the scope of the Supreme Court's holding in *Martinez-Fuerte*.

Bressi once again takes facts out of context, this time creating a wildly far-fetched portrayal of what a routine inspection looks like at the State Route 86 checkpoint. To do this, Bressi identified every search tool that is available or has been used in the past at the checkpoint, claiming that they are all used during a routine checkpoint stop. *See e.g.* Doc. 104 at 23:6-12. Believing Bressi, one might think that a typical checkpoint stop at the State Route 86 checkpoint goes something like this: An agent stops a driver at the checkpoint. The agent asks the driver whether they are a U.S. citizen, but also asks for their name so they can run their name through multiple law-enforcement databases. Because the agent is cross-designated to enforce Title 21, the agent goes on the ask about drug use. When the agent is through asking questions, the agent brings a Pima County Sheriff's deputy over to ask the driver questions designed to uncover violations of state or local laws. Meanwhile, after a canine conducts an exterior sniff, an x-ray machine is used to x-ray every compartment of the driver's vehicle. Once the x-ray is completed, once the driver's license plate has been shared with DEA and cross-checked with their intelligence, and once the criminal databases are searched, the driver can finally leave. Every driver. Every time. All without any suspicion of any wrongdoing.

1    Bressi's version is pure fantasy. The only questions routinely asked are questions
2    about citizenship. The only "search" conducted is a plain view look into the visible areas
3    of the vehicle and an exterior sniff of the vehicle if a canine is available. The backscatter
4    machine is only used in secondary after agents have developed probable cause. The
5    criminal databases are available only for unique circumstances. The DEA license-plate
6    reader is not even part of the checkpoint. Pima County Sheriff's deputies are rarely inside
7    the boundaries of the checkpoint, and they do not conduct any kind of questioning or
8    inspection unless Border Patrol has already developed a need for assistance from local law
9    enforcement.

10    The best evidence in this case are Bressi's own videos. Bressi records every one of
11    his checkpoint stops and has produced 555 videos in this case. Revealingly, he did not
12    identify a single video depicting the prolonged checkpoint encounter that he so
13    inaccurately portrays. Rather, the last year of videos show Bressi getting waived through
14    the checkpoint most of the time; other videos show that when Bressi is addressed by a
15    Border Patrol agent, the agent is introducing himself as an immigration officer, stating the
16    purpose of the inspection, or asking whether Bressi is a U.S. citizen. When a canine is
17    present, the exterior sniff takes only a matter of seconds. The videos show that the
18    checkpoint is rarely backed up with traffic, and that when traffic is present, there are never
19    more than a few vehicles waiting. The only checkpoint encounters that last more than
20    about a minute are ones where Bressi starts honking his horn or yelling at officers,
21    prolonging the encounters himself.

22    In his motion, Bressi laments that Border Patrol "will never 'waive through' a
23    recognized local resident without inspection." *See* Doc. 104 at 23:6-7. Border Patrol policy
24    calls for agents to conduct their brief inspection on every vehicle driving through the
25    checkpoint. That policy is consistent with the reasoning that the systematic stopping of all
26    vehicles makes the intrusion to the traveling public minimal because people will expect to
27    be stopped and will not be alarmed. *See Lidster*, 540 U.S. at 428; *Fraire*, 575 F.3d at 934.

28

The policy makes sense because known travelers, once they realize they are not being searched, could become involved with smuggling.

It is not clear from the record whether agents waive Bressi through more often than other motorists because they know he is prone to become extremely uncooperative, or whether agents are using their discretion to waive through many more people they recognize. Either way, the intrusion is minimal.

Because Bressi has produced no evidence that the intrusion on travelers at the State Route 86 checkpoint is more significant than any of the other dozens of checkpoints that have survived a Fourth Amendment challenge, this Court should deny his motion for summary judgment.

**III. CONCLUSION**

For the foregoing reasons, this Court should deny Bressi's motion for partial summary judgment on Count 2.

Respectfully submitted on July 26, 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

By  *s/ Dennis C. Bastron*
DENNIS C. BASTRON
Assistant U.S. Attorney
*Attorney for the Federal Defendants*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on July 26, 2021, I electronically transmitted the attached

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5  Ralph E. Ellinwood
   Attorney at Law
6  P.O. Box 40158
   Tucson, AZ 85717
7  *Attorney for Plaintiff*

8  Amy Knight
   Knight Law Firm L.L.C.
9  3849 E Broadway Blvd, Suite 288
   Tucson, AZ 85716
10 *Co-counsel for Plaintiff*

11 Andrew J. Petersen
   Humphrey & Petersen P.C.
12 6063 E Grant Rd
   Tucson, AZ 85712
13 *Attorney for the Pima County Defendants*

14 By *s/ Dennis C. Bastron*

15

16

17

18

19

20

21

22

23

24

25

26

27

28