Ralph E. Ellinwood
Ralph E. Ellinwood,
Attorney at Law, PLLC
SBA: 3890
PO Box 40158
Tucson, AZ 85717
Phone: (520) 413-2323
Fax: (855) 817-6636
ree@yourbestdefense.com

Amy P. Knight
Knight Law Firm, PC
SBA: 31374
3849 E Broadway Blvd, #288
Tucson, AZ 85716-5407
Phone: 520 878-8849
amy@amyknightlaw.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Terrence Bressi,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　vs.<br><br>(1)　Pima County Sheriff Mark Napier, in his individual and official capacities, *et al.*,<br><br>　　　　　　　　　　　Defendants. | Case No. 4:18-cv-00186 DCB<br><br>PLAINTIFF'S REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

Defendants make repeated efforts to lessen the constitutional standards and level of scrutiny applied to them, perhaps reflecting an understanding that when the true standards are applied and the undisputed facts considered, they cannot prevail. They have suggested this Court has no business scrutinizing the operation of this checkpoint because it concerns immigration enforcement. That is an alarming and

1

1  unwarranted assertion of power. None of the cases they cite discusses the authority
2  of immigration-related law enforcement agencies within the United States. *See Trump*
3  *v. Hawaii,* 138 S. Ct. 2392 (2018) (challenge to Trump administration's "Muslim
4  ban"); *Mathews v. Diaz,* 426 U.S. 67 (1976) (limitations on Medicare eligibility
5  among certain aliens); *Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010)
6  (support to foreign terrorist organizations). The Supreme Court has never said courts
7  should use an unusually deferential standard when considering the individual
8  constitutional rights of citizens acting within the United States simply because the
9  agency infringing them is tasked with immigration enforcement—especially where,
10 as here, the crux of the claim is that their activities are *not* limited to immigration
11 enforcement.

12     Indeed, federal courts have been extremely willing to issue injunctions
13 regulating the practices of immigration-related agencies to ensure compliance with
14 the Constitution. *See, e.g., Ms. L. v. U.S. Immigration and Customs Enforcement,* 415
15 F. Supp. 3d 980 (S.D. Cal. 2020) (injunction regarding family separation); *Fraihat v.*
16 *U.S. Immigration and Customs Enforcement,* 445 F. Supp. 3d 709 (C.D. Cal. 2020)
17 (preliminary injunction on conditions of confinement in immigration facilities);
18 *Ramirez v. U.S. Immigration and Customs Enforcement,* 338 F. Supp. 3d 1 (D. D.C.
19 2018) (denying motion to dismiss complaint for injunctive relief regarding DHS
20 custody placements). This very Court has issued injunctions directed at the Border
21 Patrol's practices, and has been affirmed by the Ninth Circuit. *Doe v. Kelly,* 878 F.3d

710, 713 (9th Cir. 2017). This Court should reject the Defendants' suggestion that the Border Patrol should not be scrutinized because it is the Border Patrol.[1]

Similarly, the assertion that the location and routine operation of the checkpoint need only be "rationally related to immigration" (Doc. 172 at 9) is dangerously mistaken. It amounts to an assertion that the Border Patrol can do whatever it wants, as long as it can somehow tie it to immigration. If that understanding of the law is guiding their decisions, then no wonder their practices have exceeded their constitutional limits—they do not recognize those limits exist. But the Border Patrol has always been subject to constitutional limitations. *Almeida-Sanchez v. United States,* 413 U.S. 266 (1973), is a perfect example. In holding roving-patrol automobile searches without probable cause violate the Fourth Amendment, the Court declared:

> It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the

---

[1] Defendants have either missed the point of, or misrepresented, Plaintiff's discussion of the Border Patrol's growth. It is not "political commentary" (Doc. 172 at 11). Rather, it explains why the Supreme Court's conclusions in *Martinez-Fuerte* do not determine the validity of a modern checkpoint. Plaintiff is not arguing the Border Patrol should be smaller or have fewer responsibilities—only that it may not infringe his Fourth Amendment rights. They also claim Plaintiff asserts they "would do just fine with" only the I-19 checkpoint (Doc. 172 at 11). That is not the argument; it is that *Martinez-Fuerte* recognized the validity of only a particular type of checkpoint, and the only one in the area arguably meeting those standards is on I-19. Other checkpoints may have some utility, but that does not make them Constitutional.

predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Id.* at 273.[2]

Applying their mistakenly lenient standard, Defendants assert merely that "the location of the checkpoint and the typical inspection are both rationally related to immigration enforcement" (Doc. 172 at 10-11). Even if that were true, it would not save them. The "primary purpose" inquiry demands significantly more than a mere rational relationship. The question is whether it is the *primary* purpose, not whether it could rationally serve that purpose. The Ninth Circuit's decision in *U.S. v. Soto-Zuniga,* 837 F.3d 992 (9th Cir. 2016) lays to rest any suggestion that the government need only show some rational connection between the checkpoint and immigration enforcement. There, the government had presented evidence of the connection between the San Clemente checkpoint and immigration enforcement, but the court still found it was reversible error for the district court not to have allowed discovery when "the primary purpose of the San Clemente checkpoint was placed squarely at issue." *Id.* at 1002. It explained that *Martinez-Fuerte* was forty years old, and discovery was warranted to consider "[w]hether the primary purpose of the

---

[2] Defendants discuss at length the concerns of border security (Doc. 172, pp. 4-5; Federal Defendants' Additional Facts (Doc. 173) #11-13). No one disputes border security is a pressing interest that can justify some departure from baseline Fourth Amendment protections. All of this is covered by Part II(A) of the *Martinez-Fuerte* opinion, 428 U.S. at 551-553, and is the basis for allowing any exceptions at all. Plaintiff is not seeking to overturn *Martinez-Fuerte* and has not argued immigration does not present formidable law enforcement problems. But recognizing this need, *Martinez-Fuerte* was clear that there are limits to what it can justify. It is those limits that are at issue here.

4

checkpoint has evolved from controlling immigration to detecting 'ordinary criminal wrongdoing.'" *Id.* This inquiry clearly considered not only whether the asserted basis was rational, but what the purpose was, factually. *See also United States v. Faulkner,* 450 F.3d 466, 471 (9th Cir. 2006).

Defendants also ignore the requirement that even if the primary purpose does not render the checkpoint *per se* unconstitutional, it still must be reasonable under the circumstances, considering the gravity of the public concern, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. *United States v. Fraire,* 575 F.3d 929, 933 (9th Cir. 2009). On the second factor, the Supreme Court considers whether police "appropriately tailored their checkpoint stops to fit important criminal investigatory needs." *Illinois v. Lidster,* 540 U.S. 419, 427 (2004).

Defendants similarly ask this Court not to "scrutinize every specific law-enforcement tool or practice that is available at or near the checkpoint," asserting the only question here is "whether a particular checkpoint serves a valid programmatic purpose." (Doc. 172 at 12). But this Court must determine the actual purpose of the checkpoint, and may also need to determine its reasonableness—including the level of intrusion and whether what is done there is "appropriately tailored" to the need. These tasks involve examining what, exactly, motorists are subjected to. Of course, law enforcement deserves some deference as to what is truly necessary and effective—but that does not mean courts should not examine what they are doing.

Again, the agency's insistence that the Court should not examine its actions suggests a certain discomfort with what it might find.

When the correct standards are applied, the results are clear. First, the Court should note what Defendants do *not* dispute. The Border Patrol has represented, both publicly and to other government entities, that checkpoints, including specifically the SR-86 checkpoint, have deterring narcotics smuggling as an important purpose. They have also included checkpoints in their published data on drug seizures, but not on immigration apprehensions. (Plaintiff's Facts #8, 9, 12). Defendants' response ignores these critical facts. They offer no explanation for why they would make these public representations if, in fact, that were not a primary purpose of the checkpoint.

