**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Terrence Bressi, | No. CV-18-00186-TUC-DCB |
| Plaintiff, | **ORDER** |
| v. | |
| Pima County Board of Supervisors, et al., | |
| Defendants. | |

The Court considers three related dispositive motions: Plaintiff's Motion for Partial Summary Judgment (Doc. 104); Federal Defendants' Motion for Summary Judgment (Doc.146), and Pima County Defendants' Motion for Summary Judgment (Doc. 135, 136). The Court considers all three motions with the facts construed in favor of the Plaintiff, and grants summary judgment for Defendants. The Court finds that the Plaintiff's Fourth Amendment and First Amendment rights under the United States Constitution were not violated by Defendants' border checkpoint operations on SR-86 or his detention and citation for blocking traffic on April 10, 2017.

<u>A.</u>

<u>Plaintiffs' Alleged Statement of Facts</u>

Plaintiff Bressi alleges that over the past approximately 13 years, he has been stopped at the State Route 86, "traffic checkpoint," when driving from the Kitt Peak Observatory to Tucson. (P MPSJ, SOF (Doc. 105) ¶ 1.) His work for the University of Arizona requires periodic trips to the Kitt Peak Observatory. *Id.* ¶ 33. It is undisputed that

1    he travels through the checkpoint an average of 50-60 times per year and has been doing

2    so since the inception of the checkpoint on SR-86. *Id.* ¶ 33-34.

3        "Since 2010, the United States Border Patrol has continuously operated a traffic

4    checkpoint on SR-86 at milepost 146.5; it is a permanent check point, staffed at all times,

5    and stops all traffic traveling eastbound towards Tucson. *Id.* ¶ 2. All Border Patrol agents

6    are cross-designated with so-called "Title 21 authority," which includes the power to

7    enforce federal criminal laws pertaining to narcotics. *Id.* ¶ 13.

8        "The Department of Homeland Security operates a grant program known as

9    Operation Stonegarden which provides funds to local law enforcement agencies to

10   compensate officers for overtime work during which they are assigned to assist the Border

11   Patrol." *Id.* ¶ 36. Approved by the County Board of Supervisors, *id.* ¶ 43, the Pima County

12   Sheriff's Department participated in Operation Stonegarden from at least 2008-2018, *id.* ¶

13   37, and Pima County Sheriff's deputies were regularly stationed at the SR-86 checkpoint

14   to carry out general law enforcement duties, as "reflected in incident reports maintained by

15   the Sheriff's Department in which deputies report working at the checkpoint and enforcing

16   state laws with no report of having been called there by the Border Patrol for a specific

17   purpose," *id.* ¶ 41. "Operation Stonegarden deployments were directed and approved by

18   Customs and Border Protection/Border Patrol, . . . [and] required the Pima County Sheriff's

19   Department to 'coordinate' with the relevant Border Patrol stations to 'conduct joint

20   patrols' and 'conduct joint operations.'" *Id.* ¶ 38. Pima County Sheriff's Deputies have no

21   authority to enforce federal immigration laws. *Id.* ¶ 42. There is no evidence or allegation

22   that County Sheriff deputies enforced any federal immigration laws.

23       In short, "[b]etween 2013 and 2017, it was the official policy of Pima County to

24   allow deputies to be stationed as directed by the Border Patrol during Operation

25   Stonegarden shifts, and those assignments regularly included working at the SR-86

26   checkpoint conducting general law enforcement activities such as enforcing vehicle

27   equipment requirements and checking for outstanding warrants." *Id.* ¶ 44.

28

The SR-86 border checkpoint is one of three checkpoints located in the western half of Southern Arizona.  The Government's stated purpose for these permanent checkpoints was border security, including preventing terrorism, and the dual purpose of stopping human and drug smuggling. *See* Arizona Department of Transportation (ADOT) Highway Encroachment Permit Application, dated November 4, 2019 (Fed. DMSJ, SOF (Doc. 141) at Ex. A); Border Patrol Traffic Checkpoint Policy from 2003, *Id.* at Ex. I); 2016 TUC Checkpoint Operations (G's SOF at J; P MPSJ, SOF, Ex. 20 (Doc. 132[1]-8) at 1-9); Checkpoint Procedures, dated November 2017, *Id.* at Ex. K; P MPSJ, SOF, Ex. 20 (Doc. 132-8) at 1-16; MOU between DEA and INS, dated April 28, 2011, (P MPSJ, SOF, Ex. 7 Prt 1 (132-1) at 1-11.

The relevant geographical highway system in western half of Southern Arizona includes an interstate system of I-8, an east-west interstate that comes from Southern California through Southern Arizona at Yuma to I-10 around Casa Grande, a city located between Tucson and Phoenix. I-10 is the east-west interstate that runs between New Mexico and California through Southern Arizona to Tucson, then north-south between Tucson and Phoenix. I-19 is a north-south interstate that runs between the Mexico border at Nogales and Tucson. There are three state routes in the western[2] half of Southern Arizona. SR 85 runs between Mexico at Lukeville, north-south, to I-8. SR 86 runs east-west from its intersection with SR 85 to Tucson. SR 286 runs from the Mexico border at Sasabee, north-south, to SR 85.

"The United States Border Patrol operates checkpoints on all three north-south roads coming from the Mexico border intersected by SR-86: SR 85, SR 286, and I-19." At 6. "SR-86 is an east-west road that at no point intersects the US-Mexico border. (P MPSJ, SOF (Doc. 105) ¶ 5.)  "SR-86 is the main east-west route traveled by individuals, including those coming from the Kitt Peak National Observatory." *Id.* ¶ 7.

The United States Border Patrol conducts traffic checks on these major highways

---

[1] Doc. 132 (sealed) is comprised of exhibits filed under seal.

[2] The Court considers the road system west of Tucson to be in the western half of Southern Arizona.

leading away from the border to (1) detect and apprehend illegal aliens attempting to travel further into the interior of the United States after evading detection at the border and (2) to detect illegal narcotics." *Id.* ¶ 8. In other words, one main purpose of the SR-86 checkpoint is deterring narcotics smuggling. *Id.* ¶ 9.

For the four years (2017-2020) that the Border Patrol provided statistics, there were approximately 257 immigration arrests and 83 incidents compared to 153 narcotic related arrests and 128 incidents involving narcotics. *Id.* ¶ 10. Some narcotic arrests were immigration related, and there were "other arrests," including narcotic arrests, that were not immigration related. Adjusted accordingly, there were 257 immigration related arrests and 284 nonimmigration related arrests. *See* (P MPSJ, SOF, Ex. 4: Stats at 1-4 (Doc. 106-4)).

Agents routinely use trained canines at the SR-86 checkpoint that are trained to detect narcotics and concealed humans, (P MPSJ, SOF (Doc. 105) ¶ 16, and are used in the "pre-primary" area of the checkpoint "before a driver has an initial encounter with any agents." *Id.* ¶ 17.   A backscatter (X-ray) device detects hidden compartments that can conceal both humans and narcotics. *Id.* ¶ 14. Agents wear personal radiation detector devises. *Id.*; (Fed. Resp. to P MPSJ (Doc. 172) at 17).

Border Patrol operated a pilot program for several months where it installed agency-owned automatic license plate readers at the SR-86 checkpoint, (P MPSJ, SOF (Doc. 105) ¶ 19), and between 2013 and 2017, Pima County Sheriff's deputies were regularly stationed at the SR-86 checkpoint to carry out general law enforcement duties, *id.* ¶ 41, such as enforcing vehicle equipment requirements and checking for outstanding warrants, *id.* ¶ 44.

Border Patrol's policy does not to exempt any vehicle, including those of known local commuters or residents, from inspection at the SR-86 checkpoint; there is no policy for agents to "wave through" individuals known to them whom they know to be U.S. citizens. *Id.* ¶ 21.

Each car passing through the checkpoint enters an area known as "primary inspection," where it is required to stop, and a Border Patrol agent asks the occupants if

they are United States citizens and conducts an "open view" inspection of the vehicle. *Id.* ¶ 22.   During this initial encounter, agents are trained to look both for signs that the occupants may not be United States citizens or may be present without authorization, and for indications of federal criminal activity of any kind. *Id.* ¶ 23. "The basis of a primary checkpoint inspection is the decision to allow individuals to proceed or refer them to secondary inspection" based on "immigration purposes," i.e., for "additional investigation based on some or mere suspicion that there may be an immigration violation," (PMPSJ SOF: Traffic Check Operations 11/2017 (Doc. 132-5) at 14.) "Title 21 authority in conjunction with reasonable suspicion" or "[r]easonable suspicion for any federal crime and state violations in some jurisdictions." (P MPSJ, SOF (Doc. 105) ¶ 23 (citing Ex. 9: Academy Student and Instructor Traffic Check Slide 18; Ex. 10: Field Training Instructor Guide, p. 10.1.1-10 (USA-02270)).   *Accordingly*, "agents have discretion to direct any vehicle passing through the checkpoint to a secondary inspection area." *Id.* ¶ 24 (emphasis added).