They never dispute that agents at the checkpoint are actively looking not only for illegal immigration activity, but for federal criminal activity of any kind, nor that mere reasonable suspicion of criminal, non-immigration activity suffices to refer a vehicle for further inspection. (Plaintiff's Fact #23, 25). Nor do they dispute that on multiple occasions, agents have referred vehicles to secondary solely at the request of other agencies who have no authority to enforce immigration law (Plaintiff's Fact # 26)—they claim only that they have not done this *lately*. They never explain how these actions are tailored to the purported permissible purpose of the stop.

They never dispute that Pima County Sheriff's Deputies worked at the checkpoint on Operation Stonegarden shifts dozens of times between 2013 and 2017, and that Stonegarden deployments were directed by the Border Patrol (Plaintiff's Fact #38), noting only that they do not consider this "regular" and that it did not appear to

1  have happened since April of 2017.³ And they left undisputed the fact that the Border
2  Patrol's assignments of Stonegarden deputies between 2013 and 2017 included
3  working at the SR-86 checkpoint conducting general law enforcement activities
4  (Plaintiff's Fact # 44). They have offered no reason, other than general crime control,
5  why they would assign deputies there.

6  Nor have they disputed that the Border Patrol had a pilot program operating
7  license plate readers ("LPRs") at the SR-86 checkpoint, and that the DEA has LPRs
8  in the immediate vicinity of the checkpoint, which the Border Patrol includes in its
9  encroachment permit applications. (Plaintiff's Facts # 19, 20) They admit the DEA
10 may share information with Border Patrol (Doc. 172 at 16). They offer no explanation
11 for how these devices further their stated goal of intercepting illegal immigration
12 traffic traveling from the border. These facts, never addressed by Defendants,
13 demonstrate there is no genuine issue of material fact as to the checkpoint's purpose.

14  <u>Other Evidence of Primary Purpose and Reasonableness</u>

15  Defendants run through some (not all) of the evidence Plaintiff has presented
16 on primary purpose and reasonableness and assert that each item does not by itself
17 automatically render the checkpoint illegal. They also point out there is no published
18 case stating various individual facts prove the primary purpose.⁴ But the Court can

---

³ The last documented occurrence was in July of 2017, as explained *infra*.
⁴ For example, they represent that *Torres-Laranega*, 2004 WL 7337430 (D. NM) "rejected an argument that advertisements [of drug busts] suggest that the primary purpose of a checkpoint is drug interdiction." (Doc. 172 at 18). Not only was that an entirely different kind of advertisement (signs at the checkpoint itself, rather

understand what facts mean whether or not a previous court has explicitly stated the same thing. Each of these facts contributes to the overall conclusion, which, when all the areas (those they discuss and those they ignore) are considered together, is inescapable: the Border Patrol is using this checkpoint for general crime control.

*Statistics:* Defendants argue at length that although the Ninth Circuit has said otherwise, statistics are not a useful measure of a checkpoint's purpose or effectiveness (Doc. 172 at 12-14). Plaintiff does not assert statistics alone prove purpose, but they certainly reflect to some degree what the checkpoint accomplishes. They are a relevant consideration, as are the overall very low numbers of immigration apprehensions.

*Dogs:* Defendants mischaracterize Plaintiff's assertion regarding canines, and in arguing against their inaccurate version, ignore the true import of the facts. Plaintiff has never said dog sniffs themselves violate the Fourth Amendment. Rather, they reflect what the agency is looking for when it stops vehicles, bearing directly on the primary purpose.

*Local Law Enforcement:* Plaintiff has identified dozens of occasions on which local law enforcement was present at the checkpoint without being specifically summoned. Defendants misleadingly minimize how frequently this occurs. Defendants state "[t]he best way to quantify the Pima County Sheriff's Department

---

than publication or internal memo justifying the checkpoint), but it simply does not say that. It says the evidence was "insufficient to establish" a primary purpose of drug interdiction. *Id.* at *4. It never says it could not contribute to such a finding in the presence of other convincing evidence.