"Agents may refer a vehicle to a secondary inspection area because the agent has reasonable suspicion that the occupant is engaged in non-immigration-related criminal activity." *Id.* ¶ 25. "Agents sometimes detain individuals passing through the checkpoint, including directing them to the secondary inspection area, not for immigration reasons, but at the request of other law enforcement agencies who do not enforce immigration laws." *Id.* ¶ 26

"It is the policy of the Border Patrol to detain individuals passing through the checkpoint until they have determined their citizenship." *Id.* ¶ 27. Plaintiff alleges the following: the Border Patrol knows the Plaintiff is a United States citizen, *id.* ¶ 28; many of the agents recognize him and his vehicle; *id.* ¶ 29, there is a poster with Mr. Bressi's name and photograph, with a statement that he is a United States citizen and an uncooperative motorist, posted at the SR-86 checkpoint, *id.* ¶ 30, and "agents often do not allow him to proceed without stopping him to question him about his citizenship, even

when they recognize him," *id.* ¶ 31. There is no evidence that agents at the SR-86 checkpoint have ever suspected the Plaintiff is involved in human smuggling. *Id.* ¶ 32.

On April 10, 2017, Plaintiff was stopped at the primary inspection area and "the agent request[ed] Mr. Bressi move to secondary prior to asking him any question other than 'How you doin.'" (PResp PC MSJ) (Doc. 161) at 2-3). Plaintiff left the checkpoint as soon as Border Patrol Agent Frye allowed him to do so; in total, Plaintiff was at the primary checkpoint stop for just over two minutes. (PResp PC MSJ) (Doc. 161) at 3.) Deputy Roher knew that Plaintiff was detained at the primary stop at the direction of Border Patrol and, therefore, knew there was no probable cause to arrest the Plaintiff for obstructing traffic at the checkpoint. *Id.* at 5 (relying on prior conduct of Pima County Sherriff, Deputy McMillan, who declined to arrest him for blocking roadway because Border Patrol stopped him, and he was not free to go).

On April 10, 2017, Deputy Roher detained the Plaintiff, including handcuffing him, and criminally cited him for obstructing traffic at the SR-86 checkpoint. The Plaintiff has received three civil citations for blocking or impeding the flow of traffic there on December 20, 2008, March 29, 2013, and April 30, 2014. (PResp Pima County MSJ (PC MSJ), Controverting SOF (CSOF) ¶ 2.)

### B.

### Plaintiff's claims

The Plaintiff alleges that the Border Patrol is violating the Fourth Amendment because Border Patrol agents and Pima County Sheriff's primarily use the SR-86 checkpoint for general law enforcement, not immigration. These stops are made without reasonable suspicion that he has or is committing a state or federal crime and, therefore, violate the Fourth Amendment to the United States Constitution. During these allegedly illegal stops, he is asked his citizenship and required to answer the question in violation of the First Amendment to the Constitution. He alleges he has been repeatedly subjected to these constitutional violations as he regularly traverses SR-86, and on April 10, 2017, he

1    was detained without probable cause for blocking the roadway in violation of the Fourth

2    Amendment.

3            The seminal Fourth Amendment case relevant here, *United States v. Matrinez-*

4    *Fuerte,* 428 U.S. 543 (1976), involved consolidated conflicting appeals from this circuit

5    and the Fifth Circuit, with the Supreme Court reversing the Ninth Circuit and affirming the

6    Fifth Circuit. Both circuits had considered the merits of convictions where defendants

7    argued to suppress evidence in criminal cases based on arguments that routine Border

8    Patrol checkpoint stops violated the Fourth Amendment. The Ninth Circuit reversed the

9    conviction, the Fifth Circuit did not. The Supreme Court found the convictions were not

10   unconstitutional. Border Patrol agents, after routinely stopping or slowing automobiles at

11   a permanent checkpoint, may refer motorists selectively to a secondary inspection area for

12   questions about citizenship and immigration status based on criteria that would not sustain

13   a roving-patrol stop, and there is no constitutional violation even if such referrals are made

14   largely on the basis of apparent Mexican ancestry.

15          The border patrol checkpoint stops addressed in *Matrinez-Fuerte* were on I-5 near

16   San Clemente, California, approximately 60 miles north of the Mexico border. The

17   checkpoint was well marked. Approximately one mile in advance of the checkpoint, a large

18   black on yellow sign with flashing yellow lights over the highway stated, "ALL

19   VEHICLES, STOP AHEAD, 1 MILE." Three-quarters of a mile, two black on yellow signs

20   suspended over the highway with flashing lights stated, "WATCH FOR BRAKE

21   LIGHTS." At the checkpoint, two large signs with flashing red lights suspended over the

22   highway stated "STOP HERE U. S. OFFICERS." Orange traffic cones funneled traffic into

23   two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red

24   "STOP" sign checked traffic. Border Patrol vehicles with flashing red lights blocked traffic

25   in the unused lanes. There were permanent buildings for housing the Border Patrol office

26   and temporary detention facilities. *Martinez-Fuerte*, 428 U.S. at 545-546. It is undisputed

27   that the SR-86 checkpoint is similarly located, signed, marked, and manned by Border

28   Patrol agents.

In *Martinez-Fuerte,* the Supreme Court described the "point" agent as standing between the two lanes of traffic visually screening all northbound vehicles, which the checkpoint virtually brought to a complete stop. Most motorists were allowed to resume their progress without any oral inquiry or close visual examination, but in a relatively small number of cases, the "point" agent would conclude that further inquiry was in order and direct these cars to a secondary inspection area. There, agents asked occupants about their citizenship and immigration status. The average length of the stop in the secondary inspection area was three to five minutes. A direction to stop in the secondary inspection could be based on something suspicious about a particular car passing through the checkpoint, but it could also be without any articulable suspicion. *Id.* at 546-547.

The defendants in the criminal cases considered in *Martinez-Fuerte* were stopped at the secondary inspection area for questioning related to citizenship. Here, Plaintiff challenges a stop in the primary area, but like the defendants in *Martinez-Fuerte,* he challenges a suspicionless stop and questioning related to his citizenship.

Plaintiff also asserts that the Defendants' insistence he answer the question of citizenship violated his First Amendment right to speak freely or not speak at all. *Wooley v. Maynard,* 430 U.S 705, 714 (1977).

Plaintiff seeks injunctions to stop the allegedly unconstitutional activities, and he sues the Pima County Defendants under *Monell*[3] for policies and lack of training which allegedly caused Pima County Sheriffs, including Deputy Roher, to violate the Plaintiff's constitutional rights on an ongoing basis and on April 10, 2017, and Plaintiff sues Defendant Roher, individually, under 42 U.S.C. § 1983.

### C.

### Fourth Amendment and Border Checkpoint Stops

"The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Martinez-Fuerte,* 428 U.S. at 554-555 (citing *United*

---

[3] *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978).

1   *States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975); *United States v. Ortiz*, 422 U.S. 891,

2   895 (1975); *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). "The Fourth

3   Amendment requires that searches and seizures be reasonable. A search or seizure is

4   ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of*

5   *Indianapolis v. Edmond,* 531 U.S. 32, 37-38 (2000) (citing *Chandler v. Miller*, 520 U.S.

6   305, 308 (1997)).

7        As explained in *Martinez-Fuerte,* such suspicion is not an "irreducible" component

8   of reasonableness, but only limited circumstances exist in which the usual rule does not

9   apply. *Martinez–Fuerte*, 428 U.S. at 561. For example, suspicionless searches are upheld

10  for certain regimes designed to serve "special needs," beyond the normal need for law

11  enforcement. *Edmond,* 531 U.S. at 452 (citing *see e.g*., *Vernonia School Dist. 47J v. Acton*,

12  515 U.S. 646 (1995) (random drug testing of student-athletes); *Treasury Employees v. Von*

13  *Raab*, 489 U.S. 656 (1989) (drug tests for United States Customs Service employees

14  seeking transfer or promotion to certain positions); *Skinner v. Railway Labor Executives'*

15  *Assn*., 489 U.S. 602 (1989) (drug and alcohol tests for railway employees involved in train

16  accidents or found to be in violation of particular safety regulations)). Searches are also

17  allowed for "administrative purposes" without particularized suspicion of misconduct, if

18  those searches are appropriately limited. *Id.* (citing *see, e.g., New York v. Burger*, 482 U.S.

19  691, 702–704 (1987) (warrantless administrative inspection of premises of "closely

20  regulated" business); *Michigan v. Tyler*, 436 U.S. 499, 507–509, 511–512 (1978)

21  (administrative inspection of fire-damaged premises to determine cause of blaze); *Camara*,

22  387 U.S. at 534–539 (administrative inspection to ensure compliance with city housing

23  code)).

24        A sobriety checkpoint aimed at removing drunk drivers from the road for "roadway

25  safety" does not violate the Constitution. *Michigan Dept. of State Police v. Sitz*, 496 U.S.

26  444 (1990). In *Delaware v. Prouse*, 440 U.S. 648, 663 (1979), the Supreme Court

27  suggested that a similar type of roadblock with the purpose of verifying drivers' licenses

28  and vehicle registrations would be permissible. Under *Martinez–Fuerte*, suspicionless

1    seizures of motorists at a fixed Border Patrol checkpoint, designed to intercept illegal aliens

2    does not violate the Fourth Amendment. *Supra.* at 6-8.

3    As this Court reads *Martinez-Fuerte,* a stop at a permanent Border Patrol checkpoint

4    constitutes a "seizure" within the meaning of the Fourth Amendment. The "'principal

5    protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the

6    scope of the stop.'" *United States v. Taylor*, 934 F.2d 218, 220 (9th Cir. 1991) (quoting

7    *Martinez-Fuerte*, 428 U.S. at 566-671)).