8

presence at the checkpoint is by looking at Bressi's videos." (Doc. 172 at 15). That makes no sense. The checkpoint operates 365 days a year. Mr. Bressi travels through it only 50-60 times per year. (Plaintiff's Fact #34). They could be there every single one of the other 300-plus days each year, and Mr. Bressi's videos would not capture it, but their presence there still bears on the purpose for which the checkpoint is generally being used. The deputies' reports provide a more accurate (although still likely under-inclusive) picture of how regularly they were there.[5] Mr. Bressi identified, and attached as his Exhibit 11, dozens of reports of this occurring between 2013 and the end of 2017, of which Defendants apparently acknowledge only 32. Although some of the discrepancy can be explained by the fact that Plaintiff counted incidents, not dates, and some days had multiple incidents, Defendants left off at least 7 dates from Exhibit 11 with no explanation for why they are disputed (11/13/13, pt. 1, p. 8; 11/23/16, pt. 2, p. 25; 12/16/16, pt. 2, p. 29; 2/7/17, pt. 3, p. 4; 3/8/17, pt. 3, p. 10; 4/4/17, pt. 3, p. 12; 7/28/17, pt. 3, p. 15), as well as two more where the dates are not clear from the reports but they do not correspond to any of the other reports (pt. 3, pp. 19, 20). They also ignore Deputy Roher's statement that this was a regular practice. (Exhibit 18). And all of this only addresses Pima County; they are not the only local law enforcement agency to participate in the checkpoint. Defendants are

---

[5] Defendants inexplicably characterize these incidents as deputies "stationing themselves" at the checkpoint. Most of the reports explicitly state the deputy was there on an Operation Stonegarden shift, which Defendants admit means they were directed on where to work by the Border Patrol. (Plaintiff's Fact #38).

1  left with the dubious assertion that something that happened 40-plus times in 5 years
2  is rare enough to be insignificant.

3      *LPRs:* Defendants insist that because agents on the ground at the checkpoint
4  cannot access LPR data in real time, it is not a relevant intrusion. That misses the
5  point. The government is using a checkpoint to collect data on passing motorists.
6  Using it as part of longer-term investigations is in some ways far worse than using it
7  in the moment. Nor does the fact that the DEA's LPRs are not inside what the Border
8  Patrol considers the boundary of the checkpoint make them less invasive. Defendants
9  do not claim the two are unrelated, and even admit the DEA LPR data may be shared
10 with Border Patrol intelligence units (Doc. 172 at 16). And once again, they resort to
11 arguing that LPRs alone do not violate the Constitution or transform the purpose.
12 They make the same argument about backscatter. But it remains a factor to consider.

13     *Databases:* Defendants' only argument here is that "it would be absurd" to
14 restrict access to general criminal history databases at checkpoints that are billed as
15 immigration enforcement tools (Doc. 172 at 17). Why? A search in a database that
16 goes beyond immigration information is an agent affirmatively looking for non-
17 immigration-related criminal information, not simply happening upon it when
18 conducting a plain-view inspection. The fact that they decided to so equip themselves
19 reflects on purpose, and the fact that they sometimes do it reflects on reasonableness.

20     *Intelligence*: Defendants miss the point about intelligence-gathering. The
21 complaint is not that the Border Patrol as an agency collects intelligence and runs
22 investigations. It is that it uses checkpoints to further those investigations, which they

10

1 admit may concern drug smuggling. That is an entirely different use of a checkpoint
2 from that discussed in *Martinez-Fuerte*. It is one thing to look for something illegal
3 happening right now in front of you; it is another to squirrel away information for use
4 in possibly tracking someone down or building a case against him in the future.
5 Defendants do not deny that agents *can* do all these things, and they are available
6 and/or have been used in the past. That is relevant to both purpose and reasonableness.

   Level of Intrusion

8 There are two problems with Defendants' arguments here—one logical, one
9 factual. First, they argue the scope is appropriately limited because of what occurs at
10 a "typical inspection" (Doc. 172 at 19). But the fact that agents can, and sometimes
11 do, expand their searches and seizures beyond that is absolutely relevant. Plaintiff has
12 not claimed all of these things occur to "Every driver. Every time." (Doc. 172 at 19).
13 And they don't need to bear on the intrusiveness of the checkpoint. There is no rule
14 that says it is okay to intrude significantly if you only do it occasionally.