8    First, given the importance of border security and the difficulty in securing our

9    borders, "[s]uch a stop is reasonable *per se*, so long as the scope of the detention remains

10   confined" to determining immigration status; for instance, a few brief questions, production

11   of an identification document, and "'a visual inspection of the vehicle ... limited to what

12   can be seen without a search.'" *United States v. Taylor*, 934 F.2d 218, 220 (9th Cir. 1991)

13   (quoting *Martinez-Fuerte*, 428 U.S. at 558, 562).

14   In *Taylor*, the court focused on the discussion in *Martinez-Fuerte* that balanced the

15   critical special need for the stop against the extremely limited scope of the stop to protect

16   Fourth Amendment rights. As understood by the Court in *Edmond*, none of these cases

17   indicated that the suspicionless seizure exception was so broad it could reach "a checkpoint

18   program whose primary purpose was to detect evidence of ordinary criminal wrongdoing."

19   *Edmond*, 531 U.S. at 38. In *Edmond,* the focus shifted from the limited scope of the stop

20   to ensuring that the primary purpose of the checkpoint was a special need, like border

21   security, and not for general criminal law enforcement. Importantly, *Edmond* was not a

22   border checkpoint case. *Edmond* involved checkpoints in the City of Indianapolis, which

23   had the stated primary purpose of drug interdiction. In *Edmond,* the Court expressly

24   distinguished *Martinez-Fuerte.*

25   "[T]he holding [] does nothing to alter the constitutional status of the sobriety and

26   border checkpoints that we approved in *Sitz* and *Martinez–Fuerte*, or of the type of traffic

27   checkpoint that we suggested would be lawful in *Prouse*." 531 U.S at 47. The case should

28   not be read to affect the validity of border searches or searches in airports and government

buildings, where the special need for such measures is to ensure public safety is particularly acute. Likewise, the Court reaffirmed police officers' ability to act appropriately upon information that they properly learn during a checkpoint stop which is justified by a lawful primary purpose. *Id.* "Finally, the purpose inquiry is to be conducted only at the programmatic level and not to probe the minds of individual officers acting at the scene. *Id.*

In *Edmond,* the Government challenged the law enforcement distinction because the *Sitz* and *Martinez–Fuerte* checkpoints had the same ultimate purpose of arresting those suspected of committing crimes. "Securing the border and apprehending drunken drivers are [] law enforcement activities, and law enforcement authorities employ arrests and criminal prosecutions to pursue these goals." *Id.* at 42. The Court rejected such a sweeping interpretation of Fourth Amendment exceptions because this "high level of generality," would provide "little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose." *Id.* Instead, the Court drew the line at roadblocks designed primarily to serve the general interest in crime control, otherwise the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life. *Id.*

The Court found no differences between America's intractable drug problem or illegal immigration, preventing drunk driving, or any of the other mirid of "social harms of the first magnitude." *Id.* at 42. The Court rejected the notion that the drug interdiction checkpoint could be justified by legitimate secondary purposes, such as keeping impaired motorists off roadways or immigration, because then authorities would be able to establish checkpoints for virtually any purpose so long as they also included a sobriety check or a question related to citizenship. To limit the overly broad reach of Fourth Amendment exceptions, the Court held that the primary purpose of the checkpoint is determinative of the Fourth Amendment protections. *Id.* at 46-47. If the checkpoint's primary purpose is general law enforcement, the Fourth Amendment's reasonable suspicion standard applies and the suspicionless stop is *per se* unconstitutional. *Id.*

1      1.  "Primary Purpose" Constitutional Analysis

2          Plaintiff asks the Court to apply *Edmond* and determine the primary purpose of the

3   SR-86 checkpoint. The Court recognizes that the Ninth Circuit in *United States v. Soto-*

4   *Zuniga*, 837 F.3d 992 (9th Cir. 2016) applied *Edmond* to a border checkpoint stop, but it

5   was a discovery case, not a case addressing the merits of a Fourth Amendment claim. In

6   *Soto-Zuniga*, the defendant argued that the San Clemente border checkpoint was

7   unconstitutional because its immigration purpose was a pretext for general law

8   enforcement. The trial court refused discovery of arrest and search statistics for the

9   checkpoint because this was the checkpoint found to be constitutional in *Martinez-Fuerte*,

10  therefore, the discovery was immaterial and inadmissible at trial. The Ninth Circuit

11  reversed, holding that the requested discovery was material because *Soto-Zuniga* could

12  constitutionally challenge the checkpoint stop; it had been some 40 years since the

13  *Martinez-Fuerte* decision addressing the constitutionality of the San Clement border

14  checkpoint.  *Soto-Zuniga* did not, however, answer the merits of the question and relied on

15  rules providing for broad discovery and that documents do not have to be admissible to be

16  discoverable. *Id.*

17          *Soto-Zuniga* stands for the proposition that, even where information is sensitive or

18  ultimately inadmissible, it must be disclosed if the defense makes the requisite showing.

19  Soto-Zuniga filed a motion to suppress, placing the constitutionality of the San Clemente

20  checkpoint directly at issue by challenging its primary purpose as pretextual. In the Ninth

21  Circuit, "[w]hether the primary purpose of the checkpoint has evolved from controlling

22  immigration to detecting 'ordinary criminal wrongdoing,'" is a question that is subject to

23  discovery under Rule 16. *Soto-Zuniga*, 837 F.3d at 1002 (citing *Edmond*, 531 U.S. at 42).

24  Then, with all material evidence on the table, the district court is in a position to assess and

25  decide the motion to suppress. *Id.*

26          The court in *Soto–Zuniga* relied on the dissenting opinion in *United States v.*

27  *Soyland*, 3 F.3d 1312 (9th Cir. 1993). In *Soyland*, the defendants' car was searched at an

28  immigration checkpoint's secondary inspection and agents found drug paraphernalia and

small amounts of marijuana. While the majority declined to address "the issue of whether checkpoint officers routinely overstep their authority by conducting pretextual narcotics searches" because it had not been argued below, Judge Kozinski dissented. He voiced the concern that the San Clemente checkpoint, and perhaps others, were violating restrictions on suspicionless searches, *id.* at 1315–20 (Kozinski, J., dissenting), by looking for more than illegal aliens, *id.* at 1316. "If this is true, it subverts the rationale of *Martinez–Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment." *Id.*

He recommended the majority in *Soyland* remand the case for the trial court to conduct a factual inquiry into "whether the policies, programs, directives and incentives put in place by the government, or any customs and practices that have developed with the government's tacit approval, have turned ... San Clemente into [a] general law enforcement checkpoint[ ]." *Id.* at 1319 (footnote omitted).

Judge Kozinski's dissenting position in *Soyland,* followed by the majority in *Soto-Zuniga,* applies to "the initial seizure—the vehicle stop." *Soto–Zuniga*, 837 F.3d at 999 (relying on *Edmond,* 531 U.S. at 37–38). In the Ninth Circuit, "[t]here is a two-step analysis applicable to Fourth Amendment checkpoint cases." *United States v. Fraire*, 575 F.3d 929, 932–35 (9th Cir. 2009). First, the Court determines whether the primary purpose of the checkpoint was to advance "'the general interest in crime control.'" *Id.* at 932 (quoting *United States v. Faulkner*, 450 F.3d 466, 470 (9th Cir. 2006) (quoting *Edmond*, 531 U.S. at 48)). "If so, then the stop ... is *per se* invalid under the Fourth Amendment." *Id.* Second, if the checkpoint is not *per se* invalid as a crime control device, then the Court assesses the checkpoints reasonableness under *Martinez–Fuerte* by considering "'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Fraire*, 575 F.3d at 933 (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)).

As the Ninth Circuit Court of Appeals has done, this Court looks to *Soyland*  and *Fraire,* informed by *Lidster,* to understand the application of the holding in *Edmond* to

border checkpoint stops. In *Lidster,* the Supreme Court explained the *Edmond* language as well as its context. The Supreme Court considered a checkpoint stop asking motorists for help in providing information about a crime during which a drunk driver was arrested. The Court explained that, both expressly and in context, the Court in *Edmond* made it clear that the constitutionality of *an information-seeking kind of stop* was not before it. *Lidster*, 540 U.S. at 424. Recognizing that *Edmond* describes the law enforcement objective there as a "general interest in crime control," the Court noted it specified that the phrase "general interest in crime control" does not refer to every "law enforcement" objective. In *Lidster,* the Supreme Court held this language and related general language in *Edmond* is limited to like circumstances and not to quite different circumstances that were not before it in *Edmond*. The Supreme Court held: "Edmond refers to the subject matter of its holding as 'stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime.'" *Id.* (quoting *Edmond*, at 44 (adding emphasis)). Likewise, the Supreme Court held it would not apply the Edmond-type rule of automatic unconstitutionality where the border checkpoint is a brief, information-seeking highway stop. *Id*. at 424-45 427-28 (citing *Martinez-Fuerte*)).

Here, with discovery complete, this Court is positioned to assess and decide the merits of Plaintiff's Fourth Amendment claim that the SR-86 Border Patrol checkpoint stops are unconstitutional.