15 Defendants also severely minimize the intrusions as a factual matter. They
16 write off the idea that a dog sniff could be intrusive, explaining it is only "an exterior
17 sniff of the vehicle if a canine is available." (Doc. 172 at 20). But having a large dog
18 sniff around your vehicle *is* intrusive. It is more intrusive than simply being asked a
19 question, and it is a regular occurrence at the checkpoint.

20 They claim the "criminal databases are available only for unique
21 circumstances." (Doc. 172 at 20). But Plaintiff's Fact #15, which Defendants did not
22 dispute, establishes "the agency does not have specific rules or criteria independent

1  of the general rules concerning access to each database for when agents at the SR-86
2  checkpoint may access these databases." They imply the DEA LPR doesn't matter
3  because it "is not even part of the checkpoint," but they never deny being partly
4  responsible for its presence, and it makes no difference to a motorist if the intrusive
5  device is inside or outside the line the agency has drawn on a map.   Finally,   they
6  claim the presence of deputies is rare, and they do no questioning or inspection unless
7  the Border Patrol asks them to. This is simply false. *See* Plaintiff's Fact # 41; Exhibit
8  11. Deputies have been there on many occasions, conducting inspections unrelated to
9  the Border Patrol's work and sometimes even asking the Border Patrol agents to
10 detain motorists for them.

11    Defendants argue the stops are not intrusive because they are generally short.
12 But a stop is not acceptable merely because it is brief; especially with today's
13 technology, a significant intrusion can be accomplished in a matter of seconds. The
14 Fourth Amendment deals not only with interrupting someone's day, but also with
15 gathering information about them. Plus, a number of the stops identified by Mr. Bressi
16 are not brief at all. Defendants claim in these he is "prolonging the encounters
17 himself," but that is not so; in various encounters, the *agents* are prolonging the
18 detention because they will not let Mr. Bressi leave even though they already know
19 he is a U.S. citizen. Plaintiff's Fact #31 (not disputed).

20    In discussing intrusion, Defendants ignore the fact that this checkpoint is in a
21 very different location than the *Martinez-Fuerte* checkpoints. A checkpoint on a small
22 local road primarily used by local commuters (Ex. 20 at 2) is intrusive in local

1  residents' daily lives in a way that one on a major interstate leading directly away
2  from the border is not.

3      Finally, Defendants imply throughout their brief that their intrusions are not
4  meaningful because they have not engaged in them lately. But "[i]t is well settled that
5  'a defendant's voluntary cessation of a challenged practice does not deprive a federal
6  court of its power to determine the legality of the practice. If it did, the courts would
7  be compelled to leave '[t]'he defendant . . . free to return to his old ways.'" *Friends*
8  *of the Earth, Inc. v. Laidlaw Environmental Services,* 528 U.S. 167, 189 (2000)
9  (internal citations omitted). Defendants suggest that because the violations have
10 slowed in 2018, 2019, 2020, and 2021, they are less important. The initial Complaint
11 in this lawsuit was filed in April of 2018 (Doc. 1). Just because a defendant improves
12 its behavior when it has been sued does not mean it can escape the consequences.

13     <u>Cases</u>

14     Defendants list 24 cases they claim constitute an "overwhelming consensus of
15 authority" in their favor (Doc. 172 at 3). Every last one is a criminal case, decided in
16 a markedly different context with a record developed under significantly more
17 restrictive discovery rules. Of the 24, only half were decided in the last ten years—a
18 crucial point when the claim is that checkpoints have changed over time. Of the
19 remaining twelve, five are unpublished Court of Appeals decisions (two out of circuit)
20 and seven are memorandum decisions or orders from this Court. Five of those seven
21 address the I-19 checkpoint, which is a different animal, as I-19 is a large interstate
22 highway that directly connects the international border with the City of Tucson, far

more similar to the facts in *Martinez-Fuerte*. That leaves two district court orders raise an even remotely comparable question: *United States v. McCowan*, 2018 WL 1026784, *11 (D. Ariz. Feb. 2, 2018), report and recommendation adopted, 2018 WL 993756 (D. Ariz. Feb. 21, 2018) (FR-15 checkpoint), and *United States v. Brown*, 2017 WL 6403069, *6 (D. Ariz. Oct. 4, 2017), report and recommendation adopted, 2017 WL 6381424 (D. Ariz. Dec. 14, 2017), addressing the checkpoint at issue in this case on SR-86.