The Court looks first at whether the SR-86 border checkpoint is unconstitutional, *per se,* as a general crime control device. To recap *Edmond*: the City of Indianapolis operated vehicle checkpoints on city streets for the express purpose of discovering and interdicting illegal drugs. *Edmond,* 531 U.S. at 34. The Court held that the checkpoint program violated the Fourth Amendment because the "primary purpose" was to "uncover evidence of ordinary criminal wrongdoing." *Id.* at 41–42. The Court distinguished two prior cases permitting checkpoints, *Martinez–Fuerte* and *Sitz*, on the grounds that the checkpoints in those cases served purposes other than ordinary crime control. *Id.* at 37–42. The Court explained why the primary purpose of the checkpoints in *Martinez–Fuerte* and

*Sitz* were not about detecting ordinary criminal wrongdoing. The Court acknowledged that "[s]ecuring the border and apprehending drunk drivers are, of course, law enforcement activities, and law enforcement officers employ arrests and criminal prosecutions in pursuit of these goals." *Edmond,* 531 U.S. at 42. However, the checkpoint program in *Sitz* "was clearly aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was an obvious connection between the imperative of highway safety and the law enforcement practice at issue." *Id*. at 39. As for *Martinez–Fuerte*, the objective was to "intercept illegal aliens" and "to serve purposes closely related to the problems of policing the border[.]" *Id*. at 37, 41.

The Court in *Edmond* recognized that duality of purpose should not trigger a *per se* constitutional violation. Such an overly broad application of the "primary purpose" analysis from *Edmond* would sweep away the recognized *per se* constitutional Fourth Amendment checkpoint exceptions, especially if they prove successful in accomplishing their purposes of reducing illegal immigration or getting drunk drivers to stop driving. Therefore, the Court rejects a "primary purpose" analysis for border checkpoints based on simple mathematical calculations of arrests or events with a tipping point ratio set somewhere between immigration or other general law enforcement, including drug smuggling. It would make no sense to hinge Fourth Amendment protections on swings in criminal activities that shift in response to effective law enforcement strategies.

The "primary purpose" analysis for border checkpoints looks at "whether the policies, programs, directives and incentives put in place by the government, or any customs and practices that have developed with the government's tacit approval, have turned the checkpoint into a general law enforcement checkpoint**.**" *Supra*. at 13 (quoting *Soyland,* 3 F.3d at 1319). The Court defines "general law enforcement purpose" as "stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Supra*. at 14 (quoting *Lidster*, 540 U.S. at 424). Even *Edmond*, recognized police officers' ability to act

appropriately upon information that they properly learn during a stop which is justified by such a lawful primary purpose.

2. <u>Border Checkpoints for Crime Control are *per se* Unconstitutional</u>

The Court considers the Plaintiff's argument that over a period of four years (2016-2020) arrests related to narcotics have exceeded those related to immigration. (P MPSJ (Doc. 104) at 14.) The Defendant asserts that there were more immigration (257) than narcotic (153) arrests. (Reply (Doc 181) at 2.) These statistics, presented by the Plaintiff, reflect that arrests and events at SR-86 checkpoint were fairly evenly split between immigration and narcotics. The Court basis this conclusion on the arrest data provided by the Plaintiff from 2016 through 2020, which reflects total immigration-related arrests of 257 and total narcotic-related arrests of 153, but because some narcotic arrests are also immigration related and there are also other arrests that are not immigration related, the Court considers that these totals reflect 257 immigration related arrests and 284 nonimmigration related arrests. *See* (P MPSJ, SOF (Doc. 105) ¶ 10; (P MPSJ, SOF, Ex. 4: Stats at 1-4 (Doc. 106-4)). The statistics construed in favor of the Plaintiff reflect approximately a 50/50 split between 257 immigration related arrests, including those related to narcotics, and 284 other nonimmigration related arrests. *See also* (P MPSJ (Doc. 104) at 14 (estimating across four years an average of just 47%).

There is no case law suggesting that narcotic smuggling between Mexico and the United States is not a legitimate border security issue. The SR-86 checkpoint was opened in 2008, for the purpose of securing "the Nation's borders against terrorists, smugglers of weapons of terror, other contraband, and illegal aliens." (Fed. DMSJ, SOF (Doc. 141), Ex. I: US BP 2003 Memorandum at 1). "The primary purpose of a checkpoint is to restrict the routes of egress from the border area and thereby create deterrence to the initial illegal entry." *Id*. at 2. In 2003, the Defendant identified its primary objective as being "to inspect vehicular traffic for illegal aliens. *Id*. It is undisputed that the Defendant requires its agents to have reasonable suspicion for any detention that is not related to immigration, including drug smuggling offenses.

The Fifth Circuit has determined, post-*Edmund*, that a checkpoint with a primary immigration purpose was constitutional "regardless of whether or not it could also be said to have a secondary programmatic purpose of drug interdiction." *United States v. Moreno-Vargas*, 315 F.3d 489, 491 (5th Cir. 2002). While this case does not provide precedential value, it does constitute persuasive authority. This Fifth Circuit case is not contrary to the law in this Circuit, which has upheld a suspicionless referral to secondary based on *Martinez-Fuerte*, where the primary stop, including a citizenship question, lead to a secondary referral whereat a canine sniff-search provided reasonable suspicion for a narcotic search. In *Barnett*, the court held the defendants failed to offer any affirmative evidence that the first agent's subjective purpose to refer defendants from primary to secondary inspection was drug-related, and therefore, it was not a pretext case. In the Ninth Circuit, in the absence of evidence of pretext, we need not reflect upon the applicability of *Martinez-Fuerte* to a secondary referral even if it appears that the referral is only (or even partially) drug related. No articulable suspicion was required. *United States v. Barnett*, 935 F.2d 178, 181-82 (9th Cir. 1991) (citing *United States v. Watson*, 678 F.2d 765, 771 (9th Cir. 1982) (assuming administrative plan which led to the boarding of the [vessel] was motivated partly by suspicion of drug smuggling and finding stop and search had an independent administrative justification; stop and search did not exceed in scope what was permissible under that administrative justification).

The court in *Barnett* expressly noted that "[t]he lack of evidence supporting a referral to secondary inspection is precisely what *Martinez–Fuerte* authorized.[4] It would set that decision on its head to say that, while agents do not need articulable suspicion to refer for an immigration-related inquiry, they must offer articulable suspicion of immigration-related offenses to demonstrate that they are not referring for another purpose" to avoid a charge of pretext. *Barnett,* 935 F.3d at 181.

---

[4] In *Martinez-Fuerte*, the "point" agent visually screened the traffic as it was brought to almost a virtual stop, and allowed most motorists to proceed, with a small number of cases referred to secondary inspection area based on something suspicious about a particular car or it could also be without any articulable suspicion." *Martinez-Fuerte*, 428 U.S. at 546-547).

In addition to the statistics, which the Plaintiff argues reflects the law enforcement purpose of the checkpoint, the Plaintiff argues Border Patrol now routinely employs law enforcement techniques at the SR-86 checkpoint, such as: dog sniffs, backscatter (X-ray), license-plate readers, active intelligence-gathering, and use of local law enforcement, including programs like Operation Stonegarden. Plaintiff challenges the suspisionless stops at the SR-86 checkpoint because 45 years have passed since the 1976 ruling in *Martinez-Fuerte.* During this time, the Immigration and Naturalization Service signed a memorandum of understanding with the Drug Enforcement Administration providing for cross-designation of Border Patrol agents with so-called Title 21 authority to enforce federal drug laws. Plaintiff asserts that after September 11, 2001, Border Patrol underwent significant change, including doubling its workforce and resources and expanding its use of intelligence techniques and investigative activities through collaboration with law enforcement agencies throughout the government.  (P MPSJ (Doc. 104) at 6.) Plaintiff argues that the primary purpose of the border checkpoints, including SR-86 checkpoint, has changed too as evinced by the actual law enforcement operations occurring there and it now serves a general law enforcement purpose, not immigration.

The Federal Defendant admits to using canine dogs that are trained to detect both narcotics and concealed humans and Border Patrol agents are trained to look both for signs of immigration violations and indications of federal criminal activity of any kind. This duality does not undermine the primary immigration purpose of the SR-86 checkpoint. *See Edmond*, 531 U.S. at 45, n. 1 (holding use of a drug-sniffing dog does not annul what is otherwise plainly constitutional), *see also United States v. Place*, 462 U.S. 696, 707 (1983) (the investigative technique of a limited canine sniff by a well-trained narcotics detection dog is less intrusive than other investigative techniques). The Defendant recognizes the law and clarifies that he "has never said dog sniffs themselves violate the Fourth Amendment, [but] rather reflect what the agency is looking for when it stops vehicles, bearing directly on the primary purpose." (P Reply to MPSJ (Doc. 183) at 8.)

While there was a time when Border Patrol piloted a program using license-plate readers, it no longer uses them. Currently, the DEA operates a license-plate reader near the checkpoint. The Court assumes it is strategically located to take advantage of slowing traffic passing through the checkpoint. Any license plate readings, either those now being collected by the DEA or those previously collected by Border Patrol during its pilot program, were not and are not used by agents at the checkpoint. Information gleaned from license-plate readers flows to general law enforcement activities, which may include joint task force activities and/or the general sharing of intelligence. *Id.* at 16. "License-plate readers do not implicate the Fourth Amendment because there is no reasonable expectation of privacy in one's license plate." *Id.* (citing *United States v. Diaz-Casteneda,* 494 F.3d 1146, 1151 (9th Cir. 2007)).