In *McCowan,* the defendant presented no evidence on primary purpose, and did not even cross-examine the agent who asserted the primary purpose was immigration; indeed, she mostly conceded this question. 2018 WL 1026784 at *11. The case thus has no bearing on the assessment of the extensive evidence presented here. *Brown* was similarly decided on a record far more limited than this one, and specifically noted that even a checkpoint with a valid primary purpose must be assessed "on the basis of the actual circumstances." 2017 WL 6403069 at *6.

In any event, *Martinez-Fuerte* clearly stated it was not blessing any and all Border Patrol checkpoint stops. Rather, it examined in detail the locations and documented effectiveness of two specific checkpoints and concluded those stops were reasonable, specifically referring to "major routes inland," 428 U.S. at 557. It was careful to say it was not giving the Border Patrol blanket permission, as it maintained that "a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review." *Id.* at 560. It repeated its holding that the stops were permissible "at reasonably located

14

1 | checkpoints," *id.* at 562, not at any checkpoint the Border Patrol might operate so
2 | long as its stated purpose is immigration enforcement.

3 |     Defendants leave off their list an important case discussing checkpoints, albeit
4 | one not ultimately resolving the question at issue here. In *Soto-Zuniga,* 837 F.3d 992,
5 | a recent, published case from this circuit, the Court reversed a conviction based on
6 | the district court's refusal to afford sufficient discovery on the question of the
7 | checkpoint's purpose—specifically, statistics regarding its operation and
8 | effectiveness. This ruling reflects the Ninth Circuit's view that a checkpoint's
9 | constitutionality—even one operated by the Border Patrol with the stated purpose of
10 | immigration enforcement—depends on information specific to the particular
11 | checkpoint being challenged. It could not be determined based only on the text of
12 | *Martinez-Fuerte* and the testimony of Border Patrol agents. *Id.* at 1000. Rather, the
13 | Court recognized a real concern that there are "reasons to suspect the agents working
14 | these checkpoints are looking for more than illegal aliens," which would "subvert[]
15 | the rationale of *Martinez-Fuerte* and turn[] a legitimate administrative search into a
16 | massive violation of the Fourth Amendment," *id.* at 999, and ordered the district court
17 | to revisit the question after giving both sides a fair opportunity to present evidence.
18 | When the federal defendants do discuss *Soto-Zuniga* ten pages later, it is primarily to
19 | disagree with it, citing district court decisions whose analysis they prefer.
20 | //
21 | //
22 |

CONCLUSION

Defendants have implored this Court not to look too closely at their practices, and to use only the lightest review. They have ignored the most damning facts and failed to address the actual asserted import of many more. The undisputed facts demonstrate that the SR-86 checkpoint has a primary purpose of general crime control, and that it is not operated reasonably as an immigration checkpoint. For these reasons and those stated in the motion, this Court should grant partial summary judgment to Plaintiff.

DATED this 9th day of August 2021.

Ralph E. Ellinwood, Attorney at Law, PLLC
Knight Law Firm, PC

/s/ Amy P. Knight
Ralph E. Ellinwood
Amy P. Knight
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of August 2021 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing the transmittal of a Notice of Electronic Filing.

I certify under penalty of perjury that the foregoing is true and correct.

          /s/ Amy P. Knight
          Attorney for Plaintiff

ECF copy to:

Andrew J. Petersen, Esq.
Humphrey & Petersen, P.C.
APetersen@humphreyandpetersen.com

Dennis Bastron, Esq.
Assistant U.S. Attorney
Dennis.Bastron@usdoj.gov