The Federal Defendant admits to sharing intelligence and joint task force activities between DEA and Border Patrol, but these activities have nothing to do with the checkpoint operations. There is no allegation that Plaintiff has been subject to any such sharing or taskforce activities.  Likewise, the Federal Defendant admits that agents have access to law-enforcement data bases, but agents do not run criminal record checks during a suspicionless checkpoint stop. (Fed. Resp. P MPSJ (Doc. 172) at 6-7, 16-17.) The Plaintiff does not submit legal support for his assertion that using this data "as part of longer-term investigations is in some ways far worse than using it in the moment," and the Court finds none is needed to consider it as a factor in assessing the purpose of the checkpoints. (P Reply MPSJ (Doc. 183) at 10) (also arguing that search of a criminal data base goes beyond immigration purpose and reflects law enforcement purpose of checkpoint).

Finally, the Plaintiff challenges the Stonegarden Operation and other policy and practices by the Pima County Sheriff's Office and Border Patrol that allows county deputies to be stationed at the checkpoint. Plaintiff alleges that these officers are there solely for law enforcement purposes. The facts construed in Plaintiff's favor reflect Pima County deputies are readily available at the checkpoint and assist Border Patrol agents by assuming authority over nonimmigration incidents. On April 10, 2017, Deputy Roher, who

was already at the checkpoint, came over to the primary inspection area when Plaintiff refused to comply with Agent Frye's directive to move his car to the secondary area. Deputy Roher instructed the Plaintiff to move to the secondary area because he was blocking the roadway, informed him he was violating state law, and ultimately detained and cited him for the violation.

The Plaintiff's argument is that these operational components at the SR-86 checkpoint are law enforcement techniques that are "broadly intrusive." (P MPSJ (Doc. 104) at 9.) "These techniques are much more reflective of a goal of seizing narcotics than of intercepting undocumented people." *Id.*   at 15. The Court does not agree. These operational components reflect nothing more than the dual role played by Border Patrol, approved even in *Edmond,* that police officers have the ability to act appropriately upon information that they properly learn during a stop which is justified by a lawful primary purpose.

The Plaintiff's evidence reflects nothing more because he does not show these law enforcement techniques come into play during the suspicionless stops, either primary or secondary, except for techniques which detect both narcotics and human smuggling simultaneously. The Fourth Amendment does not prevent the use of canine-sniffs or backscatter (X-ray) because the techniques *might* reveal narcotic smuggling instead of human smuggling. A constitutionally legitimate search for one purpose is not corrupted by the potential or actual discovery of contraband which is not within the scope of the purpose of the search. It is the scope of the search which is limited by its purpose. For example, if officers conduct a warrantless search for weapons for the legitimate purpose of officer safety, the Fourth Amendment does not require officers to ignore a bag of cocaine they find during the search as long as the scope of the search which found the cocaine was limited to places where a weapon could be concealed.  *See Arizona v. Gant*, 556 U.S. 332, 342 (2009) (describing ability to search a vehicle incident to an arrest as a Fourth Amendment exception which is justified by the twin rationales for officer safety or to

prevent destruction of evidence and search of glove box as being limited by those purposes).

### 3. April 10, 2017: Probable Cause and Arrest for Blocking Traffic

On April 10, 2017, Agent Frye referred the Plaintiff straight off to secondary after asking him, "How you doing." (PC MSJ, SOF, Ex. B: 4/10/17 Arrest TR (Doc. 137-3) at 2 ln 17:13:13.) Instead of pulling over to the secondary area, the Plaintiff responded that he "did mind" pulling over. *Id.* at ln 17:13:27. The agent replied that he had not asked if the Plaintiff minded following the directive, he reissued the directive, and added, "Are you a United States citizen?" *Id.* at 17:13:33. The agent asked the Plaintiff, a third time and a fourth time to move to the secondary area, and the fourth time added: "You're blocking traffic here." *Id.* at 17:13:39. This back and forth took approximately 26 seconds.

Thereafter, an argument ensued. Agent Frye submitted the Plaintiff was blocking the roadway by refusing to move to the secondary area. Plaintiff argued that Agent Frye was blocking the roadway because he, Bressi, was prepared to move through the checkpoint but Agent Frye was not allowing him to do so. For approximately a minute, the Plaintiff argued that he should be allowed to pass through the checkpoint without answering the citizenship question.

Eventually, Pima County Sherriff Deputy Roher came over and he too, unsuccessfully, asked the Plaintiff to pull to the secondary area because he was blocking the roadway. Plaintiff refused to either answer the immigration question or to pull to the secondary area. Deputy Roher repeatedly asked the Plaintiff to pull to secondary because he was blocking traffic and warned him that he was subject to arrest for blocking traffic. *Id.* at 17:14:37-17:15:02. Deputy Roher informed the Plaintiff that he was detaining him for blocking the roadway and to pull to secondary. When the Plaintiff continued to argue, Deputy Roher said he could "go" and allowed the Plaintiff to proceed through the checkpoint. *Id.* at 17:15:37. Deputy Roher got in his patrol car, followed the Plaintiff just past the checkpoint, pulled him over, and detained him, including handcuffing him, for

blocking the roadway. Eventually, after much more argument, the Plaintiff agreed to accept a citation for blocking the roadway rather than be arrested.

Plaintiff continues the argument he made to Deputy Roher on April 10, 2017, that he was not obstructing traffic at the checkpoint because he would not be stopped there but for the refusal by Agent Frye to let him go through the checkpoint without answering the citizenship question. Plaintiff argues that Deputy Roher lacked probable cause to arrest him for obstructing traffic at the checkpoint because Deputy Roher knew that the Plaintiff was detained at the primary stop at the direction of Border Patrol. *Id.* at 5 (relying on past detentions and interrogations, including Pima County Deputy McMillan, for blocking roadway, with conclusion being there was no probable cause for arrest because Border Patrol stopped him, and he was not free to go). This argument fails because Deputy Roher knew that the Plaintiff had refused to move to the secondary area when asked to do so by Agent Frye, and more importantly, the Plaintiff also refused to move to the secondary area of the checkpoint after he was told, expressly by Deputy Roher, to move there because he was blocking the roadway.

A.R.S. § 13-2906(A)(1) provides: "A person commits obstructing a highway or other public thoroughfare if the person, alone or with other persons, does any of the following: (1) Having no legal privilege to do so, recklessly interferes with the passage of any highway or public thoroughfare by creating an unreasonable inconvenience or hazard." "Recklessly" means, with respect to a result or to a circumstance described by statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such a nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A.R.S. § 13-105(10)(c).

Probable cause is defined in terms of facts and circumstances sufficient to warrant a reasonable officer to believe the suspect has been or is committing offense. *Sialoi v. City of San Diego*, 823 F.3d 1223, 1232 (9th Cir. 2016). Whether probable cause existed to

justify a search or an arrest is "an essentially legal question" that should be determined by the Court. *Actup/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

The reasonable officer test is an objective assessment, with no inquiry to be made into Deputy Roher's state of mind; it does not matter if he had any intentions other than enforcing A.R.S. § 13-2906(A)(1). Accordingly, it is for the Court to determine whether a reasonable police officer knowing what officer Roher knew would have believed probable cause existed to detain the Plaintiff for blocking the roadway because he refused to comply with the directive to move to the secondary area.

In *Whren v. United States,* 517 U.S. 806 (1996), the Court rejected the argument that something more than probable cause should be considered to establish reasonableness under the Fourth Amendment for traffic code violations. The Plaintiffs suggested the Court should consider whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop for the reasons given. Plaintiffs in *Whren* argued for this "objective test" because traffic code violations can be readily found by police and create a "temptation to use traffic stops as a means of investigating other law violations, as to which no probable cause or even articulable suspicion exists." *Id.* at 810.

The Supreme Court found the Plaintiffs' position was not just unsupported by the law, but contrary to legal precedent. The Supreme Court reported: Outside of the context of inventory or administrative inspection cases, "we have repeatedly held and asserted the contrary." *Id.* at 812-13 (citing *United States v. Villamonte–Marquez*, 462 U.S. 579, 584, n. 3 (1983) (finding otherwise valid warrantless boarding of a vessel not rendered invalid because U.S. Customs officers accompanied by state policeman and followed informant's tip that marijuana was on vessel; dismissed idea that an ulterior motive might serve to strip the agents of their legal justification); *United States v. Robinson*, 414 U.S. 218, 221, n. 1 (1973) (finding traffic-violation arrest not rendered invalid by the fact it was "a mere pretext for a narcotics search"); *Gustafson v. Florida*, 414 U.S. 260, 266 (1973) (valid search incident to arrest for driving automobile without operator's license, entitled officer

to make full search of petitioner's person, and therefore it was ok to open box of cigarettes found in his pocket, which contained unlawful substance, even though officer had no subjective fear of the defendant or that a weapon was inside the cigarette box); *Scott v. United States*, 436 U.S. 128, 138 168 (1978) (rejecting contention that wiretap evidence was subject to exclusion because agents failed to comply with statutory requirement that unauthorized acquisitions be minimized because "[s]ubjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional"). Such precedent "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Id.* at 813. In other words, a finding of probable cause forecloses any argument of pretext; where there is probable cause, the stop is reasonable under the Fourth Amendment.

The District Court in *Whren* found that the officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment, and the evidence thereby discovered admissible. The appellate court had affirmed the convictions. The Supreme Court did the same. *Id.* at 819.

This Court does the same and affirms the Pima County Defendants' assertion that there was probable cause for the Plaintiff's detention for blocking the roadway. He refused to move his car from the primary area to the secondary area of the checkpoint after being repeatedly directed to move. He did not have any constitutional right to pass through the primary lane of the checkpoint because he is a United States citizen. He did not have a constitutional right to not move to the secondary area when asked to do so by Agent Frye or Deputy Roher. There was probable cause for Deputy Roher to detain the Plaintiff for blocking the roadway.

The Court could, but does not need to, rely on this objective standard to conclude that the Plaintiff's refusal to answer the citizenship question gave Agent Frye reasonable suspicion to believe that an immigration offense was being committed. *See* (FedD Reply (Doc. 4-6) (citing cases finding reasonable suspicion created when a driver refuses to answer questions about his or her citizenship). Plaintiff's claim that under the First

Amendment he had a right to not answer the citizenship question fails for another reason. This is simply not a free speech case. Here, Border Patrol limits the primary stop to a few seconds to ask the citizenship question, and thereafter based on some or mere suspicion related to citizenship, a referral to the secondary area for further investigation. *Supra* at 5 (citing P MPSJ SOF: Traffic Check Operations 11/2017 (Doc. 132-5) at 14).

It is undisputed that in in every instance, the Plaintiff refused to comply with directives to move to the secondary area when he refused to answer the citizenship question during the primary stop.[5] "A deliberate decision to disobey a lawful police order is not speech." (FedD MSJ (Doc. 146) at 19 (citing *Yount v. Los Angeles*,  655 F.3d 1156, 1170 (9th Cir. 2011) (refusing officer's lawful directive is not speech). Additionally, in every instance,[6] reasonable suspicion existed to refer the Plaintiff to the secondary area for blocking traffic by obstructing the roadway in the primary area. *See* (P MPSJ, Deputy BP Agent in Charge of Tucson Station Operations Terran TR (Doc. 132-1) at 78-84 (explaining primary and secondary operations, including need to keep traffic moving). Because the Plaintiff never moved to the secondary area, there is no way to know whether any First Amendment rights would or would not be violated for refusing to answer the citizenship question. The answer to that question depends on the circumstances of whatever transpires, there, which in this case never happened.

The Court having concluded that Plaintiff's detention on April 10, 2017, for blocking the roadway was based on probable cause, the claims against the Pima County Defendants, including Deputy Roher, fail. The related false imprisonment claims brought under the Federal Tort Claims Act (FTCA) against the Federal Defendants, including Agent Frye, fail as well; these claims also involve criminal law enforcement decisions

---

[5] There is no allegation that the Plaintiff has ever been referred to secondary for suspicion of smuggling drugs or humans.

[6] The Court considers below the reasonableness of the primary stop conducted on April 10, 2017, in the one instance when Agent Frye straight out referred the Plaintiff to the secondary area before the Plaintiff refused to answer the citizenship question and, arguably, without some suspicion regarding his citizenship.

which are discretionary in nature and barred by the discretionary-function exception to the waiver of sovereign immunity granted under the FTCA.

### 4.   SR-86 Border Patrol Checkpoint's Purpose

It remains for the Court to determine whether the presence of Pima County Sheriffs at the checkpoint, as alleged by the Plaintiff, in combination with other law enforcement techniques being used there, have changed the purpose of the checkpoint from immigration to law enforcement.

As alleged by the Plaintiff, the Pima County Sheriffs take their direction for any activities at the checkpoint from the federal Border Patrol agents, and Border Patrol agents make the suspicionless stops, which are short, lasting long enough to ask only about citizenship. It is undisputed that all general criminal enforcement undertakings, including drug related actions, are based on reasonable suspicion. As noted above, even *Edmond*, recognized police officers' ability to act appropriately upon information that they properly learn during a stop which is justified by such a lawful primary purpose.

The strategic placement of Pima County Sheriffs or DEA agents where traffic is slowing down to pass through the checkpoint may assist officers in discerning whether reasonable suspicion exists related to any criminal conduct, including detention and/or arrest for drug or other nonimmigration offenses, but such observations and the use of license plate readers are less intrusive than a canine search, which has passed the Fourth Amendment sniff test for border checkpoints. *Supra.* at 18.

The "purpose" inquiry is made at the programmatic level and does not probe the mind of the individual officers acting at the scene, *Edmond*, at 47, unless there is some affirmative evidence that the point agent, Agent Frye, harbored a subjective purpose to orchestrate referrals to secondary inspection for drug-related offenses, *Barnett*, 935 F.2d at 181-82. This is not argued here. There is no evidence that suspicionless secondary referrals are based on the "point" agent's subjective purpose to refer defendants for drug-related law enforcement purposes. This is not a pretext case. Instead, the Plaintiff argues that at the

programmatic level the immigration purpose is a pretext for effecting law enforcement at these checkpoints.

The Court rejects the notion that some mass transformation of purpose related to border checkpoints occurred since 1976 when the Court considered the Fourth Amendment question in *Martinez-Fuerte.* This Court relies on the statements of purpose reflected in government documents from 2003, 2006 and 2016,[7] which reflect that the purpose of the SR-86 checkpoint at these points in time was border security, including terrorism and both human and narcotic smuggling. In the context of border security, terrorism and smuggling are problems related to immigration to the extent they involve an illegal entry into this country, with the immigration purpose of the border checkpoints being to intercept those who illegally enter the country, including those who smuggle in contraband.

The primary stops at SR-86, including the April 10, 2017, stop of the Plaintiff, were within the scope of the checkpoint's immigration purpose. When Plaintiff refused to move to secondary, Agent Frye asked him his citizenship and again asked him to move to secondary because he was blocking the roadway. To the extent the secondary referral of the Plaintiff on April 10, 2017, was related to his refusal to answer the citizenship question, the secondary referral remained within the scope of the stop related to immigration. To the extent the secondary referral was because he was blocking the roadway after being instructed to move to secondary, it was based on reasonable suspicion that Plaintiff was violating a state law.

Looking at the facts of this case, as alleged by the Plaintiff, the Court has considered the policies, programs, directives and incentives put in place by the government for SR-86, and the customs and practices, as alleged by the Plaintiff, that have developed there with the government's tacit approval. The Court finds that the SR-86 border checkpoint has not been turned into a general law enforcement checkpoint because the suspicionless stops there are not "justified by a generalized, ever-present, possibility that interrogation and

---

[7] September 11, 2001, Islamic extremist group al-Qaeda attacked the United States in New York City and Washington D.C., causing extensive death and destruction and triggering enormous United States response to combat terrorism.

1   inspection may reveal that any given motorist has committed some crime." *Supra.* at 14

2   (citing *Lidster*, 540 U.S. at 424). Singularly, and in combination, the alleged law

3   enforcement techniques found at SR-86 do not extend the suspicionless stops at SR-86

4   beyond for the purpose of border security, with the primary purpose being immigration.

5   The checkpoint is not *per se* unconstitutional. Accordingly, the Court turns to *Martinez-*

6   *Fuerte* to determine its reasonableness on the basis of the individual circumstances of this

7   case, and hence its constitutionality. *Lidster*, 540 U.S. at 426.

8                                                     D.

9                       Reasonableness of SR-86 Border Patrol Checkpoint

10          If the checkpoint is not *per se* invalid as a crime control device, then the Court

11   assesses the checkpoints reasonableness under *Martinez–Fuerte* by considering "'the

12   gravity of the public concerns served by the seizure, the degree to which the seizure

13   advances the public interest, and the severity of the interference with individual liberty.'"

14   *Fraire*, 575 F.3d at 932 (quoting *Illinois v. Lidster*, 540 U.S. 419, 427 (2004)).

15          1.   Gravity of the Public Concern

16          "[T]he United States has a substantial interest in controlling the flow of illegal aliens

17   [and] [c]arrying out a program of routine stops for brief questioning at permanent

18   checkpoints that is effective in support of this interest." *United States v. Vasquez-Guerrero*,

19   554 F.2d 917, 919 (9th Cir. 1977) (citing *Martinez-Fuerte*, 428 U.S. at 556). It is not

20   disputed that illegal immigration remains a serious public interest that has not lessened

21   since the Supreme Court considered the question in *Martinez-Fuerte.* As the events of

22   September 11, 2001, evinced, border security, including immigration, is now more

23   important than ever. In *Edmond,* also a case considering border security checkpoints prior

24   to September 11, the Court noted that it should not be read to affect the validity of border

25   searches or searches in airports and government buildings, where there is a particularly

26   acute special need for such measures to ensure public safety. *Edmond,* 531 U.S at 47. The

27   Court does not need to determine whether border security is more important now than it

28

was in 1976 because it is undisputed that curbing illegal immigration remains a paramount public interest.

### 2.  Degree the Checkpoint Advances the Public Interest

The Plaintiff challenges the changed degree to which the stops advance the public interest of securing our borders, specifically he argues the checkpoints do not deter illegal immigration.

The Court rejects the Plaintiff's criticism of the location of the SR-86 checkpoint because it is not on a major highway leading away from the border. The Plaintiff argues that *Martinez-Fuerte* only recognized checkpoints located on major highways leading away from the border because such checkpoints would "force smugglers 'onto less efficient roads that are less heavily travelled, slowing their movement and making them more vulnerable to detection by roving patrols.'" (P MPSJ (Doc. 104) at 19-20 (quoting *Martinez-Fuerte*, at 557)). The Plaintiff argues that SR-86 is not a major highway but is instead a smaller roadway where roving patrols could operate to detect smuggling, and the low number of human smuggling apprehensions on SR-86 does not warrant the intrusiveness of the border checkpoint there. *Id.* at 20.

The Court does not agree that *Martinez-Fuerte* is limited by road type, but if such a distinction exists, it does not apply here. The SR-86 border checkpoint is located on the only east-west state route, intersecting with SR 85, approximately, 50 miles north of the Mexico border. (DSOF, Ex. 3: Teran Depo at 34 (Doc. 141-3) at 34). So located, the SR-86 checkpoint intercepts traffic coming north from the border-crossing at Lukeville on SR-85 that turns off to travel east to Tucson. The Plaintiff ignores the fact that the SR-86 checkpoint is also strategically located to capture traffic crossing the approximately 63 miles of international border between Mexico and the Tohono O'odham Nation. *See* (D Resp. to P MPSJ (Doc. 175) at 4; Controverting SOF (Doc. 162) ¶ 9.) This area is porous and vulnerable to border crime, including illegal immigration crossings involving or not involving smuggled contraband. *Id.* The SR-86 checkpoint is the only checkpoint between the Tohono O'odham reservation and metro Tucson. *Id.* ¶ 10. Geographically, "[w]ithout

the checkpoint, anyone who crosses the border illegally within the Tohono O'odham reservation would be able to get into a vehicle close to the border and drive on an unobstructed path to Tucson, and from Tucson, anywhere in the United States." *Id.*

The Plaintiff produces arrest statistics for the SR-86 border checkpoint, which he argues reflect it is more successful at intercepting drug smuggling than human smuggling. The Court in *Fraire*, however, concluded that "the degree to which the seizure advances the public interest" does not need to be supported by empirical data demonstrating effectiveness. *Fraire*, 575 F.3d at 933-34; *see also supra.* at 15 (describing as illogical, hinging Fourth Amendment rights on crime statistics). Instead, the Court in *Fraire* relied on common sense: "We have previously observed that in certain cases effectiveness may be measured 'by the relationship of the checkpoint to its objective, rather than by any measureable results, or by any results period.'" *Id.* (quoting *Faulkner*, 450 F.3d at 473). Here too, common sense reflects a close relationship between the checkpoint's border security objective and its location on SR-86. The checkpoints in Southern Arizona force smugglers to walk further north into the United States, giving Border Patrol a better chance to detect them before they get into vehicles. (DMSJ (Doc. 146) at 3); (SOF (Doc. 141) ¶ 20.) If any of the three checkpoints within the southwestern Tucson region were removed, illegal entrants, including smugglers, would have unobstructed routes to Arizona's metro areas. Especially, removing the SR-86 checkpoint would leave an unobstructed route from the border to the Tucson metro area. Here, common sense reflects the SR-86 border checkpoint is a reasonably efficient tool to prevent illegal immigration, including intercepting human smuggling.

The checkpoint's location and the primary objective of the stop as reflected by questioning related to citizenship reflects a close connection and rational relationship between the checkpoint and border security, especially immigration.

3.  Severity of Interference with Individual Liberty

The third consideration is "'the severity of the interference with individual liberty.'" *Faire,* 575 F.3d at 934 (citing *Lidster*, 540 U.S. at 427 (quoting *Brown v. Texas*, 443 U.S.

47, 51 (1979)). The Court gauges this factor "by the objective intrusion, measured by the duration of the seizure and the intensity of the investigation, and by the subjective intrusion, measured by the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.* (citing *Faulkner,* 450 F.3d at 472–73).

The objective intrusion here is no greater than that approved by the Court in *Martinez-Fuerte.* The contact between drivers and agents is designed to last only a few seconds for the citizenship question(s) to be asked and answered, unless there is a referral to the secondary area. There is no suggestion that drivers wait long periods of time at the checkpoint; the undisputed evidence is that any delay in the short ask and answer agenda being conducted during the primary stop results in a referral to the secondary area of the checkpoint. There is no allegation of delay related to the secondary stops being conducted at the checkpoint. In short, the suspicionless stop at SR-86 border checkpoint falls squarely within the limited time constraints set out in *Martinez-Fuerte.*

There is no allegation that the canine sniff prolongs the stop, and the evidence and law is to the contrary. The personal radiation detectors are simply worn by the Border Patrol agent and have no effect on any citizen unless it detects radioactive material. The backscatter (X-ray) device is only used in secondary, if there is reasonable suspicion to believe that a vehicle has a hidden compartment being used to smuggle humans or drugs. The remainder of the alleged intrusive criminal investigative measures, like the license plate readers or criminal record checks, are not related to and have no impact on the suspicionless border-checkpoint stops, which are limited in scope to the stop and brief questioning related to citizenship.

There is no evidence related to any secondary-stop conducted by Border Patrol because Plaintiff in every instance refused to comply with secondary referrals. The Plaintiff produced video records for approximately 555 checkpoint incidents. Only one reflected a referral to the secondary area and compliance with the directive to pull over, which was given to him by a Pima County Sheriff's deputy. In that instance, on March 29, 2013, the Plaintiff pulled through the checkpoint without authorization from agents, who were

arguably antagonizing[8] him by video recording him. It is impossible to hear whether they asked his citizenship because he had his window rolled up and was blaring his horn. Agents had him back-up and asked him to pull over because he was blocking the roadway. He refused until a Pima County Sherriff took over, directed him to pull over, detained him, and cited him for blocking the roadway.  (Fed. MSJ (Doc. 146) at 6, 19) (reflecting 18 out of 555 incidents where Plaintiff identified agents as intending to detain him until he answered the citizenship question); Fed. MSJ, SOF (Doc.141) ¶ 63, Ex. N: Video, 3/29/2013 (Bates #0222)). It is undisputed that in every instance when the Plaintiff is referred to the secondary area, he refuses and, thereby, blocks the roadway and prevents traffic from moving through the primary area of the checkpoint.

Plaintiff argues that it is Border Patrol policy to detain the driver until the citizenship question is answered, which is supported in part by the record that reflects agents will not authorize him to pass through the checkpoint when he refuses to answer the citizenship question, and they instead refer him to the secondary inspection area. There is also evidence that more recently, he is often waived through. (Fed. Reply Re: MSJ (Doc. 181) at 7.) Neither fact is dispositive because it is undisputed that when the Plaintiff refuses to answer the citizenship question "he never moves his car into the secondary inspection area when agents direct him over there." (Fed. MSJ (Doc. 146) at 6, SOF (Doc. 141) ¶ 49 (citing Ex. D: Bressi Depo at 35:1-5 (Doc. 141-5) at 8.) Plaintiff ignores the fact that when he chooses to not comply with the directive to move over to the secondary area, he blocks the roadway in the primary area.

The Court must also consider the reasonableness of the primary stop conducted on April 10, 2017, when Agent Frye straight out referred the Plaintiff to the secondary area before asking a question about citizenship. Arguably,[9] Agent Frye knew the Plaintiff was

---

[8]The Court rejects Plaintiff's retaliation claim because one or two instances out of approximately 555 encounters do not establish a constitutional violation which requires injunctive relief. *See* (Fed. Reply MSJ (Doc. 181) at 7).

[9]To determine the constitutionality of the suspicionless stops at SR-86, the Court assumes as a matter of fact that Agent Frye and any other agent, who stopped the Plaintiff, knew the Plaintiff was a United States citizen. The Court makes this assumption, here, because the facts of this case are limited to determining the constitutionality of the

a United States citizen and, therefore, the referral conflicted with Border Patrol procedures that secondary referrals for immigration purposes be based on some or mere suspicion of an immigration violation. *Supra* at 5, 24 (citing PMPSJ SOF: Traffic Check Operations 11/2017 (Doc. 132-5) at 14), *see also* (Fed. MSJ, SOF (Doc. 141), Ex. L: Memo 11/8/2012 Guidance on Noncompliant Mortorists at Checkpoints (explaining referral to secondary lasting approximately five to six minutes is generally reasonable "if agent has concerns about whether motorist or his passengers are legally present in the United States"). The referral on April 10, 2017, to secondary, however, falls squarely under *Martinez-Fuerte* as a constitutional stop for the purpose of conducting the suspicionless immigration stop. The secondary referral also falls squarely within the discretionary-function of a law enforcement officer to exercise his own judgment or choice during an investigation, which this Court finds includes the suspicionless immigration inspection. Accordingly, the discretionary-function exception to liability under the Federal Tort Claims Act applies. *See* (Fed. MSJ (Doc. 140) at 21-23.) This investigatory discretion does not conflict with the nondiscretionary nature of the investigation, i.e., the stop and citizenship question; officer discretion exists over where to stop a driver, primary or secondary, and what questions to ask regarding citizenship. *See* (Fed. Reply MSJ (Doc. 181) at 8).

The Court finds minimal objective intrusion at the primary stops, including the April 10, 2017, stop, being conducted at the SR-86 border checkpoint, which were all designed to last only the few seconds it takes to ask and answer a citizenship question. Delay beyond these few seconds occurred because the Plaintiff refused to move to the secondary area when he chose to not answer the immigration question in the primary area. Contrary to Plaintiff's assertion, it is not unconstitutional for agents at a border checkpoint to conduct a suspicionless immigration stop, either in a primary or secondary area, including asking immigration related questions about citizenship. It does not matter whether the checkpoint agent knows the Plaintiff is a United States citizen. As noted above, the Ninth Circuit in

suspicionless stop and brief citizenship question, which the Court finds are constitutional as a matter of law under *Martinez-Fuerte*. This would, however, be a material question of fact if the case involved a detention of the Plaintiff beyond the scope of this limited stop.

1    *Barnett*, 935 F.2d at 181-82, concluded that no articulable suspicion is required because a

2    suspicionless referral to secondary inspection is precisely what *Martinez–Fuerte*

3    authorized.

4         The SR-86 checkpoint suspicionless stops were limited to their constitutional scope,

5    which allows for a brief stop for the purpose of determining whether there are any persons

6    in a vehicle, who may not be United States citizens. Under *Martinez-Fuerte,* the stop may

7    be long enough to visually check the vehicle and to ask a citizenship question. *Supra.* at 10

8    (citing *Taylor,* 934 F.2d at 220 (describing border checkpoint stop as reasonable *per se*, so

9    long as the scope remains confined" to determining immigration status; for instance, a few

10   brief questions, production of an identification document, and "'a visual inspection of the

11   vehicle ... limited to what can be seen without a search'") (quoting *Martinez-Fuerte,* 428

12   U.S. at 558, 562*)*. As a matter of law, the suspicionless referral to the secondary area to ask

13   the Plaintiff the citizenship question was constitutional. Based on the undisputed

14   circumstances of the primary stops made in this case, collectively and on April 10, 2017,

15   especially those that included confrontative behavior by the Plaintiff during the primary

16   stop, such as blaring his horn or driving straight through the check point, the referral to the

17   secondary area for immigration purposes was reasonable so that the brief visual inspection

18   and citizenship question could be asked without the primary roadway being blocked.

19        In summary, the Court finds that the Plaintiff was not detained because he refused

20   to answer the citizenship question during the primary stop. He was detained because he

21   was asked to and refused to pull over and stop in the secondary area. The suspicionless

22   referral to secondary was constitutional because it was within the scope of the border

23   checkpoint's immigration purpose. If the Plaintiff had moved to the secondary area and

24   then refused to answer the citizenship question, there may have been no reasonable

25   suspicion that an immigration crime was being committed to support a detention there.  But

26   this is not that case, and there are no circumstances of any such a detention presented to

27   the Court to evaluate. The Plaintiff circumvented the constitutional inquiry by refusing to

28   move to the secondary area where it could be conducted without blocking the primary

roadway. The Plaintiff was detained and arrested by Deputy Roher for blocking the roadway based on probable cause because he refused to move to the secondary area and blocked the road in the primary area of the checkpoint.

The severity of the subjective intrusion is "'measured by the amount of concern and fright that is generated on the part of lawful travelers.'" *Faire,* 575 F.3d at 934 (quoting *Faulkner,* 450 F.3d at 473). "The subjective intrusion from a checkpoint stop is significantly less than other types of seizures, such as random stops. *Id.* (citing *Martinez–Fuerte*, 428 U.S. at 558). The factors for finding the subjective intrusion is minimal set out in *Faire* apply equally here: "the checkpoint was marked in advance announcing it, the agents were uniformed, and all approaching vehicles were stopped." *Id.* (citing *Lidster*, 540 U.S. at 428 (little reason for anxiety or alarm where police stopped all vehicles systematically); *Sitz*, 496 U.S. at 453 (noting the fact that uniformed officers stopped every approaching vehicle as showing a minimal intrusion); *Faulkner*, 450 F.3d at 473–74). The lack of discretion is an important component that limits the subjective intrusion of the stop because it alleviates a driver's concern that he is being singled out for scrutiny by law enforcement. This factor cuts against the Plaintiff's constitutional claim that he cannot be stopped and asked about his citizenship because the agents know he is a United States citizen. This raises discretionary concerns that might increase the level of apprehension engendered in law-abiding motorists at the checkpoint. This does not, however, mean that Border Patrol cannot waive him through if the agent is capable of conducting a visual inspection of the interior of the vehicle to determine he is the only person in the vehicle and the agent knows his identity and citizenship.

The Court finds that the nondiscretionary nature of the SR-86 border checkpoint stop, combined with the notice given to travelers of the limited nature of the stop, the duration of the primary stop and the limited intensity of the investigation, which included a visual assessment and citizenship question, did not severely interfere with Plaintiff's individual liberties beyond what is allowed under *Martinez-Fuerte.* The addition of a canine sniff and other less intrusive law enforcement techniques did not increase the

intensity of the suspicionless investigation beyond that allowed under *Martinez-Fuerte.* In other words, the severity of the interference with individual liberty resulting from the SR-86 checkpoint stops did not violate the Fourth Amendment.

The Court concludes that the gravity of the public interest served by the checkpoint was high, the checkpoint advanced these concerns, and the severity of the interference with individual liberty was minimal.[10] It follows that the SR-86 border checkpoint operations were and are reasonable under the Fourth Amendment.

E.

Conclusion: Summary Judgment

There was no constitutional violation. If there was a constitutional violation, a law enforcement officer is entitled to qualified immunity from liability under 42 U.S.C. §1983, unless his actions violate clearly established law. Law enforcement officers are not required to be perfect. They are only required to act reasonably under the circumstances. Law enforcement officers, "who 'reasonably but mistakenly concluded that probable cause is present,'" are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Put differently, "cases establish that qualified immunity shields" officers "from suit for damages if 'a reasonable officer could have believed'" the arrest "'to be lawful, in light of clearly established law and the information the arresting officers possessed.'" *Hunter*, 502 U.S. at 227 (quoting *Anderson*, 483 U.S. at 641) (brackets omitted). Qualified immunity leaves ample room for mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Inquiry into whether a constitutional right is clearly established, for the purpose of qualified immunity, must be undertaken in light of the specific context of the case, not as a broad general proposition. *Mueller v. Auker*, 576 F.3d 979, 994 (9th Cir. 2009). "The protection of qualified immunity applies regardless of whether the government official's

---

[10]The constitutional safeguards applicable in particular contexts depend on the weight of the public interest balanced against the Fourth Amendment interest of the individual. *Martinez-Fuerte*, 428 U.S. at 555 (citations omitted).

error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2004) (quoting *Grow v. Romero*, 540 U.S. 551, 567 (2004)). Even when there are disputed and not fully developed issues of fact regarding whether any constitutional rights were violated, the Court can still make the determination as to whether the defendants' alleged conduct violated clearly established law. *Id.* at 239-245.

Qualified immunity applies unless every reasonable official would have understood that what he was doing violated a constitutional right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A motion for summary judgment on qualified immunity must be granted unless existing precedent placed the statutory or constitutional question "beyond debate." *Id*. Accordingly, the Court must grant the Motion for Summary Judgment for Pima County Sheriff Deputy Roher based on qualified immunity because even his arrest of the Plaintiff was without probable cause, it was the type of mistaken judgment covered by qualified immunity.

Summary Judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.56(c). It is not for the judge to determine the truth of a matter asserted, weigh the evidence, or determine credibility, but only to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The movant carries the burden of showing that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party, *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different inferences can be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

Both Defendants seek summary judgment and the Plaintiff seek partial summary judgment. All the parties' dispositive motions hinge on the constitutionality of the suspicionless stops conducted at the SR-86 border checkpoint, including the stop conducted on April 10, 2017. The parties' stories do not diverge on the facts. The

Defendants admit to using the tactics at SR-86 which the Plaintiff asserts are overly intrusive law enforcement tactics which singularly and together reflect the checkpoint's purpose is general law enforcement, not immigration. The Plaintiff admits he always refuses to move to the secondary area when asked to do so by Border Patrol agents and it is undisputed that he refused to move over for Deputy Roher on April 10, 2017. The inquiry before the Court is a question of law: whether the facts, if construed in favor of the Plaintiff by a trier of fact, could support a finding in favor of the Plaintiff. The standard mirrors that for a directed verdict. *Celotex*, 477 U.S. at 323 (citing *Liberty Lobby*, 477 U.S. at 250). The Court finds that no trier of fact could reasonably find for the Plaintiff because as a matter of law there was no Fourth Amendment violation. Simply put, after thoroughly examining the fully briefed motions and supporting evidence submitted by the parties, the Court finds no material, factual, contentions in dispute which require a taking of evidence, a weighing of evidence and a resolution of a factual dispute by trial. As a matter of law, the Court denies the Plaintiff's Motion for Partial Summary Judgment and grants the Defendants' dispositive motions.

   **Accordingly,**

   **IT IS ORDERED** that the Plaintiff's Motion for Partial Summary Judgment (Doc. 104) is DENIED.

   **IT IS FURTHER ORDERED** that the Pima County Defendants' Motion for Summary Judgment (Doc. 135, 136) is GRANTED.

///

///

///

///

///

///

///

///

**IT IS FURTHER ORDERED** that the Federal Defendants' Motion for Summary Judgment (Doc. 146) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment, accordingly.

Dated this 3rd day of January, 2022.

Honorable David C. Bury
United States District Judge